**HEARING DATE AND TIME: AUGUST 30, 2021 AT 10:00 A.M. (ET)**

AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Mark S. Lichtenstein
Joshua D. Bernstein
*Counsel for 286 Rider Ave Development LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:                                                          Chapter 11

286 RIDER AVE ACQUISITION LLC,                  Case No: 21-11298-LGB

                                    Debtor.         **RELATED DOC. NOS. 23-27**
-----------------------------------------------------------X

**OMNIBUS REPLY OF 286 RIDER AVE DEVELOPMENT LLC TO RESPONSES
OF BE-AVIV 286 RIDER LLC AND 286 RIDER AVE ACQUISITIONS LLC TO
MOTION TO (I) DISMISS BANKRUPTCY CASE PURSUANT TO 11 U.S.C. §§ 105, 305
AND 1112 AND (II) FOR TURNOVER OF CERTAIN MEMBERSHIP INTERESTS
UNDER 11 U.S.C. § 543**

      286 Rider Ave Development LLC ("Development"), as 100% owner of the membership

interests of the purported Debtor, 286 Rider Ave Acquisition LLC (the "Purported Debtor"), by

and through undersigned counsel, files this omnibus reply (this "Reply") to the responses of BE-

AVIV 286 Rider LLC (the "Lender" and the "Lender Response") [ECF No. 23] and the

Purported Debtor (the "Debtor's Response") [ECF No. 26] to Development's motion pursuant to

11 U.S.C. §§ 105,  305, 543, and 1112, for entry of an order dismissing this bankruptcy case and

requiring turnover of certain membership interests (the "Motion to Dismiss") [ECF No. 17]. For

its Reply, Development says:

**Preliminary Statement**

      1.      This dispute involves a coup by a *lender attempting to seize control of a borrower

and thereafter file a chapter 11 case on behalf of that borrower,* so as to weaponize the

59594250;22

automatic stay and avoid review and accountability for its aggressive actions. If allowed to stand, this tactic will have negative consequences on debtor-creditor relationships and will afford creditors the right to control property of the debtors critical to their reorganization efforts.

2.      The Lender has filed several documents in the record but misses two central points. *First*, that it acquired, at most, mere economic rights under its Pledge Agreement and, as a result, did not have the corporate authority to file this case. As shown below, consistent with the New York limited liability company law (the "NY LLCL") and the organizational documents herein, the Lender did not acquire anything more than economic rights.  The Pledge Agreement herein provides that it is subject to the borrower's Operating Agreement.  In turn, as explained in detail below, under the borrower's Operating Agreement, Development was given the "sole power" to manage the affairs and exercise voting rights for the Purported Debtor. These limitations are consistent with the applicable NY LLCL, which allows for organizational documents to limit management and voting rights and further limits a member-creditor's rights over the property of a limited liability company. *See Boyce v. Willner*, No. 650210/09, 2013 WL 358604, at *4-5 (Sup. Ct. N.Y. County 2013) (a judgment creditor is generally limited to enforcing against a debtor's economic rights in an LLC and cannot, unless permitted by the relevant operating agreement, assume ownership and control of the debtor's voting or managerial rights); s*ee also* NY LLCL § 607(b) ("No creditor of a member shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the limited liability company.")

3.      *Second*, and relatedly, is whether the Lender can be a "debtor" and whether it filed this case in good faith. Here, in a twist on the "new debtor syndrome" that courts routinely dismiss for bad faith, the Lender filed this case "as the debtor" with a newly appointed "chief

2

restructuring officer" who lacks any knowledge of the property, without sufficient financial information and ability to fulfill the most basic requirements any debtor is held to. The Lender requires use of Bankruptcy Rule 2004 to compel the borrower to provide basic information to allow the Lender, as alleged debtor, to complete even the most basic bankruptcy forms. If the Lender and CRO have limited knowledge of the borrower, they have even less incentive to maximize value after the Lender's "loan to own" tactics. Surely, no fiduciary, and no debtor, can file a chapter 11 in good faith without any knowledge of the facts and affairs of the debtor. Yet, that is exactly what has happened here. A lender has wrongfully taken control over its borrower and, to thereafter shield itself with an automatic stay, filed a chapter 11 case with no authority, facts, financial information, or ability to perform its functions as a chapter 11 debtor. Such extreme and aggressive tactics and attempts should be forbidden. Only the borrower has the management rights, knowledge of the financial affairs of "the debtor", and the incentive to maximize value.

4.      The provisions of the Pledge are expressly subject to the provisions of the Operating Agreement (as defined below) of the Purported Debtor. As discussed more fully below, the Operating Agreement expressly provides that Development has the sole authority to manage the affairs of the Purported Debtor. Accordingly, notwithstanding the Pledge, which is expressly limited and restricted by the provisions of the Purported Debtor's Operating Agreement, the Lender does not have any voting or management rights and should be construed to be a mere assignee of economic interests under New York law. Additionally, there is nothing in the record demonstrating that Lender's nominee was ever registered by Development or the Purported Debtor as an "owner" of the membership interests and, notably, the power of attorney

provision in the Pledge is expressly subject to the limitations and restrictions in the operating agreement.

5.       Even assuming *arguendo* that the Lender was able to exercise its Pledge to obtain voting and management rights, the Lender is nevertheless attempting an impermissible end run around the provisions of the Uniform Commercial Code and the Pledge which require the Lender to commence a foreclosure remedy to take title to the membership interests or to receive proceeds from a foreclosure sale thereof. Instead of doing what virtually all lenders do, and commencing a UCC sale or foreclosure sale on its collateral, the real property (which is what the Lender reserved rights to do specifically in the default letter and Notice of Transfer of Membership Interests, albeit with "without limitation" language), the Lender seeks to misuse substantive rights in the Pledge that are designed and intended to preserve and protect the collateral pending the execution of a foreclosure remedy. The Lender is unjustifiably relying on certain language of the Pledge as a backdoor way to cause a bankruptcy filing and a 363 sale of the Lender's real estate collateral subject to its credit bid rights. This contrivance constitutes an impermissible forced bankruptcy sale of the real estate collateral in a bankruptcy case without, as contractually required, requiring the Lender to execute a foreclosure under state law on either the membership interests or the real estate collateral.

6.       The manner in which the Motion to Dismiss has been opposed by the Lender and Purported Debtor is extremely revelatory. Rather than having the Purported Debtor oppose a Motion to Dismiss as is typical, the Lender has taken the lead on vigorously defending this overreaching bankruptcy case which, as detailed below, is against public policy for many of the same reasons that restrictions against bankruptcy filings may be void against public policy. Furthermore, the Lender has orchestrated this bankruptcy case and has exclusive control of the

4

Purported Debtor through its hand-picked Chief Restructuring Officer (the "CRO"), who obviously has no intention to, and no mandate from, his Lender puppet master to restructure the Debtor's affairs (which is what Development has always intended to do). As discussed below, permitting a pledgee to orchestrate a bankruptcy case for collection purposes, and permitting a lender to have exclusive control of the CRO in a bankruptcy case, is unprecedented and goes against the grain of the bankruptcy code and reorganization policy. Indeed, permitting a pledgee to orchestrate a bankruptcy case for collection purposes presents even greater public policy dangers than bargained-for restrictions on voluntary bankruptcy filings.

7.      Instead of addressing the assertion in Development's papers that permitting this case to continue would be against public policy, the Lender simply and smugly acknowledges that by commencing this bankruptcy case based on the exercise of a pledge[1] it has chosen a path seldom taken, but has taken it anyway. *See* Lender's Response at ¶5. The Lender's Response—while dodging the fundamentally important public policy issues that bear on fiduciary duties and underlying bankruptcy goals—speaks volumes about the inappropriateness of this bankruptcy case. Indeed, the reason that this extremely aggressive tactic has virtually never been employed is that lenders generally realize that commencing and conducting a bankruptcy case in this manner is too far over the line. Virtually all lenders holding pledges would appear to have appropriate concerns about lender liability and fiduciary duties resulting from taking and running with this kind of control without legal ownership.

8.      Development respectfully submits that the decision on the Motion to Dismiss has broader implications than merely resolving the instant dispute. If the case is permitted to

---

[1] As a threshold matter, Development hereby withdraws its argument that the Pledge is ineffective because it was not executed properly. Neither Development nor its attorneys were in possession of the Consent at the time the initial moving papers were filed. Development notes, however, that there are other problems with the Pledge that render the Lender's orchestration of the bankruptcy case unenforceable.

59594250;22

continue, a lender could merely exercise a pledge, take control of the equity without exercising a

foreclosure remedy, and hire a purported fiduciary to do its exclusive bidding with no fiduciary

duties to any other parties, and cause the filing of  a voluntary liquidating bankruptcy proceeding

for a borrower. The process outlined above would occur absent a proper fiduciary to protect the

interests of all stakeholders, as the purported fiduciary is controlled by the creditor which has

manipulated the bankruptcy system.  There is a reason that there is only one case from 1982 cited

by the Lender (and the Purported Debtor) where a pledgee successfully authorized a bankruptcy

filing and the facts and circumstances thereof are distinguishable (as discussed below).

9.     Development respectfully submits that, in the furtherance of public policy

consistent with the goals of the Bankruptcy Code, this Court should dismiss this bankruptcy case

and thereby send a clear message to this Lender and to commercial parties in general to exercise

proper judgment and restraint and adhere to normative enforcement behaviors.

10.    The Lender and the Purported Debtor attempt to justify the orchestrated filing on

two  principal grounds. First, they assert that the Pledge provides broad voting and economic

rights permitting the orchestration of the bankruptcy filing, and second, they assert that case law

supports the bankruptcy filing under these circumstances. On the first point, the Lender and

Purported Debtor ignore the fact that until the Lender actually forecloses on the membership

interests, Development is still the legal owner of the interests. *See* UCC Section 9-602. Indeed,

once the Lender, whose claim is vigorously disputed in a pending state court action (and Lender

has a motion for entry of default judgment pending against it in such action), either is

adjudicated to not be entitled to take action against the Purported Debtor or Development or

receives payment on account of its debt, the Pledge, by its own terms, shall either be terminated

or of no effect and Development shall regain control of the membership interests (assuming that

59594250;22

the Lender has such control). However, because of the Lender's hyper-aggressive "loan to own" tactics which contemplate a DIP loan and an expedited 363 process, Development will not have a practical opportunity to refinance the debt of the Purported Debtor (*which it owns*) if the bankruptcy case is permitted to continue.[2] The pendency of the bankruptcy case will also impede Development's and the Purported Debtor's efforts to litigate against the Lender which, as set forth in Development's initial moving papers, is one of the primary reasons that the Lender orchestrated the bankruptcy filing, in order to avoid the pending state court litigation against the Lender, including the motion for a default judgment therein.

11.     Lender filed this bankruptcy as a voluntary case that, in actuality, has all of the attributes of a single creditor involuntary filing. If this case were commenced as an involuntary case, Development would at least have the opportunity to oppose the involuntary filing or to consent to it and thereafter control a bankruptcy case, but no such opportunity exists here if the instant case is allowed to continue.

12.     Second, the Lender and the Purported Debtor cite to several inapposite cases where pledges have been exercised and bankruptcy cases have been dismissed. However, there is an enormous difference between restricting the ability to file for bankruptcy protection based on an agreement, on the one hand, and permitting a lender to oust an owner from control and orchestrate a bankruptcy filing to facilitate a quick sale of collateral, on the other hand. As discussed below, a 1982 case cited by the Lender from another district involves a voluntary bankruptcy filing based on the affirmative vote of a creditor after exercising a pledge, but that

---

[2] As set forth below and in the accompanying Declaration of Michael Lichtenstein, as part of Lender's loan to own strategy, prior to even retaining a broker or obtaining authority from the Court to conduct a section 363 sale process, Rosewood Realty, the broker that the CRO wishes to hire, has actively marketed the real property for a bankruptcy auction sale to occur, according to a glossy "teaser", in October/November 2021. Rosewood's premature and extremely damaging marketing activities include, at least, a specific email to a large universe of potential buyers and financing sources and inclusion in a multi-page glossy booklet widely disseminated to the same or a similar audience of a teaser prominently featuring 286 Rider for a bankruptcy sale. These marketing efforts have resulted in myriad calls to Development's principals and have served to chill refinancing opportunities.

59594250;22

case is factually distinguishable as it involves an operating business rather than a piece of real estate, the appointment of numerous executives and a presumably legitimate Board exercising properly its fiduciary duties—unlike the CRO and sole member in control here who are not exercising their fiduciary duties in favor of all stakeholders and are only beholden to the Lender.

13.     The Purported Debtor and Lender have studiously avoided the issue of fiduciary duty. Specifically, they have not addressed how a CRO appointed by, and taking direction from, a Purported Debtor's major creditor can be a fiduciary for all stakeholders. As discussed below, even if the CRO is somehow construed as an independent fiduciary (which is difficult to fathom), the CRO, who must be a fiduciary as the control party in the bankruptcy case— effectively the Board—cannot be, and is not, a sufficient fiduciary for all stakeholders, including Development.

14.     In addition to smugly acknowledging that the way the Lender has proceeded is virtually unprecedented but that the Lender has "taken the road less traveled," (*see* Lender's Response at ¶6(iii)), as if the hyper-aggressive tactics should somehow be excused or even lauded, the Lender (and the Purported Debtor), attempt to legitimize the bankruptcy filing as having a proper purpose. Although the Lender holds nearly 90% of the debt against the Purported Debtor (which Lender debt is vigorously disputed), the Lender asserts that the case is not a two-party dispute. This is a somewhat disingenuous statement. Development has entered into a payment plan with the taxing authorities with respect to real estate taxes owed which have just become due. The other debt remains unpaid as a result of Lender's fraudulent inducement and bait and switch tactics and other bad acts as detailed in the state court litigation, in which there is a pending motion for a default judgment against the Lender. Moreover, as the COVID-19 situation had improved somewhat after nearly two years, the borrower, until the bankruptcy case

was filed, was finally in a good position to obtain refinancing to pay all creditors (subject to the litigation claims against the Lender), only to be confronted with the Lender's virtually unprecedented misuse and abuse of the bankruptcy process as a collection device. The other creditors are aware that the Purported Debtor was in the process of seeking refinancing to pay them in full—a result that will certainly yield better results for creditors and equity holders than a 363 sale where the Lender may credit bid its lien, likely leaving nothing for junior creditors and causing the equity holders to lose their entire investment.

15.    Try as it might, the Lender cannot credibly characterize the bankruptcy case as anything more than a two-party collection dispute. Using the bankruptcy court as an expedited liquidation forum under the Lender's control and dominion has been exacerbated by the Lender's post-petition commencement of state court litigation against the guarantors. The Lender could not simultaneously attempt to foreclose (which is essentially the Lender's intent in the bankruptcy case) and sue on the guarantees in state court. Thus, the Lender is using the bankruptcy case as a litigation device to bring maximum pressure upon Development and the guarantors, both in state and bankruptcy court, when no deficiency has been established. The Lender is choosing to exercise state law litigation remedies and to effect a bankruptcy filing simultaneously, thereby potentially engendering inconsistent determinations on key issues.

16.    The Purported Debtor's and Lender's argument that Development is not a party to the State Court Action ignores the fact that the Purported Debtor is a party thereto as are numerous non-Purported Debtor affiliates, and Development was directing the prosecution of such action—Development can also be added to such action if necessary and appropriate.  Thus, the State Court Action could resolve issues related to the debt as the Purported Debtor and various non-Purported Debtor affiliates have sought therein declaratory relief against the Lender

based on failure to fund the 286 Ryder project and another project that was part of a fraudulent inducement scheme by the Lender. Accordingly, the Lender cannot escape the consequences of its misconduct spanning over several projects by orchestrating the bankruptcy filing for an entity which it grievously harmed.  The Lender's initiation of state post-petition state court litigation against the guarantors after it orchestrated the improper bankruptcy serves further to militate in favor of dismissal of the bankruptcy case and permitting the State Court action and state law enforcement remedies to resolve all issues related to the debt.

17.     As discussed below, the Lender (and Purported Debtor) miss the point that Development was seeking to make regarding clogging the Purported Debtor's equity of redemption. Simply put, as Development still owns legal title to the membership interests it still holds the equitable right to redemption. Taking this ownership right into account, the Lenders' effort to proceed improperly with the exercise of a pledge leading to a liquidating Chapter 11 case is a more egregious example of clogging the equity of redemption than an expeditious UCC sale by a lender that holds dual collateral which was the focus of the recent cases addressing this issue.[3]

18.     The Lender (and Purported Debtor as allegedly controlled by the Lender) each emphasize Development's and the  Purported Debtor's delay in responding to the default notice and notice of transfer of collateral as somehow meaningful. It should be noted that the Purported Debtor and its affiliates commenced the State Court Action in reaction to the default notice and related documentation leading to the improper bankruptcy filing. Further, Development and the Purported Debtor (as owned and controlled by Development) anticipated that the Lender would either commence a UCC sale and/or a foreclosure action and still cannot fathom that the Lender

---

[3] Development hereby withdraws its turnover motion under Section 543 of the Bankruptcy Code but reserves the right to seek turnover of the interests in the context of a bankruptcy filing of the holders of the interests in Development.

59594250;22

caused the commencement of this bankruptcy case. Once Development learned of the bankruptcy case, it promptly hired counsel and filed the Motion to Dismiss.

## **Relevant Procedural Background**

19.     On August 5, 2021, Development filed the Motion to Dismiss.

20.     On August 19, 2021, Lender and the Purported Debtor filed their Responses opposing the Motion.

21.     The Lender's Response ignores the Lender's blatant and inappropriate exercise of complete control of the Purported Debtor through the CRO, who is the antithesis of an independent fiduciary. The Lender's decision to place the Purported Debtor in bankruptcy runs afoul of established public policy, runs afoul of basic bankruptcy policy, and highlights the Lender's overreaching and improper behavior, both before and after it caused the Purported Debtor to file the bankruptcy case.

22.     Similarly, the Purported Debtor's Response contends the Motion to Dismiss should be denied because the Lender properly exercised its rights under the Pledge, the right of redemption belongs to the Purported Debtor (although it is clear that the Lender does not own legal title to the membership interests and, even if the Court determines that the Pledge conferred management and voting rights to the Lender, Development still has the right to control the Purported Debtor after the Lender is repaid), and the bankruptcy case is neither a two-party dispute nor a disguised involuntary proceeding. The Purported Debtor mischaracterizes and oversimplifies the facts, and completely ignores the deleterious public policy implications of the Lender's control of the Purported Debtor through the CRO.

**Argument**

### I. The Lender Has Improperly Utilized the Pledge in Violation of the Uniform Commercial Code, the Pledge Itself and the Operating Agreement

23.    Section 5 of the Amended and Restated LLC Agreement (the "Operating Agreement") of the Purported Debtor is very clear, with no exception, that only Development may manage the Purported Debtor:

> 286 Rider Ave Development LLC, the sole member of the Company, shall have the **sole power** to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein. **286 Rider Ave Development LLC shall manage the affairs** of the Company, and have right, power, and authority to manage the day-to-day business, affairs, operations and activities of the Company, and to execute on behalf of the Company all documents necessary and appropriate, to obtain permits, licenses, contracts and anything necessary for the renovation of the premises, to obtain mortgage and construction financing upon the premises, including but not limited to Loan Agreements, Mortgages, Promissory Notes, Environmental Indemnities, Guarantees, Confessions of Judgment and Disclosures thereof, to manage the property as a building, rental apartments, or hotel, to collect rents, to sign leases, to evict tenants, to operate the bank account of the company, and shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members under the Limited Liability Company Law of the State of New York (the "LLCL").

*See* Purported Debtor's Operating Agreement, §5 (Exhibit A to the Lichtenstein Declaration).

24.    The Pledge (Exhibit B to the Lichtenstein Declaration) is expressly *subject to* the Operating Agreement, including section 5 thereof.  The Pledge specifically provides, in several sections, that the rights of the Pledgee thereunder are subject to the provisions and/or restrictions of the Operating Agreement.

25.    Specifically, in  Section 13 of the Pledge, it is clear that the remedies upon default are subject to the terms of the Operating Agreement:

> Remedies upon Default.  If an Event of Default under the Note shall have occurred and is continuing, subject to the *Borrower Operating Agreement*, Lender shall have, in addition to all other rights given by law or otherwise, all of the rights and remedies with respect to the Collateral of a secured party under the Uniform Commercial Code as in effect in the State of New York, and Lender, at its option, may liquidate the Collateral or any part thereof to the extent and in the manner permitted under the Borrower Operating Agreement.

*See* Pledge, §13. Section 13 of the Pledge goes on to delineate the foreclosure remedies

that the Lender must exercise.

26.     Section 3(c) of the Pledge, specifically recognizes "restrictions" in the Operating

Agreement as to the rights granted by Development to Lender:

> Except with respect to the restrictions set forth in the loan documents executed in connection with the Loan, there are no restrictions, **other than those contained in the limited liability company agreement of Borrower**, dated as of August 15, 2019 (the "Borrower Operating Agreement") upon any of the rights arising from undertakings or agreements of Pledgor associated with, or the transfer of, any of the Collateral.

*See* Pledge, §13(c).

27.     Section 10 of the Pledge, which provides the Lender a Power of Attorney, also is

expressly subject to Operating Agreement:

> Lender  hereby appoints Lender Pledgor's attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor or otherwise, from time to time in Lender's discretion, **subject to the provisions of the Borrower Operating Agreement**, to take any action and to execute any instrument which Lender may deem necessary or advisable to accomplish the purposes of this Pledge. This power of attorney created under this Section 10, being coupled with an interest, shall be irrevocable for the term of this Pledge.

*See* Pledge, §10.

28.     The foregoing provisions make clear that the lender's rights under the Pledge

Agreement, including Section 1 of the Pledge, are subject to the terms and conditions of the

Operating Agreement. Given the clear and unambiguous limitation in Section 5 of the Operating

Agreement that Development has the "sole right" to manage and control the Purported Debtor and the fact that no language in the Operating Agreement contemplates allowing the Lender or any other assignee or pledgee voting and control rights in the Purported Debtor, the Lender's claimed entitlement to voting rights and control of the Purported Debtor is invalid. As a matter of contact construction, a specific restriction or limitation should trump rights and obligations contained in an agreement. Well-settled rules of contract construction require that a contract be construed as a whole, giving effect to the parties' intentions. Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one. *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,* 2012 WL 382921 (S.D.N.Y. Feb. 6, 2012); "[C]ourts construing contracts must give specific terms and exact terms . . . greater weight than general language." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co*., N.A. 957 F.Supp.2d 316 (S.D.N.Y. 2013), *citing Cnty. of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) (citation omitted); *see also John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.").

29.     As noted above, these limitations in the Operating Agreement are consistent with applicable New York LLC law, which allows for organizational documents to limit management and voting rights and further limits a member-creditor's rights over the property of an LLC. *See Boyce v. Willner*, No. 650210/09, 2013 WL 358604, at *4-5 (Sup. Ct. N.Y. County 2013)(a judgment creditor is generally limited to enforcing against a debtor's economic rights in an LLC and cannot, unless permitted by the relevant operating agreement, assume ownership and control

of the debtor's voting or managerial rights); *See also* NY LLC Law § 607(b)("No creditor of a member shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the limited liability company."); *Sutton Assoc. LLC v. Beninati, et al.*, 651296/2016, 2017 NY Slip Op 31402(U) (Sup. Ct. N.Y. County 2017) (unless otherwise provided for in the governing operating agreement, rights conferred under an assignment of membership interests consistent only of distributions and allocations of profits and losses to which the debtor would be entitled).

30.     While the rights conferred in Section 1 of the Pledge are broad, experts in secured transactions know that this provision, which is included in most pledges, simply protects the pledgor from the pledgee doing anything to adversely impact the collateral or the collectability thereof—and is typically employed defensively and to facilitate the exercise of the specified remedies in a pledge and under the UCC.  Section 1 of the Pledge is not an excuse to execute an end run around UCC Article 9 or the enforcement requirements of the Pledge. The Lender is misusing the language of Section 1 of the Pledge as a way to cause a bankruptcy filing and a 363 sale of the Lender's real estate collateral subject to its credit bid rights which constitutes an impermissible way to force a sale of the real estate collateral without foreclosing under state law on either the membership interests or the real estate collateral as required in the loan documents and the UCC.

31.     Under New York law, unless otherwise provided in the operating agreement, an assignment of a membership interest is only effective as to the economic rights of the member in the limited liability company, and voting rights do not transfer. Specifically, Section 603 of the NY LLCL provides, in relevant part, that "an assignment of a membership interest does not entitle the assignee to participate in the management and affairs of the limited liability company

15

or to become or exercise any rights of powers of a member." Rather, "the only effect of an assignment of a membership interest is to entitle the assignee to receive, to the extent assigned, the distributions and allocations of profits and losses to which the assignor would be entitled." Stated simply, an assignee is entitled only to the economic interests attendant the assigned membership interest.

32.     Notably, there is nothing in the record showing that the membership interests have been registered in the name of the Lender or its nominee.

33.     As the rights under the Pledge are subject to and limited by the provisions  of the Operating Agreement providing Development with sole power to manage the Purported Debtor, the Lender is not entitled, under the Pledge. or applicable state law, to manage the Purported Debtor.

## II.  The Case Law Cited by the Lender (and Lender-Controlled Purported Debtor) is Inapposite to the Facts and Ignores that the Bankruptcy Filing Should be Dismissed Based on a Violation of Public Policy

34.     The Lender (and the Lender-controlled Purported Debtor) have cited several cases that stand for the proposition that, upon the proper exercise of a Pledge, a pledgor cannot cause the borrower that it owns to file for bankruptcy protection. That is not the situation before us and, depending on the facts and circumstances, case law is mixed on whether such restrictions are against public policy and therefore unenforceable. *See e.g., Fallick v. Kehr,* 369 F.2d 899, 904 (2d Cir. 1966) (noting that advance agreements to waive the benefits of bankruptcy are void); *In re Gulf Beach Dev. Corp.,* 48 B.R. 40, 43 (Bankr. M.D. Fla. 1985) (holding "the debtor cannot be precluded from exercising its right to file Bankruptcy and any contractual provision to the contrary is unenforceable as a matter of law.").

35.     There is a stark difference, both legally and practically, between (i) exercising a Pledge and using it to block a bankruptcy filing (which would still leave the pledgee with the practical opportunity to refinance the debt and/or litigate with the Lender in the context of judicial or non-judicial foreclosure actions) and (ii) exercising a pledge, handpicking a so-called independent "fiduciary," causing such fiduciary to file for bankruptcy protection, and then effecting a DIP loan and a 363 sale for the benefit of the Lender without consideration of the interests of all stakeholders, including Development which still owns legal title to the interests.

36.     Former Chief Judge Bernstein's *River Air* case cited by Lender merely upheld the validity of the pledge as a way to preclude the pledgor from proceeding with a voluntary bankruptcy case it had commenced after the lender had exercised a pledge. This case, like all of the others cited by the Lender (and the Purported Debtor which not surprisingly joins wholeheartedly in the Lender's objections), other than the *Eastern Bancorporation* decision (discussed below), involves whether the exercise of a pledge can allow a lender to restrict a borrower's ability to file a bankruptcy petition or proceed with a bankruptcy case. As discussed below, even in cases where a lender or equity holder (or one having both interests) seek to have a bankruptcy case dismissed based on a blocking right, courts closely examine the equities of each situation and whether a party is being restricted from its right to file bankruptcy in derogation of its fiduciary duties and in certain instances strike the restriction on a debtor's ability to file a bankruptcy petition as being void on public policy grounds. *See In re Insight Terminal Solutions, LLC*, 2019 WL 4640773 (Bankr. W.D. Ky. Sept. 23, 2019) (denying a motion to dismiss chapter 11 cases of two affiliated limited liability companies that, at the behest of their secured lender, amended their organizational documents to provide that the companies could not file for bankruptcy without the consent of all holders of one of the company's membership units, which

had been pledged to secure the loan; lender's attempt to circumvent the bankruptcy laws and federal public policy was ineffective); *Riverstone Credit Mgmt LLC v. MDC Energy, LLC (In re MTE Holdings, LLC)*, Case No. 19-12269 (KBO), United States Bankruptcy Court, District of Delaware (Adv. Proc. Doc. 31) (denying lender's claim for declaratory judgment and finding debtor  maintained control of the business and bankruptcy in the absence of a valid exercise of lender agent's contractual and collateral rights, and noting that to hold otherwise "would be violative of public policy").

37.    In 2020, in *In re Pace Industries, LLC*, Case No. 20-10927 (MFW) (Bankr. D. Del.), Bankruptcy Judge Mary Walrath, in denying a motion by Macquarie Septa (US) I, LLC (Macquarie) to dismiss the Debtor's chapter 11 case, ruled that a minority shareholder's blocking rights were "void" in the face of the Debtor's constitutional right to file bankruptcy.  A copy of the transcript of Judge Walrath's ruling in *Pace Industries* is attached hereto as **Exhibit A**.

38.    After Pace Industries and certain affiliates commenced their chapter 11 cases, Macquarie moved to dismiss the filings. Macquarie, which had made a $37 million investment in the Debtor's preferred stock, argued that the filing was unauthorized because the Debtor did not obtain Macquarie's consent, as provided for in the applicable corporate governance agreements. Macquarie argued that its right to block a bankruptcy filing was a heavily negotiated and critical component of its investment.  Macquarie acknowledged the cases holding that blocking rights in the hands of certain creditors might violate public policy, but attempted to distinguish those cases—including *Intervention Energy* and *Lake Michigan PROVIDE CITES IN A FOOTNOTE*—on the basis that those cases involved shareholders who were also creditors, and that the equity stakes at issue were in the nature of "golden shares" intended only to vest the

creditor with the blocking right.[4]  Here, however, Macquarie held only preferred equity—indeed, a substantial, albeit minority, stake—and was not a creditor. Based on the Fifth Circuit's *Franchise Services* decision, which applied Delaware law, Macquarie argued that as a minority shareholder, it was not a controlling shareholder that owed any fiduciary duties and, specifically, the fact that Macquarie was not given opportunity to even exercise its consent rights prior to the chapter 11 filing shows that it did not control the board. In *Franchise Services*, the Fifth Circuit held that a shareholder with a blocking rights did not have control over the debtor's conduct and concluded that not being consulted as to a bankruptcy filing where it held such a consent right was indicative of a lack of control; accordingly, the Fifth Circuit did not reach the issue of whether it breached any purported fiduciary duty. *In re Franchise Servs. of N. Am., Inc.,* 891 F.3d 198 (5th Cir. 2018).

39.     Judge Walrath rejected those arguments and denied Macquarie's motion to dismiss, holding that, under Delaware state law, contrary to the Fifth Circuit, blocking rights, such as exercised in the circumstances of this case, would create a fiduciary duty on the part of the shareholder; a fiduciary duty that, with the Debtor in the zone of insolvency, is owed not only to other shareholders, but to all creditors. Tr. of Hr'g, dated May 5, 2020 at 40:22–41:3.

40.     The court saw "no reason to conclude that a minority shareholder has any more right to block a bankruptcy—the constitutional right to file a bankruptcy by a corporation than a creditor does," and therefore broke from the *Franchise Services* decision. *Id.* at 40:14-17.

41.     In conclusion, Judge Walrath stated, "whether or not the person or entity blocking access to the Bankruptcy Courts is a creditor or a shareholder, federal public policy does require that the Court consider what is in the best interest of all, and . . . whether the party seeking to

---

[4] *See In re Intervention Energy Holdings, LLC*, 553 B.R. 258 (Bankr. D. Del. 2016); *In re Lake Michigan Beach Pottawattamie Resort, LLC*, 547 B.R. 899 (Bankr. N.D. Ill. 2016).

block [the filing] has a fiduciary duty that it appears it is not fulfilling[.]" *Id.* at 41:24–42:4 Importantly, Macquarie had conceded that it was "not considering the rights of others in its decision to file the motion to dismiss." *Id.* at 42:5-7. Thus, Judge Walrath's decision should put parties seeking to manipulate the bankruptcy process—offensively (like the situation here) or defensively on notice that such efforts will likely be met with strong resistance, and could even give rise to liability for breach of fiduciary duties if the efforts to prevent a Debtor's filing (or, as pertinent to this case, impair a stakeholder's ability to restructure its debts and preserve value by orchestrating a bankruptcy case and forced sale) result in harm to other stakeholders.

42.     The situation here is virtually unprecedented as the Lender is trying to cross a bridge too far and must be stopped. Otherwise there will be judicial imprimatur and precedent for this sort of overreaching manipulation of the bankruptcy system. Even the Lender acknowledges that lenders seldom, if ever, use the exercise of a pledge as a means to cause a bankruptcy filing as an offensive tool.  This is because other lenders, although aggressive, apparently recognize that orchestrating a bankruptcy filing like this while hiding behind a hand-picked fiduciary could expose the lender to equitable subordination or lender liability risk. As emphasized in Development's initial motion papers, permitting this case to continue, especially during the COVID-19 pandemic would change the normative behavioral expectations of the lender/borrower relationship.

43.     In *Eastern Bancorporation*, a creditor used its pledge to terminate existing managers and to appoint a roster of new managers. *See In re Eastern Bancorp.*, 23 B.R. 474 (Bankr. E.D. Pa. 1982). It is difficult to discern from the decision but it seems reasonable to assume that in this asset-based corporate bankruptcy case of a financial institution that the lender did not have absolute control over the recommendation of a bankruptcy filing by executives and

a multi-member board with respect to an operating company with presumably complex operations and multiple employees.  Also, nothing in the *Eastern Bancorporation* case suggests that the lender was pushing for an expedited liquidation sale and, presumably, the multiple fiduciaries there had sufficient information and familiarity with the enterprise to make an informed decision to file for bankruptcy or not and had the requisite information to file schedules and statements prior to filing for bankruptcy protection.  The uninformed and precipitous manner in which the Lender, through the CRO, caused the bankruptcy filing is further evidence of a bad faith filing against public policy.

44.    The CRO, appointed by and controlled by the Lender, is not a proper fiduciary. A debtor or its representative in a bankruptcy case acts for the benefit of all creditors and equity holders of the bankruptcy estate, not solely for the benefit of the party responsible for its appointment. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 353 (1985) (a  debtor in possession has a duty of loyalty to maximize the value of the estate, refrain from self-dealing, and treat all parties fairly in addressing and resolving the conflicting tensions among stakeholders); *In re Integrated Resources, Inc.*, 147 B.R. 650, 658 (S.D.N.Y. 1992).

45.    Similar to the *Pace* and *Insight* decisions, in *In re Gen. Growth Props., Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009), the court denied a motion by secured lenders to dismiss voluntary chapter 11 filings by several SPE subsidiaries of a real estate investment trust. The lenders argued, among other things, that the loan agreements provided that an SPE could not file for bankruptcy without the approval of an independent director nominated by the lenders. The lenders also argued that, because the SPEs had no business need to file for bankruptcy and because the trust exercised its right to replace the independent directors less than 30 days before the bankruptcy filings, the SPE's chapter 11 filings had not been undertaken in good faith.

59594250;22

46.     The *General Growth* court ruled that it was not bad faith to replace the SPEs' independent directors with new independent directors days before the bankruptcy filings because the new directors had expertise in real estate, commercial mortgage-backed securities, and bankruptcy matters. The court determined that, even though the SPEs had strong cash flows, bankruptcy remote structures, and no debt defaults, the chapter 11 filings had not been made in bad faith. The court found that it could consider the interests of the entire group of affiliated Purported Debtors as well as each individual Purported Debtor in assessing the legitimacy of the chapter 11 filings.

47.     Among the potential flaws in the bankruptcy remote SPE structure brought to light by *General Growth* is the requirement under applicable Delaware law for independent directors to consider not only the interests of creditors, as mandated in the charter or other organizational documents, but also the interests of shareholders. Thus, an independent director or manager who simply votes to block a bankruptcy filing at the behest of a secured creditor without considering the impact on shareholders could be deemed to have violated his or her fiduciary duties of care and loyalty. *See In re Lake Mich. Beach Pottawattamie Resort LLC*, 547 B.R. 899 (Bankr. N.D. Ill. 2016) (a "blocking" member provision in the membership agreement of a special purpose limited liability company was unenforceable because it did not require the member to comply with its fiduciary obligations under applicable non-bankruptcy law).

48.     The inverse has occurred here: the Lender imposed a CRO, who is beholden to the Lender, upon the Purported Debtor and Development. The CRO has violated his fiduciary duties of loyalty and care by preventing Development from exploring the possibility of a refinance or sale outside bankruptcy by filing for bankruptcy protection and commencing a marketing process without even obtaining required bankruptcy court approval and asserting that

the equity of redemption is the property of the Purported Debtor (run by the CRO) when legal title to the equity in the Purported Debtor still resides with Development. The Lender and CRO fail to recognize that Development still owns the membership interests of the Purported Debtor. The Lender has not foreclosed on Development's interests in the Purported Debtor, and Development remains entitled to redeem those interests.

49.     If the bankruptcy case is dismissed, Development and the Purported Debtor will at least have an opportunity to reorganize through a refinancing of the debt and to litigate with the Lender. The Lender will not be harmed because it can still seek to foreclose under the UCC or start a foreclosure action on the real estate (to add to its present pursuit of its state court remedies in the post-petition state court actions against the guarantors). The few other creditors will have a much better chance of full repayment if Development is given an opportunity unrestricted by the bankruptcy case to refinance the debt and pay all creditors and thereby protect its substantial equity in the property rather than to have an expedited 363 sale, plus additional debt under section 364 of the Bankruptcy Code which will likely result in the Lender taking title to the Property. The Court should dismiss this bankruptcy case to permit Development and the borrower to proceed as the Pledge, the UCC, and applicable foreclosure law intend, and put a final end to the Lender's radical maneuvers.

**III**.  **This Case is a Two Party Dispute and Dismissal is Appropriate Under Sections 305 and 1112**

50.     As noted above, the Lender's and Purported Debtor's actions here cross the line and warrant dismissal. In addition, the Responses filed by the Lender and Purported Debtor fail to establish that dismissal is not warranted under sections 305 and 1112. The arguments put forth in the Responses of the Lender and Purported Debtor to the Motion to Dismiss fail to address, and even confirm critical facts that support the Motion to Dismiss. In particular, (1) that this is in

23

essence a two party dispute involving a single asset, (2) that this bankruptcy case was initiated following the filing of state court cases relating to this dispute, (3) that this case is very clearly an overly aggressive litigation tactic, seldom if ever used, and (4) that the Lender's aim is not to reorganize the Debtor but rather to avoid and subvert state court remedies that were bargained for and the pending litigation and quickly liquidating the Purported Debtor's assets.

51.    The Lender and Purported Debtor point to the existence of other creditors, real and imagined, in an effort to portray this case as something other than a two party dispute.  The real estate taxes are subject to a payment plan, however, and the only other material creditor is not pushing for a quick sale  In fact, that creditor will be paid if, as Development intends, the property is refinanced as part of a construction loan, which is what Development has been working on prior to the Lender attempting this bankruptcy action.   The other two vendors, namely the architect and engineer, work with Development's principals on other projects and continue to be patient.  If the Lender had honored its funding obligations and funded the full construction loan as was explained in the state court action, none of these other debts would exist.

52.    Much has already been written about the status of the State Court proceedings, and Development largely will not repeat what was written in the Motion to Dismiss.  What is not in dispute however, is that there was pending state court litigation commenced by the Purported Debtor against the Lender when this bankruptcy case was filed by the Purported Debtor, under the control of a CRO handpicked by the Lender to carry out the Lender's strategy to avoid the state court litigation and avoid having to follow, as virtually all other lenders do, the state court remedies that were bargained for between the parties. The disputes between the parties, which do not need to be decided in the context of this Motion, involve only state law that can be decided in

the State Court, whether by judgement or an agreed resolution between the parties therein. That there may be other properties or parties involved is of no moment, and does not change the fact that the Purported Debtor's property, and this Lender's rights, are at issue therein.

53.     Moreover, this case was and is indisputably part of a litigation strategy on the part of the Lender. Having claimed to have assumed control of the Purported Debtor, the Lender put Lee Buchwald in place as CRO to put the Purported Debtor in bankruptcy and immediately initiated a sale process, without considering other alternatives that might work to the benefit of all stakeholders, not simply the Lender. The strategy is laid bare in the Purported Debtor's Response where the Purported Debtor repeatedly refers to the perceived need to sell the property, which is simply not true. *See* Purported Debtor Resp., ¶37. In fact, Development has become aware that the Purported Debtor is already marketing the property, despite the absence of a court order approving same, or even a motion requesting such.

54.     Abstention pursuant to section 305(a)(1) of the Bankruptcy Code is appropriate. There is no dispute as to the factors the Court should weigh in determining whether abstention is appropriate as set forth in *In re Monitor Oil, PLC*.

55.     The notion that Development is a "disgruntled former owner" and should be viewed as such, is not only however factually incorrect but shows the CRO and Purported Debtor, are representing only the interests of the Lender. The Purported Debtor argues that Factors 1, 2 and 3 favor the Purported Debtor and the Lender because the State Court Action includes other lenders and different borrowers**.** This ignores, of course, that the State Court litigation involves this Lender and this property and this borrower.  That the motion to turn over membership interest would not be resolved, is a red herring. Ownership and the rights of the Purported Debtor/borrower and Lender will be determined therein or in state law foreclosure

actions as required under the Pledge for enforcement. Likewise, it is a red herring that other creditors of the Purported Debtor are not involved in the State Court action because, in essence, there are no other creditors other than the Judgment creditor discussed above, who is not advocating for a quick, fire sale of the property and almost certainly would not benefit from such. In sum, there is no reason for a federal bankruptcy proceeding in this two party, single asset case, other than to placate the Lender, to the detriment most likely of Development and the Judgement creditor. The issues in dispute are state law issues that were in pending litigation when this bankruptcy case was filed and are commonly resolved by state courts. There is no issue that arises from or relies on federal bankruptcy law for its resolution.

56.     Factor 4 likewise favors Development. The Purported Debtor's suggestion that the state court proceeding will not result in an equitable distribution of assets ignores both the prospect of a refinancing that would satisfy both the Lender and other parties in interest, or the prospect of a mediated resolution. Resolution of the issues in the state court would also clarify the rights of the parties and thus lead to not only an equitable distribution, but one that takes into account the parties actual legal rights.

57.     Factor 5 also favors Development. The Purported Debtor wrongly argues that the only resolution that would satisfy "all interests" is selling the property in bankruptcy. Development respectfully submits that selling the property in a bankruptcy fire sale would only serve the interests of the Lender and that virtually any agreed out of court settlement, or refinancing, would be far more likely to serve "all interests."

58.     Although there is no pending state court insolvency proceeding, as discussed in the initial moving papers, a federal bankruptcy proceeding will likely be unnecessarily costly and time-consuming and would most likely simply add a layer of further litigation and expense in a

hotly contested bankruptcy case. As set forth above, resolution of the State Court Action and appropriate state court enforcement actions would likely resolve the claims of all parties, not simply those of the Lender.

59.     The Purported Debtor's argument in regards to Factor 7 that it was the Purported Debtor, not the Lender, that filed the case, while perhaps technically true, ignores the undisputed facts that the Purported Debtor and Lender are one and the same, the Lender selected the Purported Debtor's management, that in determining the purpose in filing the case was to sell the property the Purported Debtor's new management conferred with no party other than the Lender and that the chosen "purpose" benefits only the Lender.

60.     The Lender admits executing on a pledge is seldom done. It crossed the line in a transparent effort to avoid foreclosure and litigation, which constitutes bad faith filing. The Lender's bad faith is also evidenced by (i) its commencement of a post-petition collection lawsuit against the guarantors in state court, which the Lender could not otherwise have done under New York's election of remedies statute, and (ii) with no authority to sell the collateral, the Lender caused Rosewood Realty to send emails and an advertisement for sale of the 286 Rider real property in November or December, all while Development was trying to refinance the debt. The Lender's bad faith actions have wholly impaired Development's ability to seek a refinance.

## Conclusion

61.     In blatant disregard of established public policy, the Uniform Commercial Code, and the plain language of the Pledge, the Lender attempted to take control of the Purported Debtor and force it into this bankruptcy case. If this case is not dismissed, lenders will be unrestricted in their ability to repossess collateral through a liquidating bankruptcy case and the foreclosure process will be rendered meaningless in dual collateral transactions. For the reasons

59594250;22

set forth above, Development urges the Court to dismiss this bankruptcy case and permit the State Court proceedings to progress as applicable law, established public policy, and the negotiated Pledge intend.

Dated: New York, New York
      August 25, 2021

                       AKERMAN LLP


                   By:   */s/Mark S. Lichtenstein*
                       Mark S. Lichtenstein
                       Joshua D. Bernstein
                       1251 Avenue of the Americas
                       37th Floor
                       New York, New York 10020
                       Tel. No. (212) 880-3800
                       E-mail: mark.lichtenstein@akerman.com
                       E-mail: joshua.bernstein@akerman.com

                   *Counsel for 286 Rider Ave. Development LLC*

## **EXHIBIT A**

## **TRANSCRIPT OF JUDGE WALRATH'S RULING IN**
## *IN RE PACE INDUSTRIES, LLC*,
## **CASE NO. 20-10927 (MFW)**
## **(BANKR. D. DEL.)**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                        |     |                               |
|------------------------|-----|-------------------------------|
|                        | .   | Chapter 11                    |
| IN RE:                 | .   |                               |
|                        | .   | Case No. 20-10927(MFW)        |
| PACE INDUSTRIES, LLC, et al, | . |                         |
|                        | .   |                               |
|                        | .   | 824 Market Street             |
|                        | .   | Wilmington, Delaware 19801    |
|          Debtors. | .   |                               |
| . . . . . . . . . . . . . . . . | . | Tuesday, May 5, 2020     |

TRANSCRIPT OF TELEPHONIC HEARING ON
MACQUARIE SEPTA (US) I, LLC'S MOTION FOR AN ORDER DISMISSING
THE CHAPTER 11 CASES OF KPI IMMEDIATE HOLDINGS, INC., AND ITS
DIRECT AND INDIRECT SUBSIDIARIES
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Robert S. Brady, Esq.
                            Edmon Morton, Esq.
                            Joseph Mulvihill, Esq.
                            YOUNG, CONAWAY, STARGATT
                             & TAYLOR, LLP

                            Alexander L. Cheney, Esq.
                            Matthew Feldman, Esq.
                            Debra M. Sinclair, Esq.
                            Rachel Strickland, Esq.
                            WILLKIE, FARR & GALLAGHER, LLP

                            Kathryn Coleman, Esq.
                            HUGHES, HUBBARD & REED, LLP

For the U.S. Trustee:       David L. Buchbinder, Esq.
                            OFFICE OF THE U.S. TRUSTEE
(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Brandon J. McCarthy, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)

For Macquarie:                    William Bowden, Esq.
                                  ASHBY & GEDDES

                                  Jeffrey C. Krause, Esq.
                                  GIBSON, DUNN & CRUTCHER, LLP

For Toyota Motor
Engineering & Manufacturing
North America, Inc.:              Patricia K. Burgess, Esq.
                                  FROST BROWN TODD, LLC

For TCW Asset Management
Co., LLC:                         Adam G. Landis, Esq.
                                  Matthew B. McGuire, Esq.
                                  LANDIS, RATH & COBB, LLP

                                  William Gussman, Esq.
                                  Adam Harris, Esq.
                                  Kelly V. Knight, Esq.
                                  SCHULTE, ROTH & ZABEL, LLP

For Bank of Montreal:             John Knight, Esq.
                                  David T. Queroli, Esq.
                                  RICHARDS, LAYTON & FINGER, PA

                                  Wade Kennedy, Esq.
                                  Alexandra Shipley, Esq.
                                  Brian I. Swett, Esq.
                                  MCGUIREWOODS

For FCA US, LLC:                  Morgan L. Patterson, Esq.
                                  WOMBLE BOND DICKINSON US, LLP

                                  James A. Plemmons, Esq.
                                  M. Kimberly Stagg, Esq.
                                  DICKINSON WRIGHT, PLLC

For Kenner & Company:             Jeremy W. Ryan, Esq.
                                  POTTER, ANDERSON & CORROON, LLP

For the Ellwood Group,
Inc.:                             Michael Shiner, Esq.
                                  TUCKER ARENSBERG

Also Appearing:                   Mark F. Hebbeln, Esq.
                                  FOLEY & LARDNER, LLP

(Appearances Continued)

APPEARANCES VIA TELEPHONE:   (Continued)

Also Appearing:                    Walt Popiel
                                   Daniel Schultz
                                   CONWAY MACKENZIE

                                   Daniel Duffy, Pro Se

                                   Suzanne Grosso, Pro Se

                                   Megan F. Tripodi, Pro Se

INDEX

                                                                Page

ARGUMENT BY MR. KRAUSE                                            12

ARGUMENT BY MR. CHENEY                                            20

ARGUMENT BY MR. GUSSMAN                                           28

COMMENTS BY MR. SWETT                                             32

FURTHER ARGUMENT BY MR. KRAUSE                                    33

FURTHER ARGUMENT BY MR. CHENEY                                    37

COURT DECISION                                                    38

5

1        (Proceedings commence at 10:30 a.m.)

2             THE OPERATOR:  And Her Honor has joined us.

3             THE COURT:  Excuse me?

4             THE OPERATOR:  Yes, Your Honor.  My name is Cynthia

5    with CourtCall.  I will assist you on the 10:30 calendar.  We

6    do have your court clerk standing by --

7             THE COURT:  Thank you.

8             THE OPERATORS:  And your court deputy is in a

9    listen-only mode.

10            THE COURT:  Thank you.

11       (Pause in proceedings)

12            THE COURT:  Who is that?

13       (No verbal response)

14            THE COURT:  Okay.

15            THE OPERATOR:  Your law clerk Brandon has an un-

16   muted line, and James and Laurie have listen-only lines,

17   muted lines.

18            THE COURT:  All right.  Thank you.

19            THE OPERATOR:  And Your Honor, just to keep you

20   updated on the time, I do show we're three minutes away from

21   the start of the calendar.  Your judicial assistant Cathy has

22   joined us; she's in a listen-only mode, as well.  And counsel

23   is still checking in.

24            THE COURT:  All right.  Yeah, I'm waiting for one

25   more person on June [sic], which is the U.S. Trustee's

6

1   Office.

2                    THE OPERATOR:  Okay.

3                    THE COURT:  Thank you.

4                    THE OPERATOR:  And Your Honor, we show we're one

5   minute away from the start of the calendar.  Was there

6   someone in particular you were waiting on before we get

7   underway?

8                    THE COURT:  Yeah, we're waiting for the United

9   States Trustee's Office, David Buchbinder, who --

10                   THE OPERATOR:  Okay.  And Mr. Buchbinder has

11  checked in.

12                   THE COURT:  On CourtCall.

13                   THE OPERATOR:  That is correct, yes.

14                   THE COURT:  All right.  Well, let's start then and

15  I'll -- I thought he was going to be on Zoom, but --

16                   THE OPERATOR:  He has checked in --

17                   THE COURT:  -- let's just go ahead.

18                   THE OPERATOR:  -- through CourtCall.  Yeah, he has

19  checked in on court -- through CourtCall, Your Honor.

20                   THE COURT:  All right.  Well, maybe he's just going

21  to not speak then -- not be on Zoom.  All right.  You can

22  open up the line then.  Thank you.

23                   THE OPERATOR:  Okay.  What I'm going to do then is

24  I'm going to step away and start a record line, and then I

25  will come back to let you know that counsel is live.  Okay?

1    Please stand by.

2                    THE COURT:  All right.  Thank you.

3                    THE OPERATOR:  And Your Honor, counsel is live.

4                    THE COURT:  All right.  Thank you.

5                    Good morning.  And thank you to everybody who's

6    participating, both on CourtCall and by Zoom.

7                    Before we get started, I want to give my wishes to

8    everybody that everybody is still safe and handling the

9    pandemic appropriately.  And I want to thank counsel who are

10   appearing on Zoom for getting out of their exercise gear and

11   getting in business attire.  And I want to just assure you

12   that I'm using the headphones, so that I can hear the

13   arguments that will be made today without interruption.

14                   So, with that said, we are here on the motion to

15   dismiss filed by Macquarie.  And I'll turn it over, I guess,

16   to you, Mr. Krause.  Are you going to present the argument?

17       (No verbal response)

18                   THE COURT:  Can everybody hear me?

19                   MR. BOWDEN:  Your Honor, it's Mr. Bowden at Ashby &

20   Geddes.  I can hear you without any trouble whatsoever.

21                   MR. KRAUSE:  Judge, this is Jeffrey Krause.  The

22   screen says your speaker is muted.

23                   THE COURT:  Yeah, the -- you all should be on

24   CourtCall, rather than speaking through Zoom, because we need

25   to record this.  Are you all connected to CourtCall?

1          MR. CHENEY:  Your Honor, this is Alex Cheney.  Are

2     we supposed to dial in through CourtCall, as well?

3          THE COURT:  Yes.

4          MR. BOWDEN:  Yes.

5          THE COURT:  Yes.

6          MR. CHENEY:  (Indiscernible) thank you.

7          THE COURT:  Yes.

8          MR. MORTON:  Your Honor, this is Edmon Morton --

9          THE COURT:  All right.  I'll give the parties a

10    minute --

11         MR. MORTON:  -- (indiscernible)

12         THE COURT:  I'll give the parties a moment to do

13    that.

14         MR. MORTON:  Yes.  Thank you, Your Honor.  This is

15    Ed Morton.  I was going to suggest that same thing, if we can

16    just take a moment and let Mr. Krause and Mr. Cheney dial in

17    to CourtCall, so that the audio can work in that regard.

18    Thank you.

19         THE COURT:  All right.

20         MR. MORTON:  And Your Honor, one other thing, I

21    will just -- I'll just observe for the record while we're

22    waiting is that we also had scheduled today final

23    consideration of our NOL trading restriction motion.  We were

24    able to present that on CNO and Your Honor has entered that

25    order.

1     The final thing I'll note is, I think, for purposes

2 of today, as you've surmised from Zoom, Alexander Cheney from

3 Willkie, Farr & Gallagher will be arguing our objection on

4 behalf of the debtors.  And so I just -- you've already

5 entered a pro hac vice order for him.  I just wanted to kind

6 of introduce him for purposes of the record today and not to

7 break up the flow of the hearing as we get to our portion of

8 the hearing.

9     THE COURT:  All right.  Thank you.

10     All right.  Let me see.  If those who are on Zoom

11 can give me a thumbs up if they are connected to CourtCall,

12 or when they get connected to CourtCall.  If those on Zoom

13 can give me a thumbs up when they're connected to CourtCall.

14     (Pause in proceedings)

15     MR. BOWDEN:  Your Honor, it's Mr. Bowden from

16 Macquarie.  I'll send Mr. Krause an email now, in the event

17 he's having difficulty hearing you, to let him know to give

18 you the thumbs up when he's connected.

19     THE COURT:  Okay.

20     MR. MORTON:  And I'm doing the same thing for Mr.

21 Cheney.  Your Honor, this is Ed Morton.

22     THE COURT:  Okay.  I got a thumbs up from Mr.

23 Cheney.

24     MR. MORTON:  His quicker with his dialing fingers

25 than I am with my typing fingers.

1      (Pause in proceedings)

2          MR. HARRIS:  Your Honor, it's Adam Harris from

3      Schulte Roth.  Mr. Gussman, who's on the Zoom, may not have

4      independently set up a separate dial-in line through

5      CourtCall, so it may take him a minute to get through on

6      that.

7          MR. GUSSMAN:  Your Honor, I have been able to join.

8      This is Bill Gussman from Schulte.

9          MR. HARRIS:  Oh, hey, Bill.  Great.

10         MR. GUSSMAN:  I am now on.

11         MR. LANDIS:  Your Honor, Adam Landis is here.  I am

12     Delaware counsel, along with Mr. Harris and Mr. Gussman.  We

13     did get them set up.  I am on CourtCall.  We filed a joinder

14     on behalf of TCW Asset Management, to the debtor's opposition

15     to Macquarie's motion to dismiss.  Mr. Gussman will handle

16     it, handle the argument, and I'm going to remain on mute,

17     largely on CourtCall.

18         THE COURT:  Okay.

19         MR. LANDIS:  And Mr. Gussman has -- we moved his

20     admission pro hac vice, which Your Honor has entered.

21         THE COURT:  I already have that.  Is Mr. Krause on

22     CourtCall?

23         MR. BOWDEN:  Your Honor, it's Mr. Bowden.  I

24     understand that Mr. Krause is attempting to dial in through

25     CourtCall now, so, hopefully --

1          THE COURT:  Okay.

2          MR. BOWDEN:  -- he will be with us momentarily.  I

3     apologize for the inconvenience.

4          THE COURT:  How about Mr. Swett, on behalf of Bank

5     of Montreal, is he on CourtCall?

6          MR. SWETT:  Thank you, Your Honor.  I'm on both.

7          THE COURT:  Okay.  I don't know that Mr. Buchbinder

8     is.  He is on.  Okay.

9          THE OPERATOR:  And Your Honor, Mr. Krause has

10    connected.

11         THE COURT:  Okay.  Good.  We finally have everybody

12    on CourtCall, as well as those who are arguing on Zoom.

13         So, again, let's start.  This is the Pace

14    Industries hearing, and this is the hearing on Macquarie's

15    motion to dismiss the case.  I'm having some feedback on the

16    talking, so I hope everybody can hear me.

17         UNIDENTIFIED:  We can hear you.

18         THE COURT:  I'll ask that the --

19         UNIDENTIFIED:  Yes, Your Honor.  You're --

20         THE COURT:  Put the --

21         UNIDENTIFIED:  You're fine on our end.

22         THE COURT:  Cynthia, could you mute all the lines,

23    except Mr. Krause, Mr. Cheney, Mr. Buchbinder, Mr. Gussman,

24    and Mr. Swett.  And I'll ask them to not talk over each

25    other.

1          THE OPERATOR:  Very good.

2          THE COURT:  Thank you.

3          All right.  I guess it's Mr. Krause.  I'll turn it

4     over to you.

5          MR. KRAUSE:  Thank you, Your Honor.  Good morning.

6     Jeffrey Krause of Gibson Dunn on behalf of Macquarie Septa,

7     the preferred shareholders and movant.

8          Macquarie is not a creditor in this case; it's a

9     preferred shareholder.  The Series A preferred shareholders

10    invested $37 million and, at the time, negotiated provisions

11    in the certificate, including Section 6.1.3, that limited the

12    authority of the board to file Chapter 11 cases.  The board

13    ultimately decided that it was not bound by those limitations

14    and filed the Chapter 11 petitions without the consent of the

15    Series A preferred shareholders.  None of that is disputed.

16         That means the questions that the motion to dismiss

17    presents for the Court are whether public policy somehow

18    voids a provision that limits what shareholders can consent

19    to.  Does the consent alone make Macquarie a minority

20    shareholder, despite authority directly to the contrary and

21    no authority that says that it does?  Can this Court exercise

22    jurisdiction, even though the petitions were not authorized?

23    And finally, does the fact that the secured lenders have

24    threatened to file an involuntary petition if the Court

25    recognizes the lack of authority of the directors and the

1    lack of jurisdiction of the Court because of that lack of

2    authority; does that somehow imbue the directors with

3    authority they do not have?

4            Your Honor, this is not the first case to deal with

5    these issues.  We cited multiple cases in our motion that say

6    that an equity holders, as distinguished from a creditor, can

7    retain authority in the certificate to consent to the filing

8    of a bankruptcy proceeding?  Franchise Services of North

9    America, Global Shipping, NNN 123 North Wacker all hold that

10   a shareholders or member of a limited liability company can

11   retain the authority to make the decision whether or not a

12   bankruptcy proceed should be filed.

13           These are consistent with Delaware Courts that have

14   said that the parties have freedom of contract in deciding on

15   the terms of the articles of incorporation and the

16   certificates.  Indeed, the Jones case, Your Honor, which the

17   debtors tried to distinguish, specifically said Delaware

18   Courts -- or excuse me -- Delaware's corporate statute is

19   widely regarded as the most flexible in the nation.  And it

20   stated the purpose of Section 141, to allow -- which allows

21   limitations in the articles on what the directors can do is:

22               "-- to permit (absent some conflict with Delaware

23               public policy) certificate provisions to withdraw

24               authority from the board."

25           There's no question this is permissible under

1    Delaware law.  There's no question it's been permitted by the

2    Bankruptcy Courts that have addressed the issue.

3            The debtor cites multiple cases in an effort to

4    say, well, there are some cases that have held that the

5    articles or the certificate cannot limit the power of the

6    board to file a voluntary bankruptcy petition.  All of those

7    cases are easily distinguishable.

8            Quad-C, which is one of the cases they rely on,

9    there was actual a super majority vote of the shareholders to

10   file the petition.  The question was all of the stock had

11   been validly issued.  And the Court said it didn't need to

12   get into that, the shareholders had voted for the filing.

13           In American Globus, one of the shareholders had

14   ignored the requirement of unanimity for the board to act --

15   or for the shareholders to act when it liquidated the

16   company, closed the doors, and paid itself preferences.  The

17   other shareholder filed a bankruptcy petition.  And the

18   shareholder who had completely disregarded the unanimity

19   provision said, oh, now the unanimity provisions apply, and

20   the Court said it couldn't have it both ways.

21           Intervention and Lake Michigan, which they rely on,

22   are the classic "give the creditor a golden share."

23   Intervention, the creditor paid one dollar for one membership

24   interest out of 22 million.  In Lake Michigan, the membership

25   interest actually didn't have any economic interest; no right

1    in profits, no right in losses.  These are the only cases the

2    debtor has been able to cite for the proposition that a

3    limitation on the powers of the board in the certificate is

4    not binding.  Those cases involved creditors seeking a golden

5    shares, as the Court in the Fifth Circuit held in Franchise

6    Services of North America.

7              So, Your Honor, we respectfully submit that there

8    is no case authority supporting the debtors' proposition that

9    there's a limitation on the ability of shareholders,

10   sophisticated parties investing millions of dollars, to agree

11   in the certificate on the power of the board to file a

12   proceeding.

13             So the next question I'd like to address is:  Does

14   that power, in and of itself, make a minority shareholder a

15   controlling minority shareholder who is a fiduciary.  Your

16   Honor, we've cited Delaware Chancery Court cases that say it

17   does not.  Franchise Services Company of North America, on

18   almost identical facts, says it does not.

19             And the debtors cite one case for the proposition

20   maybe it does, which is the Basho case.  But they completely

21   ignore what the Court in Basho actually said.  I think there

22   are two quotes from the Basho opinion that demonstrate how

23   far the debtors have gone in their attempt to void a

24   provision that is valid under Delaware law.

25             The first, the Court said, and I quote:

1          "A blocking right, standing alone, is highly

2          unlikely to support either a finding or reasonable

3          inference of control."

4      And Your Honor, the Court went on to say -- and

5   this is pretty remarkable -- the Court didn't want anyone to

6   read the Basho opinion in exactly the way the debtors ask you

7   to read the opinion now.  The Court said:

8          "Lest readers fear that this decision heightened

9          risk for venture capital firms who exercise their

10         consent rights, I reiterate, a finding of control

11         requires a fact-specific analysis of multiple

12         factors.  If preferred shareholder only had

13         exercised its consent right, that fact alone would

14         not have supported a finding of control."

15     So, Your Honor, in this case, like in Franchise

16  Services of North America, the fact that the board filed

17  without getting Macquarie's consent demonstrates beyond any

18  argument Macquarie didn't control the board.  That's what

19  makes a minority shareholders a minority controlling

20  shareholder and imposed fiduciary duties.

21     Your Honor, the next issue I would like to address

22  is the debtors' argument that it's not really jurisdictional.

23  Even if the people who purported to file the bankruptcy

24  proceeding didn't have authority to file the bankruptcy

25  proceeding, this Court can keep the case because the debtor

1    really needs relief.  Your Honor, the Supreme Court has said

2    that is not true.  The Supreme Court said, in Price v.

3    Gurney, if the Court concludes that the people who filed the

4    petition did not have authority, it has no alternative, it

5    must dismiss the case.

6        They say that Price v. Gurney didn't deal with a --

7    in their footnote, they quote "invalid blocking rights."

8    That is a circular argument.  They're saying the rights are

9    invalid; therefore, they're invalid; therefore, they have

10    authority.  The problem for the debtors is that all of the

11    case law actually dealing with the issue says that the rights

12    are valid.  So, if they are valid blocking rights or consent

13    rights, the debtor had no authority to file.  Price v.

14    Gurney, Franchise Services of North America say the Court has

15    no alternative to -- but to dismiss the case.

16        Your Honor, the debtors say but we really need

17    Chapter 11.  Separate and apart from whether or not that's

18    true -- because many of the things the debtors and the

19    secured lenders propose to do in the plan, the debtors and

20    the secured lenders could do outside of the case -- they're

21    un-impairing other unsecured creditors.  They're

22    restructuring the secured debt, which they could do out of

23    court.  The one thing they're doing that they couldn't do out

24    of court is wiping out the interests of my client for no

25    consideration, without providing it with any opportunity to

18

1    participate in the process.  But with respect to all of the

2    other things they're doing, they could do those things out of

3    court.  So maybe they don't really need Chapter 11.

4         But the Supreme Court addressed that issue, too.

5    In Price v. Gurney, the debtor said -- or the petitioning

6    party said we really need this proceeding to benefit all

7    parties.  And the Supreme Court said:

8         "Respondents may have a meritorious case for

9         relief.  On that, we intimate no opinion.  But if

10        they are to be allowed to put their corporation

11        into bankruptcy, they must present credentials to

12        the Bankruptcy Court showing their authority."

13        The debtors have not done that.  The board did not

14   have authority.  The Supreme Court and the Fifth Circuit have

15   both said dismissal is mandatory.

16        Your Honor, the lenders then say, well, there's no

17   point in dismissing the case because, if you dismiss the

18   voluntary, we'll just file an involuntary.  Well, Your Honor,

19   I don't know if they will or they will not file an

20   involuntary.  I know they (indiscernible) against the

21   ultimate parent because it's not an obligor under the pre-

22   petition loan documents and it's giving releases to

23   shareholders and insiders under the plan.  I don't know if

24   they will.  They haven't.  And the issues that an involuntary

25   might present are not before the Court today.

1          But Your Honor, an involuntary would present

2     issues:

3          Are the debtors generally paying their debts as

4     they come due?  The plan is providing for unimpairment of all

5     the unsecured creditors.

6          If the debtors are not generally paying their debts

7     as they come due, are the guarantee claims against multiple

8     of the debtors not contingent?

9          Are the claims that are secured by all of the

10    assets of the debtors indisputably unsecured up to at least a

11    certain dollar amount?  And the secured lenders try and get

12    around that requirement by saying, well, we'll just waive

13    $15,000 of our collateral.  The secured lenders in Taburna

14    tried that, and the Court dismissed the case as having been

15    filed improperly.

16          And the secured lenders seem to say the directors

17    will collude with us to actually consent to the entry of an

18    order for relief, once we file the involuntary petition.  And

19    Your Honor, that's exactly what Global Shipping said is a bad

20    faith filing.

21          So those issues aren't before the Court.  They

22    haven't filed the involuntary petition.  But an involuntary

23    petition is not an automatic slam dunk there would be in

24    order for relief.  If they filed that petition, the Court and

25    the parties would have to deal with the issues that petition

1    raises.  They haven't filed that petition.  The petition

2    that's been filed is a voluntary petition, approved only by

3    the directors who, under the certificate, clearly had no

4    authority to file the petition.  And the Supreme Court has

5    said, if the Court finds that those who purport to act on

6    behalf of the corporation have not been granted authority by

7    local law to institute the proceedings, it has no

8    alternative, no alternative but to dismiss the petition.

9           So, Your Honor, we respectfully request that the

10   Court grant the motion to dismiss.  And I'm happy to answer

11   any questions the Court has or to respond to counsel.  I'm

12   not quite used to the telephonic and Zoom appearances, but

13   I'm happy to answer any questions the Court may have.

14          THE COURT:  I have none at this time.  So I'll turn

15   it over to -- who wants to go first?  Mr. Cheney.

16          MR. CHENEY:  (indiscernible) Your Honor.  Can you

17   hear me?

18          THE COURT:  I can.

19          MR. CHENEY:  Great.  Good morning, Your Honor.

20   Alex Cheney from Willkie, Farr & Gallagher on behalf of the

21   debtors.

22          I want to start by focusing on why it is Macquarie

23   says it's refusing to consent to these bankruptcy proceedings

24   because I think that's critical to the Court's analysis.

25          First, it says it has certain objections to the

1    prepackaged plan.  That's easy to address.  The Court can

2    address any objections Macquarie has to the plan at

3    confirmation.

4          Second, it says that it wants a seat at the table,

5    that it wants to be involved in deciding the future for the

6    company, or that it wants to be involved in the process, but

7    it hasn't submitted any evidence that it's been shut out of

8    that process.  And in fact, Macquarie does not want a seat at

9    the table.  It doesn't even identify any other viable options

10   for the debtors.  Instead, it wants ultimate authority to

11   decide whether the company can file for bankruptcy.  And it

12   says that the interests of the company are totally

13   irrelevant.

14         So what we (indiscernible) is a company that's out

15   of money, that's unable to pay its debts.  The company has

16   been forced to close facilities and terminate a substantial

17   portion of its (indiscernible)

18         THE COURT:  I think you've been cut off.  Is

19   CourtCall on?

20         THE OPERATOR:  Yes, Your Honor.  This is CourtCall.

21   Mr. Cheney does have an active line, but I'm not hearing him.

22         THE COURT:  Yeah.  Mr. Cheney, can you speak a

23   little bit?  And let's see what the issue is.

24         MR. CHENEY:  Yeah.  Can you hear me?

25         THE COURT:  Yes.

1           MR. CHENEY:  Oh (indiscernible)

2           THE COURT:  Maybe closer.

3           MR. CHENEY:  Thank you, Your Honor.

4           So what we have here is a company that's out of

5     money, it's unable to pay its debts.  The company has been

6     forced to close facilities and terminate a substantial

7     portion of its workforce as a result of the pandemic.  We

8     have fiduciaries, the directors of the company, who have

9     determined that these cases are in the company's best

10    interests.  And we have a minority shareholder who claims

11    that none of that matters.

12          And we make the point in our papers, Your Honor,

13    that Macquarie is doing this just to gain leverage in

14    negotiations with the debtors' lenders, and it does not

15    dispute that.  More to the point, Macquarie is threatening to

16    force a foreclosure, so that it can try to get something in

17    negotiations that it would not get under the Bankruptcy Code

18    or in a foreclosure action.  Allowing Macquarie to abuse its

19    consent right in this fashion is contrary to Delaware law and

20    federal public policy.

21          Now I'll start with Delaware law, Your Honor.

22    Macquarie says that there's no question that this blocking

23    right is permitted.  That's not actually the case.  As far as

24    we know, no Delaware State Court has even addressed the

25    legality of this kind of blocking right in this contest.

1    This is a matter of first impression.

2         And while the DTCL [sic] is flexible, we do think

3    that Delaware Courts would put some limits on exercising this

4    kind of blocking right in this context.  And we see that in

5    the Basho case.  The Basho Court explained that Delaware law

6    imposes fiduciary obligations on minority shareholders when

7    they can control a particular transaction.

8         Now Macquarie argues that consent rights alone do

9    not create fiduciary obligations.  While that may be true in

10   the context of a typical corporate transaction, the decision

11   of whether or not to file for bankruptcy is not a typical

12   transaction.  That decision is often a last resort.  And

13   having a blocking right in that context gives the shareholder

14   an extraordinary level of control over the company.

15        And the Basho case made clear that that context

16   matters.  In that case, the blocking right gave the

17   shareholder the ability to cut off the company's access to

18   capital.  And the Court said that, typically, this right

19   alone would be indicative of control if the company had

20   multiple sources of capital.  But the Basho company was not

21   in that situation.  It was a cash-burning company and it was

22   light on assets.  And I want to quote what the Court said

23   here because I think it's very important.  It said, quote:

24        "For a company like Basho, the parties that control

25        its access to cash sit on the company's lifeline,

1          with the ability to turn it on or off.  When cash

2          is like oxygen, self-interested steps to choke off

3          the air supply provide a strong indicator of

4          control."

5          And that's at Page 29.

6          Now, for a company like Pace, Chapter 11 is the

7    company's lifeline.  And Macquarie says it alone can cut it

8    off.  That level of control renders Macquarie a fiduciary,

9    with the obligation to consider the company's best interests.

10          In any event, Your Honor, the Court need not decide

11   this matter of first impression under Delaware law because,

12   even if Macquarie is not a fiduciary, the outcome is the

13   same.  And that is because federal public policy does not

14   permit Macquarie to exercise its blocking right in the way

15   it's doing here.  And we know this from the Intervention

16   Energy and Lake Michigan cases.

17          The Intervention Energy case is the only decision

18   from this Court addressing these types of blocking rights.

19   And what the Court found problematic about the blocking right

20   in that case were a list of things:

21          One, the blocking right was obtained by contract;

22          Two, it gave single minority shareholder the

23   ultimate authority to file for bankruptcy;

24          And, three, the shareholder had no obligation to

25   consider the company's best interests.

1          Those same facts exist here.  Now it is true that

2     the shareholder in that case was also a lender.  But that was

3     just one factor in the Court's analysis.

4          And Macquarie has not cited any authority -- and

5     we're not aware of any -- saying that these public policy

6     concerns that are raised by blocking rights in this context

7     are only implicated when a lender exercising the blocking

8     right.  That would be an extraordinarily narrow reading of

9     the important public policies ensuring that companies have

10    access to bankruptcy relief when needed.

11         So what the Court must do here is determine whether

12    Macquarie's exercise of its blocking right conflicts with the

13    company's constitutional right to seek bankruptcy relief.

14    Under the circumstances of this case, Your Honor, it does

15    conflict; and it's, therefore, void.  It cuts off the

16    company's right to seek bankruptcy relief completely.

17         Again, Macquarie does not dispute the company needs

18    bankruptcy relief.  It does not identify any other viable

19    options for these companies.  And Macquarie does not dispute

20    that it is trying to block these cases, so that it can gain

21    leverage in negotiations with lenders, or that a dismissal

22    will harm the debtors.

23         As the Intervention Energy and Lake Michigan cases

24    tell us, this kind of self-interested exercise of a blocking

25    right at the expense of the debtor offends public policy.

1    And the reason for that is simple, Your Honor.  Unless the

2    parties who are deciding whether or not the company will file

3    for bankruptcy are compelled to consider the company's best

4    interests, there is nothing protecting the company's

5    constitutional right to seek bankruptcy relief.  Otherwise,

6    the right really becomes subject to the whim and interests of

7    a third party, who may not care if the company is driven into

8    the ground.

9          Now Macquarie relies heavily on the Fifth Circuit's

10   decision in the Franchise Services case.  And I'll make three

11   points about that case, Your Honor:

12         First, the Court's holding regarding the

13   lender/shareholder distinction is actually quite limited.  It

14   held that a blocking right held by a shareholder is not void

15   just because the shareholder is also a lender.  That's not at

16   issue here.

17         And on the issue of whether the shareholder must

18   consider the interests of the company, with all due respect

19   to the Fifth Circuit, we think the Court got it wrong.  It --

20   the Court's decision is not consistent with Delaware law, as

21   stated in Basho, or with federal public policy, as stated in

22   this Court's decision in Intervention Energy or in the Lake

23   Michigan case.

24         And finally, what the fifth -- the Fifth Circuit

25   said that, even if this exercise of a blocking right

27

constituted a breach of fiduciary duty, the proper remedy is

a state law claim, not denial of the motion to dismiss.  But

I think that really misconstrues what the Court's rule is

here.

The Court is not searching for the appropriate

remedy for a state law breach of fiduciary duty claim.  It's

determining whether or not the exercise of the blocking right

in this context comports with public policy.  And if the

shareholders completely disregards the company's interests in

exercising this blocking right and disregards that exercising

its blocking right is going to harm the company when the

company has no other options, we submit that is -- that does

offend federal public policy, Your Honor.

Now Mr. Krause mentioned the Quad-C and American

Globus cases, Your Honor, and tried to distinguish those.

Your Honor, what those cases tell us is that courts do have

the discretion to overlook defects in authorization for

filings when it's supported by law or equity, as is the case

here.

And Mr. Krause also discussed the Price v. Gurney

case.  Your Honor, that really has very little application

here.  It has nothing to do with federal public policy

concerns or consent rights.  In that case, a shareholder

tried to commence a Chapter 10 case, which it's not permitted

to do under the Bankruptcy Code; and the Court found that,

1    therefore, it had -- the Bankruptcy Court had no jurisdiction

2    over that matter.

3         Now, finally, Your Honor, the debtors are going to

4    end up in Chapter 11 one way or another.  Dismissing this

5    case will not benefit Macquarie and keeping the cases will

6    not prejudice Macquarie.  It can raise any objections to the

7    plan that it has at confirmation.  But dismissal will

8    prejudice everyone.  And for what, so that Macquarie can come

9    back and object to the plan?  There is no good reason to

10    force the debtors and the stakeholders to go through that

11    process.

12         And unless Your Honor has any other questions -- or

13    has any questions, that completes my presentation.

14         THE COURT:  No, I don't.  Thank you.

15         MR. CHENEY:  Thanks.

16         THE COURT:  Who wants to go next?  Mr. Gussman?

17         MR. GUSSMAN:  Your Honor, this is -- yeah, this is

18    Bill Gussman from Schulte, Roth & Zabel, Your Honor, on

19    behalf of TCW, and I'll be brief.

20         I'm going to just address the involuntary petition

21    piece that Mr. Krause touched on.  As we -- as the Court

22    knows, we filed the declaration of Suzanne Grasso of TCW, in

23    which she states that, if this case is dismissed, the pre-

24    petition noteholders will file an involuntary petition.

25         Macquarie's argument on this point is that this

1   fact is irrelevant.  Your Honor, it is not irrelevant.

2   Context and reality, quite simply, are important and real.

3   And Macquarie would like the Court to ignore reality and the

4   consequences of dismissal of this bankruptcy case, and that

5   would be inappropriate here.

6           First of all, Your Honor, the very fact that the

7   noteholders would file an involuntary underscores the fact

8   that this company really needs to be in bankruptcy.  Mr.

9   Cheney touched on a number of those reasons in his papers and

10  in his presentation, so I won't belabor that.  But preserving

11  value, protecting creditors, protecting employees, that

12  requires bankruptcy process here.  In this -- in the

13  proceedings presently before the Court, the general unsecured

14  claims will be paid in full.  Macquarie wants to take us in a

15  different direction that would harm everybody.

16          And not only does Macquarie want to force the

17  noteholders to file the involuntary petition, they, as you

18  heard today and at -- it's foreshadowed in their papers, they

19  promise to oppose it.  Obviously, today is not the time to

20  argue the involuntary petition.  I don't want to do that, but

21  Mr. Krause touched on the five issues that he raised in his

22  reply, and I want very, very quickly to touch on all five

23  because, frankly, there will be no basis to oppose the

24  involuntary.

25          I think there is no doubt, based on the facts in

1    the first-day declarations and what Mr. Cheney went over,

2    that the company is unable to generally pay their debts as

3    they become due.  That is a totality of the circumstances

4    test, as Your Honor knows.

5          Second, Mr. Krause raises the issue in the papers

6    about whether we would have the ability to file an

7    involuntary against KPI Holdings, LLC.  We expressly carve

8    that out in our papers; that's not an issue, we would not be

9    able to do that.  But there are plenty of other debtors here

10   at issue.

11         Third, and very importantly -- and I think that Mr.

12   Krause touched on -- referenced the Taburna case in

13   connection with the issue of whether the noteholders would be

14   able to waive their secured claims with respect to an amount

15   -- the statutory amount to gain eligibility to file an

16   involuntary.  And he suggests that Taburna says that they

17   can't do that, that that would be a bad faith way of getting

18   around the requirements under 303(b).  That is not the case.

19         First of all, that is not what Taburna holds.  It's

20   a Southern District case, it does not hold that.  That is one

21   of many, many factors in a very different case that that

22   court considered in dismissing that bankruptcy case.  That

23   was a CDO case [sic].  There was no operating company.  The

24   noteholders purchased the notes to get around the governance

25   provisions within the notes, a very different case.

31

1          Furthermore, he overlooks case law that is directly

2      on point.  For example, in In Re East-West Associates, 106

3      B.R. 767, another case in the Southern District of New York,

4      quote -- the quote said -- and I quote -- and it couldn't be

5      more on point:

6               "A secured creditor may waive all or part of its

7               secured claim to become an eligible unsecured

8               petitioning creditor under Section 303(b)."

9          I've never heard a more directly on point statement

10     in a decision, and it's directly contrary to the position

11     that Mr. Krause is taking.

12         Fourth, Your Honor, he references in the papers the

13     notion that some of the debtors are merely guarantors, and

14     whether or not the noteholders would have non-contingent

15     claims.  That will not be an issue with all the defaults

16     here.  Those claims are clearly not contingent any longer.

17         And then, finally, and I think most tellingly, he

18     raises this issue of collusion or conspiracy or bad faith,

19     that somehow Ms. Grasso's declaration suggests there's been

20     some wrongdoing.  He completely mischaracterizes what her

21     affidavit says, indicating that she stated that the debtors

22     would immediately consent to the involuntary petitions and

23     orchestrate the same Chapter 11 process.  That quote is not

24     what she said.  She simply said that they would work together

25     with the debtors.  That's the spirit of cooperation and good

1    faith, Your Honor, that is actually necessary to benefit this

2    company and its stakeholders.

3            What we would be left here, Your Honor, if we had

4    to go the involuntary route -- which we would --

5    unfortunately, would be a vortex of litigation.  And that is

6    something that we should, obviously, avoid.  Those are my

7    comments, Your Honor.

8            THE COURT:  All right.  Thank you.

9            Mr. Swett?

10           MR. SWETT:  Thank you, Your Honor.  It's Brian

11   Swett from McGuireWoods on behalf of the Bank of Montreal,

12   which is the ABL agent, pre-petition and under the DIP.

13           I have nothing substantive to add to the

14   presentations made by Mr. Cheney and Mr. Gussman.  We've

15   joined in their papers with a reservation with respect to the

16   involuntary, and we join in their arguments here this

17   morning.  Thank you, Your Honor.

18           THE COURT:  All right.  Thank you.

19           Mr. Buchbinder, do you have anything that you would

20   like to add from the U.S. Trustee?

21      (No verbal response)

22           THE COURT:  I'm getting a no signal.

23           Mr. Krause, do you want to respond to any of the

24   opposition arguments?

25           MR. KRAUSE:  Yes, Your Honor, if I could.  I'll try

1    and be relatively brief.

2          I want to start with the last arguments, relating

3    to the involuntary petition.  And Mr. Gussman said that, in

4    Taburna, the creditors who were filing the petition were

5    waiving part of their debt -- and I think I got this right --

6    to get around governance in the corporate documents.  That's

7    exactly what the secured lenders and the debtor are talking

8    about doing here.

9          With respect to the question of does the consent

10   right, in and of itself, give rise to a fiduciary duty, the

11   only case applying Delaware law that the debtor has cited is

12   Basho.  Basho -- and the Court specifically said there are

13   multiple other reasons why there's a breach of fiduciary duty

14   here, including other conduct and intimidation and actions by

15   the creditor who -- or the shareholder, who also had approval

16   rights.  The Court specifically said the approval rights, in

17   and of themselves, the consent rights did not give rise to a

18   fiduciary duty.

19         And Your Honor, that is not unique to Basho or to

20   bankruptcy cases.  Delaware Courts have, on multiple

21   occasions, held that consent rights over critical issues

22   relating to a debtor do not make a minority shareholder a

23   controlling shareholder.  We cited Superior Vision and

24   another Chancery Court case in our materials.  And the

25   debtors have not cited one single case where a non-creditor

1    shareholder was deprived of contractually negotiated consent

2    rights, upon which they relied when they invested millions of

3    dollars, that were negotiated among sophisticated parties.

4         Now there are two other matters that I think are

5    important, Your Honor.  One is counsel talked about the

6    directors and that they are fiduciaries trying to do the

7    right thing.  Well, Your Honor, the directors in this case

8    are not unconflicted.  The directors negotiated for personal

9    releases, personal releases by the companies, including the

10   ultimate parent company against whom the secured lenders say

11   they couldn't file an involuntary.  So, if that entity is not

12   in bankruptcy, it can't grant releases.  So, even if we went

13   down the involuntary path, the directors could not get the

14   releases they negotiated for in the plan from the ultimate

15   parent company.

16        Some of the directors will benefit from

17   compensation.  All of the directors will get exculpated from

18   doing what they knew they had the right to do in filing the

19   involuntary petition.  All of them will have broad

20   indemnifications assumed that might not otherwise be assumed.

21   So, Your Honor, the members of the board who made the

22   decision to ignore the provision in the certificate had

23   personal motivations and personal conflicts.

24        That is why preferred shareholders negotiate for

25   provisions in the certificate to give them approval rights

1   because they recognize that board members are not always

2   objective, are sometimes interested in doing what is in their

3   own personal best interests, as the board members did here.

4         Your Honor, with respect to the question of whether

5   Macquarie Septa has a better plan for the debtor, I come back

6   to the fact that most of the things that the debtor is doing

7   in connection with the bankruptcy case it doesn't need a

8   bankruptcy to do, in cooperation with its secured lenders.

9         Now counsel for the secured lenders said it needs

10  the bankruptcy process to preserve value.  At no point has

11  anybody for the debtors or the secured lenders explained why

12  they could not preserve the same value they're proposing to

13  preserve in a proceeding by cooperating together out of the

14  proceeding.  We don't know what that will look like because

15  Macquarie has been excluded from the process, despite the

16  fact that its consent right is intended to give it a right to

17  be heard in connection with the process.

18        Your Honor, counsel for the secured lenders ticked

19  through multiple issues that would have to be addressed by

20  the Court if the involuntary petition were filed, including

21  arguments about which of two cases govern in the bad faith

22  context.  Those issues are not before the Court.

23        And counsel said, Judge, you have to look at

24  reality.  Okay.  What's the reality?  The reality is the

25  debtor filed an unauthorized voluntary petition.  The reality

1    is the secured lenders didn't believe filing an involuntary

2    petition was a no-brainer and would just go forward, and

3    didn't file an involuntary petition.  So the Court is not,

4    today, being asked to rule on the five issues that we've

5    listed that might come up in the context of an involuntary

6    petition because the reality is nobody filed an involuntary

7    petition.

8              Your Honor, there is no case holding that a

9    blocking authority held by someone who is not a secured

10   lender is void.  As we pointed out in our brief and in our --

11   I repeated in the opening argument, in Lake Michigan, the

12   equity interest had literally no value, no profit rights, no

13   loss obligations.  And it was granted to a secured creditor

14   in the context of a forbearance agreement to allow it to

15   foreclose if the forbearance agreement expired.

16             The same dynamic is true in connection with -- I

17   apologize -- the only Delaware case that counsel cited, where

18   the member paid one dollar for an LLC interest to enable it

19   to foreclose on its secured debt.  Franchise Services of

20   North America says both cases turn on the fact that the

21   blocking right was granted to a creditor who was primarily a

22   creditor.

23             No case says that a true shareholder, who is only a

24   shareholder, cannot negotiate as a condition to putting in

25   millions of dollars -- in this case, north of $37 million --

1    as a preferred equity to have a consent right.  This Court

2    would be making new law if you said an equity holder who is

3    not a creditor cannot exercise consent rights they negotiated

4    for in the underlying certificate.  It would be contrary to

5    Delaware law.  There is no federal case that holds that.  And

6    we respectfully submit, Your Honor, that's because there is

7    no public policy that prohibits the entity from vesting the

8    authority to make a decision whether or not to file in the

9    preferred shareholders, as opposed to in the board.

10            And we respectfully request that the Court do what

11   the Supreme Court said it must do, if it concludes the

12   petition was not authorized, which is to dismiss the case.

13            THE COURT:  All right.  Thank you.

14            Any final comments from anybody before I rule?

15            MR. CHENEY:  Your Honor, can I make two quick final

16   comments in response --

17            THE COURT:  Yes.

18            MR. CHENEY:  -- to Mr. Krause?  Thank you, Your

19   Honor.

20            First, Mr. Krause mentioned the allegations of

21   director conflicts.  The only allegations of conflicts here

22   relate to the details of the plan and have nothing to do with

23   the decision to file for bankruptcy.  Those are separate

24   issues.

25            And two, were the case -- were the motion to be

1    denied, that would not be contrary to any controlling

2    authority.  There is no case law saying that shareholders may

3    always exercise blocking rights and the exercise of these

4    kinds of blocking rights is always consistent with federal

5    public policy, and that the Court should disregard that out-

6    of-the-money shareholders are trying to hold a company

7    hostage in order to gain something in out-of-court

8    negotiations.  Thank you, Your Honor.

9          THE COURT:  All right.  Well, let me make my ruling

10    then.  I do recognize that there is no case directly on

11    point, holding that a blocking right by a shareholder who is

12    not a creditor is void as contrary to federal public policy

13    that favors the constitutional right to file bankruptcy.  But

14    I think that, based on the facts of this case, I am prepared

15    to be the first court to do so, and therefore conclude that

16    the motion to dismiss must be denied.

17          And I think it's important to talk about the

18    context of this case.  There is no contest that the debtor

19    needs a bankruptcy.  It was in financial straights even

20    before COVID-19 hit.  With COVID-19, its plants have been

21    closed and most of its employees have been furloughed.  Even

22    as states reopen, the resumption of operations will not

23    happen overnight, and they will require additional liquidity.

24    At the time the debtor filed -- debtors filed bankruptcy, it

25    had less than 150,000 in liquidity.

1            There is also no contest that, in the current

2     context, the bankruptcy case will benefit most stakeholders.

3     There is a prepack.  The lenders have agreed to the payment

4     of all other creditors in full, if the plan is confirmed.

5     The debtor and lenders contend that they can make a case for

6     cramming down the shareholders, who will be wiped out in that

7     plan.  I am not prepared to deal with any of that today, and

8     I don't think it is necessary.  But I think it is clear that

9     a lack of access to the Bankruptcy Code and the Bankruptcy

10    Courts would violate the federal public policy, again, to

11    allow a debtor to file bankruptcy.

12            The provision in the charter of one of the debtors

13    that bars the filing by that debtor and all its subsidiaries

14    I believe violates public policy and is void as it is

15    exercised by a minority shareholder.  Numerous courts have

16    held that all persons -- which, by definition, include

17    corporations -- have a constitutional right to avail

18    themselves of a right to file a bankruptcy, to negotiate with

19    their creditors and other stakeholders.  And the Courts have

20    held that any restriction of that constitutional right is

21    against federal public policy.

22            And I think Judge Walsh, in the TWA case, said it

23    best.  He noted that Bankruptcy Court are loathe to enforce

24    any waiver of rights granted under the Bankruptcy Code

25    because such a waiver violates public policy, and that it

1   purports to bind the debtor-in-possession to a course of

2   action without regard to the impact in the bankruptcy estate,

3   other parties with a legitimate interest in the process, or

4   the debtor-in-possession's fiduciary duty to the estate.

5          And Macquarie argues that the above cases that hold

6   that federal public policy precludes the blocking of the

7   filing of a bankruptcy are distinguishable because they

8   involved creditors who acquired an equity interest only to

9   block the bankruptcy filing, and therefore protect their

10  interests as creditors, not as equity.  And the Fifth

11  Circuit, in Franchise Services, did, in fact, say that, and

12  said that that was a distinguishing factor.

13         But I must respectfully decline to follow that

14  case.  I see no reason to conclude that a minority

15  shareholder has any more right to block a bankruptcy -- the

16  constitutional right to file a bankruptcy by a corporation

17  than a creditor does.  Federal public policy allows any

18  entity to file for bankruptcy, and it is the same regardless

19  of who is seeking to block that filing.

20         But I think that the Fifth Circuit and the Basho

21  case, particularly, inform my decision.  I do believe that,

22  under Delaware state law, contrary to the Fifth Circuit's

23  interpretation of that law, would and does find that a

24  blocking right, such as exercised in the circumstances of

25  this case, would create a fiduciary duty on the part of the

shareholder; a fiduciary duty that, with the debtor in the

zone of insolvency, is owed not only to other shareholders,

but to all creditors.

Basho particularly noted that the circumstances of

the case control.  And while the Basho felt, in that case,

that a blocking right alone was not enough to find such a

fiduciary duty, I think that, on the circumstances of this

case, the additional facts do support that such a blocking

right does create a fiduciary duty.  And those include,

again, the debtors are clearly in the zone of insolvency.

They do not have the liquidity, in the absence of the DIP

loan, to pay their debts as they come due.  And their

operations have been severely disrupted by the COVID

pandemic.

The proposed plan of reorganization, again, or any

other plan that could be negotiated in the bankruptcy case,

would offer a better prospect than leaving the company

outside of bankruptcy.  It is hard to contemplate an

alternative to the bankruptcy proceeding, and Macquarie has

not suggested any; any viable one, anyway.  There appears to

be no benefit to a dismissal of this case for any party,

other than perhaps Macquarie, and giving it negotiating

rights.

And I think that, whether or not the person or

entity blocking access to the Bankruptcy Courts is a creditor

1     or a shareholder, federal public policy does require that the

2     Court consider what is in the best interest of all, and does

3     consider whether the party seeking to block it has a

4     fiduciary duty that it appears it is not fulfilling by not

5     specifically -- and Macquarie has said clearly it is not

6     considering the rights of others in its decision to file the

7     motion to dismiss.

8             So, accordingly, I will deny the motion to dismiss.

9     I do not think that I am precluded from proceeding with the

10    case.  Consequently, I'll look for a form of order to be

11    presented by counsel.

12            And I think we have nothing else today then?

13        (No verbal response)

14            THE COURT:  All right.

15            UNIDENTIFIED:  Thank you, Your Honor.

16            THE COURT:  We'll stand adjourned.  And thank you

17    to the parties.

18            COUNSEL:  Thank you.  Thank you, Your Honor.  Thank

19    you, Your Honor.

20        (Proceedings concluded at 11:27 a.m.)

21                          *****

43

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6

7

8

9

10

11      _____        May 6, 2020

12      Coleen Rand, AAERT Cert. No. 341

13      Certified Court Transcriptionist

14      For Reliable