Hearing Date: **Thursday, February 10, 2022 @ 10:00 a.m. (ET)**

**MAYER BROWN LLP**
Douglas Spelfogel
Leah Eisenberg
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

*Special Counsel to 286 Rider Ave Development LLC*

**OFFIT KURMAN, P.A.**
Jason A. Nagi
590 Madison Avenue, 6th Floor
New York, NY 10022
Telephone: (212) 545-1900

and

Joyce A. Kuhns, Esq. (Admitted *Pro Hac Vice*)
300 East Lombard Street, Suite 2010
Baltimore, Maryland 21202
Telephone: (410) 209-6463

*Attorneys for 286 Rider Ave Development LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | **Chapter 11** |
| **286 Rider Ave Acquisition LLC,** | **Case No. 21-11298 -(LGB)** |
| **Debtor.** | |

## OMNIBUS RESPONSE BY DEVELOPMENT IN FURTHER SUPPORT OF MOTION TO CONFIRM DISPUTED PAYOFF AMOUNTS, SATISFACTION OF DIP LOAN, AND FOR RELATED RELIEF

286 Rider Ave Development LLC ("Development"), by and through its undersigned counsel Mayer Brown LLP and Offit Kurman, P.A., hereby submits this omnibus response (the "Response") to objections filed by 286 Rider Ave Acquisition LLC (the "Debtor"), Be-Aviv 286 Rider LLC ("Lender"), Rosewood Realty Group ("Rosewood"), and the U.S. Trustee ("U.S. Trustee") and in further support of its *Motion Confirming Disputed Payoff Amounts, Satisfaction*

746161696

*of DIP Loan, and for Related Relief* [ECF No. 218] (the "<u>Motion</u>"),[1] pursuant to Sections 105(a), 364, 502, 503, and 506 of the Bankruptcy Code, and in support thereof states as follows:

<b><u>Omnibus Response</u></b>

1.      Despite what should be a straight forward process to provide for submission of back-up for the outstanding fees and expenses asserted in the case, after all creditors have been paid, the court appointed Debtor's counsel and Lender submit over 40 pages of briefing, plus a new "plan" in what can only be termed a blatant attempt to keep churning out fees that they will then demand Development pays unabated, without regard for reason (let along reasonableness), back-up, support, or Court review.  Similarly, Rosewood submits a baseless and procedurally defective request for payment of fees that were neither earned nor due.  The U.S. Trustee raises certain technical issues, which can readily be addressed (are contradicted by the record), as discussed below, or should be overruled.

2.      In the way of brief background, here Development paid approximately $12 million to the Lender, which satisfied the full amounts asserted due under the pre-petition loan agreement ("<u>Pre-Petition Loan</u>") and the DIP financing (the "<u>DIP Loan</u>") as demanded in its Payoff Notice [Dkt. No. 171].  Lender has nonetheless claimed to retain its liens, while accepting the cash redemption, and still seeks to run up legal charges for services that are at best unreasonable fees spent only for one purpose - to collect fees.  The court appointed Debtor's counsel, not to be outdone, drafted a now second amended plan, after the Debtor received stipulations from all general creditors advising that they want the case dismissed -- and that they have agreements in place for payment outside of the bankruptcy case.  None of this legal work serves any purpose

---

[1]   Capitalized terms used by not defined herein have the meanings given in the Motion.  Development reserves the right to update or correct any numbers listed herein, based upon further review of the information available.

2

other than creating needless legal bills, and inflating legal costs, and cannot meet the standards for payment under the Bankruptcy Code.

3.        Each of the court appointed Debtor's counsel and Lender attempt to assert that what is basic relief is not permitted and should be denied.  However, as provided below, the relief sought, is the relief as suggested by the Court, and simply seeks to address four points as expressly discussed and provided for at the hearing ("January Hearing") on January 12, 2022.  Specifically, the Supplemental Motion seeks to address (i) Payoff and satisfaction of the DIP Loan, including obtaining an accounting for amounts advanced and backup for fees and expenses charged (including a breakdown of such charges between the DIP Loan and Pre-Petition Loan); (ii) obtaining an accounting for any fees and expenses charged (as well as asserted) due by the Lender and backup with respect to the Pre-Petition Loan from inception of the bankruptcy case; (iii) confirmation of execution of stipulations resolving claims with the general unsecured creditors and payment of real estate taxes: (iv) proviso for submission of final fee applications by Debtor's professional, including a process for notice and objection to such.  Such relief is not novelle or complex.  In addition, the Court requested that the Supplement address the exit from bankruptcy, as well as the establishing of an escrow to pay any allowed fees.  Development addresses each of the foregoing in turn.

4.        As an initial matter, below are cites to the transcript from the January Hearing, which discuss each of these items as follows:

> With respect to the DIP Loan, the Court provided in relevant part as follows:
>
> I realize that 364 is Debtor's finance. But I think, honestly, that with respect to claims, any -- you know, under section 502, any party at interest can, you know, seek, you know, determinations of claim, you know, by filing objection.

> So, I would think that, right now, what's reasonable, is to ask the Lender to supplement, and ask -- sorry, to ask Development to supplement their motion and for seek the Court's determination under 364 and 105, as to whether the DIP has been terminated, has been paid in full, to ask the Lender to provide an accounting of the amount that's been paid. And then ask the Lender, to the extent there's anything that is owed that hasn't been determined, such as if there's legal fees in connection with the DIP, to provide evidence of that. That seems like part of the supplement; that that would be permissible under the Code, between 364, 105 and my prior order, with respect to the payment.

Transcript, January Hearing, pp 74 -75.

5.    With respect to the Lender's pre-petition claim, the Court noted in relevant part as follows:

> . . . my description, not anybody else's description but mine -- is that the Development gave the Lender payments, you know, as a gift. It's not coming from the estate; it's coming from their own fund. And that money is now at the Lender. So, the Lender now has the cash, and the Lender now has a lien on the property. And so, I'm trying to figure out now, you know, because I don't think the risk to the estate, what's left of the estate, whatever's left of the lender's claims, I'm just putting it that way, that more or less than what, you know, than what is actually, you know, has been paid, if there's anything.

Transcript, January Hearing, p. 73

. . .

> With respect to the payment of the Lender itself, it's not clear to me if what the, if there's a request for me to determine the allowed amount of a secured claim against the estate, under 506. I certainly can do that if that's what people are asking me to do. And if they're not asking me to do that, because their perspective is that amounts have already been paid and that's all done and determined, based on the pay-off notes, that's also okay with me. ask me to that that note that.  But I think, to the extent somebody is seeking to determine the allowed amount of the secured claim, can also be asked of me under Section 506.

Transcript, January Hearing, p. 75.

4

6.      With respect to creditor stipulations, while the court appointed Debtor's counsel suggests that there is some improper conduct in Development reaching out to the creditors to memorialize agreements to be paid outside of bankruptcy, this is exactly what was discussed and required.  Specifically, at the January Hearing, the Court provided in relevant part as follows:

> If there was written agreements that were filed with the Court, so we actually know what the treatment, proposed treatment are for the other claim, or some kinds of stipulations that were filed with the Court with respect to the other claims, then I think we'd all know that the other parties had agreed to be paid out over time and that that was satisfied for those claims.
>
> I haven't seen anything in writing. I am completely taking everyone's word that that's going to -- been resolved. But I think that those would have to be filed with the Court as part of any (indiscernible).

Transcript, January Hearing, p. 78.

7.      Finally, with respect to the exit from bankruptcy, the Court also noted at the January Hearing as follows:

> . . . I think that the -- it would be helpful if the motion, at least even if the purpose of that motion is not the exit, if there's been some discussion about the exit. . . .

Transcript, January Hearing, p. 78.

8.      Accordingly, the instant relief seeks exactly what was discussed and required, whereby the court appointed Debtor's counsel and Lender would submit an accounting and support for amounts advanced under the DIP Loan, as well as support for the fees and expenses charged and asserted due under the DIP Loan and Pre-Petition Loan; submission of executed stipulations from creditors confirming agreement for payment outside of the bankruptcy case; and proviso for setting up an escrow, as discussed below, and the exit from bankruptcy with what will be a fully administered estate, with no remaining claims.

9.      However, to date, the court appointed Debtor's counsel, nor Lender have provided sufficient documentation to support any accounting and/or claims asserted despite millions of dollars paid to pay off not only the underlying principal and interest, but exorbitant and unreasonable legal fees and inflated costs.  The court appointed Debtor's counsel has not filed any final fee application as of yet, and has submitted only heavily redacted time sheets which are not discernable in their present form.  The Lender has provided nothing in the way of back up (suggesting that it will provide back-up when their system can generate such and only as to unpaid amounts).  This is particularly concerning, given that Development tendered the full amount asserted in the Payoff Notice, which included approximately $1,500,000.00 for legal fees, to Lender, including $100,000 in estimated fees through the payoff, and an additional $750,000.00 to payoff the DIP Loan (used almost exclusively to cover fees and expenses for the court appointed Debtor's professionals, resulting in payment of well over $2,000,000.00 in fees).  As discussed below, the Lender is not entitled to churn unreasonable fees after the payoff date, ostensibly whereby it seeks fees for payment of fees, and irrespective, is required to provide support for all amounts asserted.

10.     Mr. Buchwald has also provided so-called statements which simply list total hours without any details supporting the time expended, which call into question the reasonableness of such undocumented fees, in particular, in a case with no ongoing operations.  Nor do the statements submitted appear to be the statements that Development understands were contemporaneously generated and provided to the Lender during the case.  Irrespective, such support for any fees is required as a matter of fundamental due process.

11.     The court appointed Debtor's counsel spends the balance of its objection arguing that its latest "amended plan" should be approved, and that Development somehow has interfered

6

with approval of such.  As an initial matter, the proposal of a plan for the benefit of professionals,
at the expense of Debtor and its general creditors, is *not* what is contemplated by the Bankruptcy
Code.  Here all creditors have been satisfied or have agreed to payment outside of the bankruptcy
case.  The Lender has been paid nearly $12 million, leaving at best a relatively small disputed
claim for professional fees.  All unsecured claims have been paid or such creditors have agreed to
payment outside of the bankruptcy case, and have requested that the case be dismissed.[2]

12.    Moreover, the court appointed Debtor's counsel contention that the creditors should
be required to proceed with a plan where they have affirmatively requested dismissal, goes against
the interests of the Debtor, is disingenuous, and an improper  mean for Lenders and the court
appointed Debtor's attorney's to generate additional legal fees, and run up costs.  Further, as noted
above, the court appointed Debtor's attorney's contention that Development's reach out to the
creditors to obtain stipulations confirming their agreement as such, was somehow an improper
interference with the case, is specious at best.  The Court expressly required Development to reach
out to the creditors to obtain the stipulations to attach to the Supplement, which was done, with
the stipulations timely filed.  With respect to the court appointed Debtor's attorney latest claim
that Development's counsel's providing the ballots directly to Mr. Ringel somehow disqualifies
the ballots is nonsensical.  As an initial matter, a request to "designate" ballots as part of an
objection to Development's Supplement, without motion served upon the respective creditors is
improper and violates any notion of fundamental due process. A creditor's ability to vote on a
reorganization plan is considered to be one of the most sacred entitlements it has in a chapter 11
case and it should not be denied except for highly egregious conduct.  *See In re Adelphia*

---

[2]    According to Mr. Ringel, a new real estate tax bill was recently issued in the amount of approximately $31,000.
While such taxes are not yet due, Development submits that such amounts will be paid prior to dismissal of the
case subject to approval of the instant relief.

*Communications Corp.*, 359 B.R. 54, 56-57 (Bankr. S.D.N.Y. 2006). Further, the submissions provided were done to assist in facilitating the prompt return of the ballots.[3]  The stipulating creditors have affirmatively asked for dismissal of the case.   Mr. Lederman has appeared throughout the proceedings and is intricately involved in the case.  He has repeatedly advised that his client has worked out agreement for payment outside of the case, and that they do not want the case to proceed through a plan process.  The rejecting of the plan is simply in furtherance of such, and the rights of the creditors. Further, the court appointed Debtor's counsel has acknowledged that the solicited plan cannot proceed, and has now submitted a new -- equally flawed -- plan, which has not been approved for solicitation.[4]  All of this legal work performed by the court appointed Debtor's attorney is against the interests of the Debtor and against the interest of all the creditors, should not be paid for by the Debtor or by Development  and is not supportable  under the Bankruptcy Code.

13.    In addition, while not before the Court, a preliminary review of such plan reveals that it includes broad releases and exculpations for Lender that are contrary to long-established Second Circuit law,[5] and other objectionable provisions that purport to adjudicate rights as

---

[3]   Offit Kurman P.A. did not have any contact with the creditors other than receiving and forwarding the ballots to Mr. Ringel as an accommodation.

[4]   Although the concept of "bad faith" is not described in the Bankruptcy Code, it has been laid out through the applicable case law. Specifically, the Southern District of New York has set out the definition of "bad faith" in the case, *In re Adelphia Communications Corp.*, in which the Court states: "Courts have designated votes as having been case in bad faith  in the following instances: 1) if the claimant is using obstructive tactics and hold-up techniques to extract better treatment for its claim compared to the treatment afforded similarly situated creditors; or 2) if the holder of the claim casts its vote for the ulterior purpose of securing some advantage to which it would not otherwise be entitled; or 3) *when the motivation behind its vote is not consistent with a creditor's protection of its own self-interest*".  *See Adelphia* 359 B.R. 54 at 60 (emphasis added). As the court specifically reserves designation for instances in which a creditor is not furthering its own self-interest, it follows that designation is inappropriate in circumstances, such as here, when creditors *are* acting to further their own interests. Moreover, the law upholds a creditors' right to maximize their individual recoveries in their self-interests as creditors. *See Id*. at 64.

[5]   *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 and 143 (2d Cir 2005) ("While none of our cases explains when a nondebtor release is important to a debtor's plan, it is clear that such a release is proper only in

between non-debtors, i.e., Lender and Development with respect to the redemption of the non-debtor equity. This new plan submitted by the court appointed Debtor's counsel is to the detriment of the Debtor, and only to the benefit of the Lender (seeking impermissible broad exculpation and releases), and as such violates the Debtor's duties and is to the detriment of the Debtor and the creditors.

14. Further, despite Mr. Ringel's characterization of the meeting with the U.S. Trustee, at such time, the parties discussed different options for an exit from Chapter 11. Therein, the U.S. Trustee raised certain questions regarding a dismissal, including that no releases be provided to anyone; that stipulating creditors' agree to waive or withdraw their claims upon dismissal so that it is clear that there are no remaining claims; and that the final fees be determined and paid prior to dismissal.

15. The foregoing is not inconstant with the relief requested. With respect to dismissal, the Supplement contemplates that dismissal will not occur until the final fee applications have been approved, and would be effectuated contemporaneously with payment of such. In other words, after all claims have been resolved by virtue of the stipulations, and open administrative fees paid, where there is nothing left to administer, the case would be dismissed. Development requires that as a condition to final payment of whatever claims are ultimately determined, that the case be dismissed. However, this would not occur until the final determinations on open fees, which is addressed in the further amended order attached.

---

rare cases"… "No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique."); *In re Stearns Holdings, LLC*, 607 B.R. 781, 787-88 (Bankr. S.D.N.Y. 2019).

16.    Regarding appeals, as provided in the Supplement, Development is agreeable to a short adjournment of any deadlines for the one pending appeal, pending resolution of the instant motion, provided parties are proceeding in good faith and the instant relief is granted.[6]

17.    With respect to the state court litigation, also as provided in the Supplement, the Florida Action was dismissed previously, and Development has provided stipulations to the Lender to dismiss the stayed New York action.  While the Lender has not signed off on such (or rejects such), the foregoing action is stayed, and Development will seek withdrawal upon dismissal of the case, without prejudice to all parties rights.  As to the contention that releases or with prejudice orders must be entered, this is rejected, and this once again shows court appointed Debtor's counsel clearly arguing against the interests of the Debtor.  The determination of open administrative fees herein, simply requires a determination of whether amounts billed are supportable, reasonable, and necessary, and for payment of such.

**Lender Response:**

18.    The Lender in turn asserts that the Court has no power to review its fees for reasonableness, that Development somehow waived its rights to seek accounting, and now further inflates its fees to collect fees to a whopping $250,000, plus new estimated fees of another $100,000.00. The bulk of the fees asserted offend any notion of reasonableness and are all from after the payoff.  Further, the Lender fails to provide credit for the overpayment made in the amount of $100,000.00, nor provide any breakdown for fees charged to the tune of approximately $1,500,000.00 (not to mention the action new amounts asserts).  In addition, the Lender continues to improperly expand services to tangential and irrelevant matters that have nothing to do with

---

[6]    Development expressly reserves the rights to proceed with the dismissal of the case pursuant to the remanded appeal.

collection of the relatively small amount of disputed fees (assuming such was reimbursable), including assisting in drafting a new amended plan, that includes broad exculpation and releases *to benefit the Lender* -- that are impermissible under Second Circuit law.  All of this comes under the backdrop, that Lender has been paid approximately $1,500,000.00 for fees and expenses without providing any evidence of charges, or support for the excessive amounts asserted.

19.    As an initial matter, Lender says it is confused as to the relief sought.  For clarity, as discussed above, Development is simply seeking to confirm that the DIP has been paid off, obtain an accounting to confirm the amounts advanced thereunder, for the use of such funds, and back-up for any fees asserted due under the DIP Loan and the Pre-Petition Loan, with a breakdown and back up detailing whether any such funds are asserted under the DIP Loan or the Pre-Petition Debt, and amounts and support for such, to confirm payment is proper and reasonable.[7]  As discussed above, although the Court previously indicated that Development was entitled to a detailed accounting and told Lender to provide such accounting, it has failed to do so.

20.    Lender asserts that Development is barred from seeking such relief, citing to an inapplicable doctrine, the so-called voluntary payment doctrine, to somehow trump the bankruptcy court's authority to review fees.  However, as discussed below, the voluntary payment doctrine is inapplicable and cannot override the Court's inherent power under Bankruptcy Code to review and determine claim amount under Section 364, 502, and 506.

21.    Courts have made clear that the voluntary payment doctrine, if relevant at all, doesn't apply where the payment is made when the counter party is under compulsion or duress, such as through a pending auction sale, nor where the counter party has reserved rights to challenge

---

[7]    Development reserves all rights to seek all remedies for a full accounting of amounts provided for pursuant to the Payoff Notice, which rights are expressly reserved.

11

the payoff as here. Specifically, the voluntary payment doctrine is inapplicable when a party makes payment under economic duress or compulsion; *e.g.* when a party must make payment or for the loss of possession of its property. *Rocky Knoll Estates MHC, LLC v. C W Cap. Asset Mgmt., LLC*, No. 14-CV-06097 2015 WL 1632637, at *2 (W.D.N.Y. Apr. 13, 2015); *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-2310 2010 WL 4628548, at *3 (D. Minn. Nov. 4, 2010) (same); *see also U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Nos. 12 Civ. 6811(CM)(JCF), 13 Civ. 1580(CM)(JCF) 2014 WL2199428, at *10 (S.D.N.Y. May 23, 2014) (voluntary payment doctrine does not apply "where payments were necessary 'in order to preserve [the plaintiff's] property or protect his business interests'" quoting *Steinman v. Malamed*, 111 Cal.Rptr.3d 304, 309 (Cal. Ct. App. 2010)).

22.    Moreover, courts have also made clear that the voluntary payment doctrine is inapplicable where the payment has been protested. To protest payment – party must do so in writing at the time of payment, exactly what Development did here. *Neuner v. Newburgh City Sch. Dist.*, 92 A.D. 888 (N.Y. App. Div. 1983). Written notice must indicate that the plaintiff was reserving his rights when the payment was made and must communicate such to the party receiving the payment. *DRMAK Realty LLC v. Progressive Credit Union*, 133 A.D. 3d 401, 405 (N.Y. App. Div. 2015).

23.    Here, Development not only continually protested in its fillings the amounts asserted by Lender, Development has also expressly reserved all rights as part of the Payoff Letter [Dkt. No. 257]. The Payoff Letter provided in relevant part: "[t]his letter and the payoff wire sent do not constitute a waiver of any claims or rights which are reserved." *See* Payoff Letter. Accordingly, the Lender's claims that the bankruptcy court does not have jurisdiction to review the reasonableness of the fees here, that it cannot require a review and accounting of the fees and

expenses, or that Development somehow waived such rights as part of the payoff is specious and contradicted by the facts and law.

24.    Lender also asserts that the DIP Order somehow constitutes a waiver of the requirement to account for fees and expenses charged.  This argument too is inapposite.  Here, while the DIP Order, entered on November 23, 2021, provides an acknowledgment of the pre-petition indebtedness, with respect to attorney's fees, the DIP Order expressly provides that such obligations (which are not delineated) cover only "reasonable and documented attorney's fees". *See DIP Order F(i).*  The DIP Order is silent with respect to the amount of any such fees.  Further, with respect to any ongoing fees in connection with the DIP Loan, the Lender's expenses are expressly limited to "reasonable costs, charges, and expenses" incurred by Lender.  *See DIP Order, 10(n).*The fact that the DIP Order contained a provision for monthly payments, is irrelevant and does not override the requirement that only reasonable fees be reimbursable and the Court's inherent powers to review fees for reasonableness.  In this regard, Lender's position that it does not have to account for amounts advanced, nor support any fees charges directly contradicts the Court's direction at the January Hearing.

25.    Moreover, courts have made clear, that the bankruptcy court has an independent power to limit fees to a reasonable amount.  While Lender attempts to distinguish *Baker Botts* by arguing that that case involved an estate professional, the rationale is equally applicable here -- Lender is not entitled to attorney's fees as a matter of fundamental bankruptcy law -- and under the terms of the DIP Order which expressly limit fees to *"reasonable"* fees.  *See also*, *In re Ward*, 190 B.R. 242, 246 (Bankr. D. Md. 1995 ("[t]he court enjoys broad discretion in determining whether the proposed fees and costs are 'reasonable'").  Here, Development simply seeks to confirm what funds were advanced, and charges for fees asserted, and upon what basis, whether

under the Pre-Petition Debt or the DIP Loan (including the back-up support for such), in particular, in light of the additional undocumented charges asserted since the Payoff amount, and the Lender's propensity to spend funds without regard for reason, and just as a means to shake down the Debtor.[8]

26.    With respect to the allowability of any of the Lender's fees, such should await the Lender providing documentation substantiating the claims asserted, whereupon Development expressly reserves all rights to challenge the reasonableness of such fees, including, but not limited to that the Lender was overpaid in full, that the Lender was overpaid with respect to excessive fees and expenses asserted, with monies due back to Development, and that the Lender is not entitled to further fees to collect fees for payment of fees and/or post payoff.[9]

**Escrow:**

27.    Regarding the escrow, while Development is prepared to escrow funds to cover payment of legitimate amounts to the Debtor as provided for herein, and has submitted an

---

[8]    As to the pre-petition claim, while the Debtor acknowledged the pre-petition claim of the Lender under the DIP, the DIP Order did not provide any determination with respect to the amount of fees asserted nor a waiver with respect to Lender's legal fees, nor provide a right for it to charge unreasonable fees and not to document such. With respect to any fees in connecting with the DIP Loan, the provisions for payment of fees under the DIP similarly does not constitute a waiver of the court's authority to require an accounting for amounts advanced, as well as the use of such loans, nor in determining the reasonable of any fees charged. Rather, the DIP order simply permitted the payment of fees if no objection is raised.

[9]    Nor are fees compensable under the Loan Documents. Here, the Mortgage provides that Mortgagor will pay Debt defined as "principal with interest thereon…, according to … the Note." First Witnesseth paragraph in Mortgage. Section 1.17 of Mortgage, which Lender cites, is limited to expenses relating to administration of the Mortgage [ administration is not what we have here] and the other Loan Documents. Further, Loan Documents are defined at Section 4.1.1(h) of the Mortgage as " this Mortgage or the Note … or any other agreement or instrument executed by the Mortgagor which secures the indebtedness as evidenced by the Note." Accordingly, the only relevant provision would be what Debt is required to be paid under the Note. *See* Dkt. No. 24, Exhibits C and E for copies of the Note and Mortgage.

However, the Note does not define Debt. The section Lender relies on to keep accruing fees is "Attorneys" Fees; Expenses" which provides only for fees "Upon the occurrence of an Event of Default," which would require that Debt continue to exist on which fees could accrue. As noted, there was no Debt once tender was made by Development on which fees could accrue. While Lender apparently bases its entitlement to fees by referring to "obligations" that continue to exist under the Note, in fact, the Note does not use the term "obligations" to include accruing fees.

application to set up an account at PNC Bank, as discussed in the Supplement, the amounts sought are excessive, appear to be a moving target, and include improper and undocumented claims. Moreover, given the foregoing and the staggering amounts paid to date, which have not been reviewed or approved through any Court process, Development submits that the amount of any escrow be limited as proposed in the Supplement pending submission of detailed back-up and support for the charges asserted and any estimated amounts going forward.  Moreover, as to the Lender, the Lender, has improperly claimed to retain its lien on the subject property, and been paid nearly $12 million.  Accordingly, no further escrow as to the Lender is reasonable or appropriate.[10]

28.    Specifically, while Development challenges the excessive, unreasonable, amounts of fees asserted, through an opaque process, with no supporting documentation provided by Lender, and the court appointed Debtor's counsel only providing heavily redacted and/or deficient invoices, it is establishing the initial escrow at PNC Bank, as provided in the Supplemental, to cover allowed fees and expenses, if any, and the U.S. Trustee fees, in the amount of $118,000.00, which together with the remaining funds advanced under the DIP Loan and held for professional fees (app. $80,000.00), aggregate total funds of approximately $200,000.00.[11]  Development will escrow such amounts with PNC Bank, subject to payment in accordance with the Supplemental Motion and herein.[12]  In this regard, any payment to be made from the escrow shall be subject to

---

[10]    Development reserves all rights with respect to the foregoing.  In addition, regarding the  amounts of fees asserted, the court appointed Debtor's counsel has increased his fee number by approximately $35,000 since the days since last estimate.  Not only is such excessive, but they fail to reduce estimated fees to conclude the case.  At the same time, the court appointed Debtor's counsel continues to expend unnecessary and unreasonable amounts for fees, with no benefit to the Debtor.  Further, Lender's claim fails to credit the $100,000 overpayment made as part of the Payoff, and improperly adds another $100,000 in additional unsubstantiated estimated future costs -- in other words, the lender is estimating charging hundreds of thousands of dollars to collect fees of a fraction of such.

[11]    The total new disputed amounts asserted by the Debtor is approximately $294,000.00; i.e., $404,000.00 less $110,000.00 in estimated fees, excluding unreasonable and unsubstantiated future time.

[12]    Development has submitted an application to establish the escrow at PNC Bank, an approved depository.  While Development is working to finalize and fund the escrow, because of KYC requirements, the final establishment of

final Court determination regarding the amounts due with respect to the foregoing asserted claims, and Development (and any parties right to object), entry of an order substantially in the form provided, and the contemporaneous dismissal of the case. For clarity, the dismissal shall not occur prior to the payment, but contemporaneously with and subject to confirmation of such payment.

**Response to U.S. Trustee Objection:**

29.    The U.S. Trustee continues to assert the Pay-Off Motion is an impermissible structured dismissal which this Court should deny as it did Development's prior Exit Refinancing Motion [Dkt. No. 171]. It ignores the Court's own acknowledgment at the February 1, 2022 Status Conference that the Pay-Off Motion is significantly different from the prior Motion in the following respects:

1. Development is not seeking any refinancing of existing debt or to place liens on Debtor's assets but rather has paid all or substantially all of the debt owed Lender through a wire transfer of $11,918,974.12;

2. All creditors other than Lender have either been paid in full (i.e., the New York taxing authority[13]) or have entered into settlements with Development to be paid outside the Bankruptcy Case, conditioned on dismissal of the Bankruptcy Case;

3. The remaining judgment lien creditor and general unsecured creditors have submitted ballots "rejecting" the Debtor's Amended Plan of Reorganization (the "Debtor Plan");

---

the escrow may require an additional waiting period for final clearance. Development has or will fund the escrow as soon as such is available to receive funds.

[13]    As noted above, according to Debtor's counsel, a new real estate tax bill was recently issued. Subject to approval of the instant relief, Development will pay such prior to dismissal.

4.    Lender's claim does not appear to be "impaired" within the meaning of the Bankruptcy Code and therefore the Debtor's Plan will not be confirmable under Section 1129 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(10).

Transcript of February 1, 2022 Status Conference at p.8:3-p.10:13

30.    Development, furthermore, notes that in its Supplement and related proposed Order it clarified that the Bankruptcy Case will not be dismissed until all allowed administrative claims have been satisfied and any remaining assets will be deemed to fully revested in the Debtor, subject to orders entered in this case remaining in effect in accordance with a final dismissal order to be sent on separate notice.  Thus, contrary to the U.S. Trustee's contention, Development does not seek a dismissal with any provisions courts have found prohibitive, *e.g.*, distributions that violate the absolute priority rule,  non-debtor releases, retention of jurisdiction, post-dismissal, to resolve pending matters.  *See generally In re KG Winddown LLC, et al*., 628 B.R. 739 (Bankr. S.D.N.Y. 2021).   As in *KG Winddown*, Development's request for dismissal fits squarely within the parameters permitted by the Supreme Court in *Czyzewski v. Jevic Holding Corp., (In re Jevic Holding Corp*.), 137 S.Ct. 973 (2017) (leaving open the door for dismissals that do not violate the absolute priority rule or other specific provisions of the Bankruptcy Code).

31.    Here, consistent with *Jevic*, the traditional plan process is not violated, viable, or necessary.  As noted,  based upon the foregoing, there will be no creditors, nor anything to administer, and all general creditors will have affirmatively and repeatedly requested dismissal of the case.  In addition, Debtor's Plan is unconfirmable under Section 1129 of the Bankruptcy Code, as the Lender's claim is unimpaired and the claims of all other creditors have been paid or will be satisfied in full pursuant to the stipulations entered into with Development.  A disclosure statement is unnecessary to protect the rights of creditors who have either actively participated throughout

the case and made clear their unequivocal choice for dismissal of this case as soon as practicable: first, by joining in Development's Motion to Dismiss [Dkt. No. 38]; then, by entering into settlement stipulations with Development providing for satisfaction of their claims in full outside of the Bankruptcy Case; and, finally, through casting ballots rejecting Debtor's Plan.

32.     While the U.S. Trustee's role may be to oversee the integrity of the bankruptcy process to ensure fair treatment to creditors, these creditors have already spoken about their preferred treatment and do not need to be protected from an exit that provides prompt and full satisfaction of their claims at the time and manner they have selected here.  As such the U.S. Trustee's Objection is inappropriate in this case, where it goes against the stated preferred treatment of creditors.

**Objection of Rosewood:**

33.     Rosewood, as Broker, has articulated no basis for an administrative expense claim in this Bankruptcy Case, let alone, a basis to escrow $472,500.00 on account of a sale that it admits will never occur.  Response of Rosewood at ¶ 19 [Dkt. No. 282].  Nonetheless, it argues spuriously and contrary to the express terms of the Retention Agreement and the Bankruptcy Code that is has an administrative breach of contract claim under its Retention Agreement or substantive contribution claim under Section 503(b)(3)(D) of the Bankruptcy Code that must be escrowed.

34.     There can be no breach of contract claim by Development because Development is not a party to the Retention Agreement.  The sole party authorized to enter into the Retention Agreement by this Court was the nominal Debtor, Acquisition.  *See* Order Authorizing Retention of Real Estate Broker and for Related Relief [Dkt. No. 163].  Furthermore, any delay in either approving a Stalking Horse Bidder or conducting the Auction was a direct result of entry of this Court's Scheduling Order [Dkt. No. 259].  There is no legal basis and, in fact, it is highly inappropriate for a Broker to suggest that a court order such as the Scheduling Order impairs a

contract whose very interpretation and enforcement hinges on this Court's Retention Order. Therefore, neither Debtor nor Development could as a matter of law have dealt unfairly with or prevented Rosewood from receiving the benefits of the Retention Agreement as Rosewood contends violates section 14 of the Retention Agreement since any delays in the sale process are a result of this Court's own Scheduling Order.

35.    Furthermore, Rosewood blatantly ignores that its entitlement to a commission of 4.5% of the gross purchase price of the Property is contingent on a closing[14] (which requires Court approvals through a plan which has now been rejected) and is to "be **paid directly to Rosewood at closing** without further Order of the Court, **by the successful purchaser, separate from and in addition to the consideration** (for gross purchase price) **that successful purchaser pays for the Property** under paragraph 2 of the Retention Agreement." (emphasis added).  As no closing has occurred and will not occur, Broker's request for a speculative, unearned commission is specious and such commission cannot be subject to an escrow.

36.    Broker makes the further attenuated argument that because Development seeks to revest control over Acquisition upon dismissal that it has earned a "change of control" commission. A plain reading of the relevant provision of the Retention Agreement demonstrates otherwise. Paragraph 2.b. expressly states:

> "If a sale, exchange or other conveyance of the Property or **ownership or control of the Property** is made or takes place **within the 'Additional Period'** after expiration of the Term **to its Prospective Purchaser** with whom Debtor had not reached an Agreement during the Term but **with whom Rosewood has negotiated** concerning the Property, or **to whose attention the Property has been brought by Rosewood**, **or who was**

---

[14]    Rosewood's retention is predicated on Section 328 of the Bankruptcy Code, "Limitation on compensation of professional persons," which allows for employment of professional persons under Section 327 on a contingent fee basis as here. Therefore, Rosewood's entitlement to a commission is strictly limited to the contingency in its Retention Agreement that a closing must occur for a commission to be earned and payable.

> **introduced to Debtor by Rosewood during the Term,** or to a
> credit bidder.  For these proposes, a "Prospective Purchaser" shall
> include partnerships, joint ventures, limited liability companies,
> corporations, trusts or other similar entities which the prospective
> buyer represents, is involved with, or in which it holds an ownership,
> management or beneficial interest."

(emphasis added).

37.    This provision is a classic tail, and not a change of control provision.  It permits a commission to be earned for an additional period after expiration of the term solely if a change of control is made or takes place of the Property to a "Prospective Purchaser" whom Rosewood negotiated with or who was introduced to the Property by Rosewood or introduced to the Debtor by Rosewood with respect to the Property.  None of these circumstances are remotely applicable here.  Under the Amended Statement of Financial Affairs, Development is listed as 100% equity holder of Acquisition on the Petition Date, post-Petition and indisputably will be 100% equity holder, post-dismissal.  *See* Dkt. No. 116, Part 13 Nos. 28 and 29.  In no stretch of the imagination could Development be deemed to have been introduced to the Property at any time by Rosewood or by Debtor to Rosewood or deemed a "Prospective Purchaser" of the Property, post-dismissal. Section 2.b. of the Retention Agreement is simply inapplicable.

38.    Lastly, Broker makes the extraordinary argument that its efforts caused Development to post the Pay-Off Amount to Lender and, therefore, it provided a "palpable" benefit to the estate worthy of a Section 503(b)(3)(D) "substantial contribution" claim of almost $500,000[15].  This contention is wholly unsupported by the facts and law.  The record is replete with Development's persistent attempts to obtain a Pay-Off letter or Pay-Off Amount from Lender

---

[15]    To the contrary, Rosewood prematurely marketed the Property through an email blast to thousands in August 2021 (without obtaining Bankruptcy Court approval) and again in December 2021 (without advising the public that any sale was subject to Bankruptcy Court approval) thus, creating confusion in the marketplace that unduly delayed Development in obtaining exit funding. *See* Development's Objection to Bid Procedures Motion at Dkt. No. 190-3.

which was ignored until Lender filed its Pay-Off Statement with the Court on January 4, 2022 [Dkt

No. 236].  Furthermore, Broker does not qualify to pursue a Section 503(b)(3)(D) claim.  Section

503(b)(3)(D) covers –

> "(3).  the actual, necessary expenses … incurred by –
>
> (D) **a creditor**, an indenture trustee, an equity security holder, or a
> committee … in making a substantial contribution in a case under
> chapter … 11 of this title; …"

11 U.S.C. § 503(b)(3)(D) (emphasis added).

39.    Arguably, Broker could only be a "creditor" under Section 503(b)(3)(D).  However,

Section 101(10) of the Bankruptcy Code limits the term "creditor" to entities that hold claims

against the debtor or the estate that arose or are deemed to have arisen prior to the order for relief.

Such is not the case here.

40.    Even if Rosewood qualified to seek a "substantial contribution" claim the fact that

it has merely performed its contract to date fails to satisfy the stringent prerequisite limiting such

compensation to "extraordinary creditor actions which lead directly to tangible benefits to the

creditors, debtor or estate." *In re Bayou Grp., LLC*, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010)

(citations omitted); *See also In re Best Prods. Co*., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994)

(holding efforts undertaken by creditors solely to further their own self-interest are not

compensable as administrative expense based on substantial benefit to the bankruptcy estate).

WHEREFORE Development respectfully requests that the Court overrule the Objections,

grant the relief requested in the Motion and this Supplement, and such other and further relief as

it deems just and proper.

Dated:  February 8, 2022
          New York, New York

Respectfully submitted,

By:  ___/s/ Douglas Spelfogel_____

Douglas Spelfogel
Leah Eisenberg
Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910
Email: dspelfogel@mayerbrown.com
         leisenberg@mayerbrown.com

*Special Counsel to 286 Rider Ave
Development LLC*

**OFFIT KURMAN, P.A.**

Jason A. Nagi
590 Madison Avenue, 6th Floor
New York, NY 10022
Telephone: (212) 545-1900
Email: jason.nagi@offitkurman.com

and

Joyce A. Kuhns, Esq. (Admitted *Pro Hac
Vice*)
300 East Lombard Street, Suite 2010
Baltimore, Maryland 21202
Telephone: (410) 209-6463
Email: jkuhns@offitkurman.com

*Attorneys for 286 Rider Ave Development
LLC*