RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

*Counsel for Rosewood Realty Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| 286 RIDER AVE ACQUISITION LLC, | : | Case No.: 21-11298 (LGB) |
| Debtor. | : | |

**PROOF OF ADMINISTRATIVE EXPENSE**
**CLAIM AND RESQUEST FOR PAYMENT**

Rosewood Realty Group (the "Rosewood"), by its counsel, Rubin LLC, hereby submits this Proof of Administrative Expense Claim and Request for Payment (the "Proof of Administrative Expense Claim"). In support of this Proof of Administrative Expense Claim, Rosewood respectfully represents as follows:

## INTRODUCTION[1]

1. This Proof of Administrative Expense Claim asserts a straightforward breach of contract claim for payment to Rosewood based upon a Court-approved Retention Agreement that requires the Debtor and its affiliate, including Development, to allow Rosewood to perform its duties and receive the benefits of that agreement, and not to interfere, prevent or prohibit

[1] Capitalized terms not defined in this Introduction shall have the meaning ascribed to them hereinafter.

Rosewood from carrying out its obligations so it could receive the benefits of the agreement. Rosewood devoted significant resources, worked diligently, and successfully performed its assigned task within the allotted time frame. Rosewood produced the clear and tangible results it was hired to deliver: It is undisputed that Rosewood procured a Stalking Horse who made a $1,050,000 deposit, submitted a signed contract, and provided proof of financial ability to close on an all-cash purchase for $10,500,000. The Stalking Horse was ready, willing, and able to close on the purchase of the Property. There is no question that Development interfered to block the sale that Rosewood arranged, and thus prevented and prohibited Rosewood from receiving its commission. Accordingly, Rosewood is entitled to allowance and payment of its administrative expense claim for the lost commission it did not receive as a result of the breach of the Retention Agreement.

## BACKGROUND

2. 286 Rider Ave Acquisition LLC (the "Debtor") is the owner of certain real property located at 286 Rider Avenue, Bronx, New York (the "Property"). The Property is vacant, non-income producing land. 286 Rider Ave Development LLC ("Development") owns 100% of the membership interests in the Debtor. The principals of Development are Toby Moskovits and Michael Lichtenstein.

3. The Debtor retained Rosewood as the Debtor's exclusive real estate broker to assist the Debtor with the marketing and sale of the Property. Rosewood's retention was approved by an order entered by this Court on November 17, 2021 (the "Rosewood Retention Order") [ECF No. 163]. The Rosewood Retention Order incorporates therein by reference the terms of the *Retention Agreement* dated July 14, 2021 (the "Retention Agreement") between Rosewood, the Debtor, and Be-Aviv 286 Rider LLC (the "Lender"), which was annexed as Exhibit A to the Rosewood Retention Order.

4. Pursuant to the Retention Agreement, Rosewood is entitled to a commission equal to 4.5% of the gross purchase price of the Property to be paid by the successful purchaser as a buyer's premium. The Retention Agreement also provides that "[e]ach party to this Agreement will deal with the other fairly so as to allow it to perform its duties and to receive the benefits of this Agreement and will not interfere, prevent or prohibit the other party, in any manner, before or during the closing of a sale of the Property, from carrying out its obligations under this Agreement." Retention Agreement ¶ 14. The Retention Agreement further provides that the "Debtor's obligations under this Agreement will survive any change in control of the Debtor." *Id.* at ¶ 20. The terms of the Retention Agreement are also binding on the Debtor's affiliates, which would include Development, the 100% owner of the Debtor. *Id.* At ¶ 8.

5. Rosewood extensively marketed the Property through numerous mediums to a vast number of investors, residential and commercial developers, bankruptcy attorneys and trustees, lenders, family offices, contractors, syndicators, institutional funds, and distressed asset investors both locally and nationally. Rosewood worked with its internal team of brokers and outside commercial and residential brokerage firms to reach an estimated over 80,000 people through direct emails, snail mail, social media, industry websites, co-brokers, and print and online advertisements. Rosewood took the following actions to market the Property:

- Created and sent HTML email campaigns to 39,000 investors;
- Sent emails to 2,540 bankruptcy and real estate attorneys, and trustees;
- Launched social media campaigns on LinkedIn, Instagram, Facebook, and Twitter;
- Designed a 60-page offering memorandum to email to investors;
- Hired a third party service to take aerial drone photos and create amenities maps;
- Posted the listing to real estate websites: CoStar / Loopnet, Crexi, Brevitas, Crezma, Propertyshark/Commercial Café, Sonoture, and Apartmentbuildings.com;

- Featured the Property on the Rosewood Realty Group website;
- Utilized Rosewood's proprietary database to call and email Bronx-centric, greater New York, and nationwide investors and developers, and groups mentioned above;
- Compiled and utilized additional real time market data including new buyers and sellers of similar buildings and development sites, who Rosewood subsequently contacted;
- Emailed the outside brokerage community, both residential and commercial, from Rosewood's proprietary tri-state list of 26,250 brokers and sales agents;
- Featured the Property as a New York Real Estate Journal Property of the Month (paid advertorial);
- Reached out to media and press and received coverage from multiple publications including Commercial Observer and The Real Deal;
- Ran banner ads in Pincus Media Co's newsletter; and
- Ran print and online ads in the Epoch Times and on the cover of Chinese Daily.

6. On October 15, 2021, Development filed a motion (the "Exclusivity Termination Motion") [ECF No. 87] seeking entry of an order terminating the Debtor's exclusive periods to file and solicit a chapter 11 plan, and authorizing Development to file its own plan. Development also filed on objection to the Debtor's motion (the "Exclusivity Extension Motion") [ECF No. 110] to extend the exclusivity periods. On November 18, 2021, the Court granted the Debtor's Exclusivity Extension Motion [ECF No. 164], and denied Development's Exclusivity Termination Motion [ECF No. 167].[2]

7. On November 23, 2021, the Debtor filed a motion (the "Bid Procedures Motion") [ECF No. 173] seeking approval of certain bid procedures (the "Bid Procedures") to govern the auction sale of the Property in connection with a chapter 11 plan.

[2] Undeterred, on December 29, 2021, Development filed a renewed Exclusivity Termination Motion [ECF No. 220], which Development appears to have abandoned.

8. On December 13, 2021, the Court entered an order (the "Bid Procedures Order") [ECF No. 200] approving the Bid Procedures, setting a bid deadline of January 7, 2022, and scheduling an auction for January 14, 2022. The Bid Procedures Order includes (i) an express finding by the Court that the relief requested in the Bid Procedures Motion, including establishment of bid procedures to govern an auction sale of the Property, "is in the best interests of the Debtor's estate, its creditors and other parties in interest," and (ii) a determination by the Court "that there is sufficient cause to grant relief and that such relief is in the best interest of the Debtor's estate."

9. On December 15, 2022, the Debtor filed its *Plan of Reorganization of 286 Rider Ave Acquisition LLC* (as supplemented, modified, and/or amended, the "Plan"), which provides for the Sale of the Property in accordance with the Court-approved Bid Procedures as the means of implementation of the Plan. The Debtor also filed its disclosure statement for the Plan (as supplemented, modified, and/or amended, the "Disclosure Statement").

10. Through the diligent efforts of Rosewood, the Debtor was able to procure an offer from The Vaja Group (the "Stalking Horse") to serve as a stalking horse bidder for the purchase of the Property, with an all cash bid in the amount of $10,500,000.00. The Stalking Horse delivered a signed Purchase and Sale Agreement, paid a ten percent contract deposit in the amount of $1,050,000, and it provided proof that it has cash available to proceed with the purchase, as required under the Bid Procedures. *See* Stalking Horse bid letter dated January 10, 2022, annexed hereto as Exhibit A. Along with the bid letter, the Stalking Horse demonstrated its financial wherewithal to close on its offer by providing copies of bank accounts statements, a commitment letter for financing, as well as proof of a payment of $10,640.00 application fee under the

commitment letter. The Stalking Horse bid was a real bid, and the Stalking Horse a was real bidder.

11. On December 29, 2021, Development filed the *Motion for Entry of an Order Pursuant to Sections 105(a) and 541 of the Bankruptcy Code Confirming Disputed Payoff Amounts, Satisfaction of DIP Loan, and for Related Relief* (the "Payoff Motion") [ECF No. 218], which sought to, among other things, forestall the sale of the Property through Development's proposal to pay in full the Lender's debt as well as all other claims against the Debtor in a structured dismissal of the Debtor's chapter 11 case. The Payoff Motion specifically provides that Development will "pay or deposit into escrow with the Court, sufficient sums to cover payment of all allowed claims in full." *See* Payoff Motion ¶ 11.

12. On January 6, 2022, the Court entered the order (the "Disclosure Statement Order") [ECF No. 247] preliminarily approving the Disclosure Statement and scheduling a hearing on final approval of the Disclosure Statement and confirmation of the Plan for February 9, 2022.

13. On January 10, 2022, in accordance with the Bid Procedures, in the exercise of its business judgment, the Debtor filed the *Stalking Horse Notice* [ECF No. 255], providing notice to all parties in interest of the selection of The Vaja Group to serve as the Stalking Horse in connection with the scheduled auction sale.

14. Just one day after the Debtor filed the Stalking Horse Notice, Development filed the *Notice of Payoff and Confirmation of Wire* [ECF No. 257], which attached a payoff letter from Development to the Lender and confirmation of a wire transfer to the Lender in the amount of $11,918,974.12.

15. Just two days before the scheduled auction, on January 12, 2022, the Court entered a scheduling order (the "January Scheduling Order") [ECF No. 259], pursuant to which the Court

(i) fixed January 26, 2022 as the deadline for Development to file a supplement to the Payoff Motion; (ii) fixed February 4, 2022 as the deadline for parties to submit any responses to the Payoff Motion, (iii) adjourned the hearing on the Payoff Motion to February 10, 2022, (iv) set February 11, 2022 as the deadline to object to the Stalking Horse, (v) adjourned the hearing on approval of the Stalking Horse to February 15, 2022, and (vi) adjourned the auction to February 16, 2022.

16. Notably, the January Scheduling Order further provides that the Stalking Horse hearing and the auction would not be further adjourned by the Court unless Development establishes an escrow account with funds in an amount sufficient to pay in full all administrative expenses and other claims against the Debtor. *See* January Scheduling Order ¶ 8. Despite entry of the January Scheduling Order, and the adjournment of the Auction, the Stalking Horse did not withdraw its bid.

17. On January 26, 2022, Development filed a supplement (the "Supplement") [ECF No. 272] to the Payoff Motion. The Supplement discloses that counsel for the Debtor notified Development of Rosewood's claim in the amount of $472,500.00 as an administrative expense for which Development must escrow pursuant to the January Scheduling Order. Development, however, stated in the Supplement that it would not escrow for any portion of Rosewood's claim. *See* Supplement ¶ 12.

18. In accordance with the January Scheduling Order, on February 4, 2022, Rosewood filed a response to the Payoff Motion (the "Response") [ECF No. 282], requesting that the Court deny the Payoff Motion, or, in the alternative, require Development to escrow Rosewood's claim for Rosewood's commission under the Retention Agreement.

19. Following a hearing on the Payoff Motion on February 10, 2022, the Court entered a scheduling order on February 11, 2022 (the "February Scheduling Order") [ECF No. 293] which

adjourned the portion of the Payoff Motion requesting dismissal of the chapter 11 case to April 4, 2022, further adjourned the auction to April 13, 2022, and fixed the following dates: (i) March 4, 2022 as the deadline for parties to file claims seeking the allowance and payment of any post-petition administrative expenses; (ii) March 18, 2022 as the deadline to file any objection to administrative expense claims; (iii) March 25, 2022 as the deadline for any replies in further support of administrative expense claims; and (iv) March 29, 2022 as the hearing on allowance of administrative expense claims.

20. On February 14, 2022, the Debtor filed a letter informing the Court of the Stalking Horse's desire to terminate the Stalking Horse agreement and its request for the return of its deposit as a result of the continued delays in the auction. On February 17, 2022, the Court entered an order authorizing the Debtor to release the deposit back to the Stalking Horse.

**ADMINISTRATIVE EXPENSE CLAIM**

21. By this Administrative Expense Claim, and in accordance with the February Scheduling Order, Rosewood requests allowance of its post-petition administrative expense claim for the full amount of the commission due to Rosewood under the Court-approved Retention Agreement on account of the breach of the Retention Agreement. Rosewood procured a Stalking Horse who was ready, willing, and able to close on the purchase of the Property, only to be chased away as a result of the Development's interference because it did not want the Debtor to sell the Property.

22. The terms of the Retention Agreement expressly require the Debtor to deal fairly with Rosewood and to not prevent Rosewood from receiving the benefits of the Retention Agreement before or after a closing. Retention Agreement at ¶14. Rosewood fully performed its obligations under the Retention Agreement. It procured a qualified bidder who signed a contract of sale, paid a $1,050,000 good faith deposit, and delivered a signed purchase and sale agreement

in accordance with the terms of the Court-approved Bid Procedures. Abandonment of the sale of the Property at the very last minute, as a voluntary and intentional act—not because of (i) the business judgment of the Debtor, (ii) a business necessity, (iii) a creditor objection, or (iv) an inability to comply with the Bankruptcy Code's requirements for plan confirmation, but simply based on the preference of its 100% equity owner, after Rosewood worked for months on this project and procured a Stalking Horse and deposit for an auction sale—constitutes a breach of the Retention Agreement.

23. Under Paragraph 8 of the Retention Agreement, Development was bound, as an affiliate of the Debtor, not to interfere with Rosewood's performance thereunder or to prevent Rosewood from obtaining the benefits of the Retention Agreement. The post-petition breach of the Retention Agreement, *i.e.*, interfering with Rosewood's performance and preventing Rosewood from receiving the benefits of the agreement after Rosewood fully performed, creates an administrative claim. *See, e.g., Reading Co. v. Brown*, 391 U.S. 471, 479 (1968) (tort claims against receiver in administration of a chapter XI arrangement are an "actual and necessary" expenses entitled to administrative priority); *In re Eagle-Picher Indus., Inc.*, 447 F.3d 461, 464 (6th Cir. 2006) ("Applying *Reading* and this two-part test, courts have concluded that the following claims fall within the Code's definition of administrative expenses: tort; trademark infringement; patent infringement; and breach of contract.") (citations omitted) (citing *In re Klein Sleep Prods.*, 78 F.3d 18, 26 (2d Cir. 1996) for breach of contract); *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp. (In re Davis-Edwards Pharmacal Corp.)*, 443 F.2d 867, 874 (2d Cir. 1971) (applying *Reading* in patent infringement context); *Packer Ave. Assocs.*, 1 B.R. 286 (E.D. Pa. 1979) (applying rationale in *Reading* and treating breach of contract claim against trustee as administrative expense).

24. There is no question that a chapter 11 plan of reorganization providing for the payment of all fees of retained professionals and allowed claims in cash in full plus post-petition interest (leaving creditors unimpaired), can be confirmed in this case. Although the Debtor's only asset is the Property, which has no tenants and does not generate any revenue, the Property can be sold as contemplated by the Bid Procedures to produce more than enough funds needed to fund such a plan. The decision to suspend the sale process and effectively block the sale of the Property to the Stalking Horse was not based upon an exercise of the business judgment of the Debtor, but was designed instead to serve the interests and desires of Development.

25. After making the above-described payment to the Lender, Development is now asserting the right to make management decisions for the Debtor. *See* Transcript of Jan. 12, 2022 Hrg. at 9, 12. Development has gone so far as to send to Lender's counsel stipulations providing for dismissal without prejudice of state court litigation that is pending between Debtor and Lender that have been executed by counsel for the Debtor selected by Development. *See* Letter from counsel to Development dated Jan. 19, 2022 [ECF No. 268] at 10, 12. Furthermore, Development has also sought to remove Robinson Brog as counsel for the Debtor. *See Motion to Discharge Robinson Brog Leinwand Greene Genovese & Gluck P.C. as Debtor's Counsel Pursuant to 11 U.S.C. §§ 101(14), 105, and 327* [ECF No. 299]. It is undisputed that, in any event, under Development's game plan, Development will be restored to control of the Debtor, in which case the Debtor's obligations to Rosewood under the Retention Agreement survive. Retention Agreement ¶20. Those obligations do not disappear.

26. Development made a considered decision that it would prefer to have the Debtor breach the Retention Agreement by derailing the sale, thereby preventing Rosewood from receiving its commission, instead of proceeding with the sale of the Property contemplated by the

Bid Procedures. While this may be an "efficient breach of contract," the non-defaulting contract counterparty party is still entitled to damages as a result of the breach. *See Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 261 n.12 (S.D.N.Y. 2005) ("[T]he law presumes that parties to contracts are rational: they chose to breach contracts because it is more efficient to breach and pay compensatory damages than to perform. If so, efficiency is promoted by allowing parties to break their promise, *provided that they compensate the non-breaching party for actual losses*.") (emphasis added).

WHEREFORE, Rosewood respectfully requests that this Court allow Rosewood's administrative claim against the Debtor, and grant Rosewood such other relief as may be just and proper.

Dated: New York, New York
March 4, 2022

ROSEWOOD REALTY GROUP

By: /s/ Greg Corbin
Greg Corbin

Dated: New York, New York
March 4, 2022

RUBIN LLC

By: /s/ Paul A. Rubin
Paul A. Rubin
Hanh V. Huynh

345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

*Counsel to Rosewood Realty Group*

# EXHIBIT A
# (STALKING HORSE BID LETTER)




223 Spencer St. Suite 50
Brooklyn, NY 11205
T. 718.599.2125
E. info@thevajagroup.com
W. www.thevajagroup.com

**VIA EMAIL**

Mr. Greg Corbin
President, Bankruptcy and Restructuring
greg@rosewoodrg.com
Rosewood Realty Group
152 West 57th Street, 5th Floor
New York, New York 10019

Re: *In re 286 Rider Ave Acquisition LLC*, 21-11298-lgb in the United StatesBankruptcy Court for the Southern District of New York;Bid Submission for 286 Rider Avenue, Bronx, New York

Dear Mr. Corbin,

This office is Potential Bidder VAJA Group Rider Holdings LLC **("VAJA").** On behalf of VAJA, we submit the following in accordance with the Bid Procedures for Auction Sale **("Bid Procedures")** you have provided to us:

1. A mark-up of the proposed APA in both PDF and MS-WORD format executed by Moses Freund on behalf of VAJA.
2. In accordance with the Bid Procedures for Auction Sale, we confirm the following onbehalf of VAJA as a Potential Bidder:
   (i) the Bid is formal, binding, and unconditional (except for those conditionsexpressly set forth in the proposed APA);
   (ii) the Bid is not subject to any due diligence or financing contingency; and
   (iii) the Bid is irrevocable until the first business day following the proposed Saleexcept as otherwise provided in the Bid Procedures.
3. As evidence of VAJA'S capacity to consummate the Sale set forth in its Bid with cash on hand or other immediately available cash we attach: Bank Statements, Bank summaries and Northeast Community Bank Term sheet for Land Loan.
4. On behalf of VAJA, we further confirm that the Bid is based on an all-cash



223 Spencer St. Suite 50
Brooklyn, NY 11205
T. 718.599.2125
E. info@thevajagroup.com
W. www.thevajagroup.com

offer with sufficient cash consideration to pay Buyer's Premium as defined in the Bid Procedures.

5. As Potential Bidder VAJA makes the following representations and warranties as required in the Bid Procedures:
   (i) that the Potential Bidder has had an opportunity to conduct any and all duediligence regarding the Property prior to submitting its Bid;
   (ii) that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Property or the completeness of any information provided in connection therewith, except as expressly stated in the representationsand warranties contained in the Potential Bidder's Proposed APA ultimately accepted and executed by the Debtor;
   (iii) that the Potential Bidder agrees to serve as Back-Up Bidder (as defined in the BidProcedures), if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the Property, until the Back-Up Bid Termination Date (as defined in the Bid Procedures);
   (iv) that the Potential Bidder has not engaged in any collusion with respect to thesubmission of its Bid;
   (v) that all proof of financial ability to consummate the Sale in a timely manner and all information provided to support its financial ability to consummate the Sale istrue and correct; and
   (vi) that the Potential Bidder agrees to be bound by the terms of the Bid Procedures.

In the event that the Debtor has any questions or wishes to discuss the Bid by the Potential Bidder, please contact Moses Freund at 718-599-2125 Ext 101, mf@vajagroup.com or Elliot Steinmetz Esq at 212 713 9904 or esteinmetz@rspclawyers.com

VAJA advises it has wired $1,050,000 (0110B1QGC01C005298, 0107B1QGC05C002532, 0107B1QGC03C002172) as the Deposit for this Bid.



223 Spencer St. Suite 50
Brooklyn, NY 11205
T. 718.599.2125
E. info@thevajagroup.com
W. www.thevajagroup.com

6. The proposed contract shall be amended to add the following provisions at the end thereof:

16.14 Break-Up Fee. As consideration for and as a material inducement to Purchaser's conducting due diligence and entering into this contract, if this contract is terminated as a result of the Court approving the Debtor entering into an Alternative Transaction (as defined in section 16.15), Purchaser shall be entitled to a breakup fee of two hundred and ten thousand ($210,000.00) dollars ("Break-Up Fee") which will be paid in accordance with, and at the time set forth in, Section 16.15.

16.15 Payment of Break-Up Fee. If the Debtor accepts a higher and better offer for the Property and the Bankruptcy Court approves an Alternative Transaction (as defined below), the Debtor shall proceed to close the Alternative Transaction. In such event, this transaction set forth in this agreement shall be considered a back-up transaction and will move forward in the event the Alternative Transaction fails to close. If the Alternative Transaction closes, provided Purchaser is not in default of its obligations hereunder and the contract has not otherwise been terminated, Seller shall pay the Break-up Fee and return the Down payment to Purchaser, which sums shall be paid from the sales proceeds of the closing of the Alternative Transaction, *provided however*, if the Alternative Transaction is a credit bid, then the party making the credit bid shall pay the Break-Up Fee in cash before the Alternative Transaction shall be permitted to close. An "Alternative Transaction" means any transaction with a non-Debtor counterparty for the sale of the Premises, which the Court approves.

Confirmed and Agreed to this 10th day of January, 2022 by:

MOSES FREUND

Name: The VAJA Group by Moses Freund
Title: Managing Member