UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-11298(LGB) |
| | . | |
| | . | |
| 286 RIDER AVENUE, | . | |
| ACQUISITION LLC | . | 1 Bowling Green |
| | . | New York, NY 10004 |
| | . | |
| | . | |
| Debtor. | . | March 25, 2022 |
| . . . . . . . . . . . .. | | 2:01 p.m. |


TRANSCRIPT OF SUPPLEMENTAL BRIEFING AND ARGUMENT WITH RESPECT
TO MOTION OF 286 RIDER AVE DEVELOPMENT LLC TO ALTER OR AMEND
THE JUDGMENT UNDER BANKRUPTCY RULE 9023 AND FEDERAL RULE OF
CIVIL PROCEDURE 59(E)
BEFORE HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:

| | |
|---|---|
| For 286 Rider Ave | Offit Kurman, P.A. |
| Development, LLC: | By:  JASON NAGI, ESQ. |
| | JOYCE A. KUHNS, ESQ. |
| | 590 Madison Avenue, 6th Floor |
| | New York, NY 10022 |
| | |
| For 286 Rider Ave | Robinson Brog Leinwand Greene |
| Acquisition, LLC: | Genovese & Gluck, P.C. |
| | By:  FRED B. RINGEL, ESQ. |
| | 875 Third Avenue, 9th Floor |
| | New York, NY 10022 |


ECRO:                    Carmen


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (Cont'd):

```
For Be-Aviv 286          Morrison Cohen LLP
Rider LLC:               By:  JOSEPH THOMAS MOLDOVAN, ESQ.
                              DAVID KOZLOWSKI, ESQ.
                         909 Third Avenue
                         New York, NY 10022


For the U.S. Trustee:    Office of the U.S. Trustee
                         By:  GREG M. ZIPES, ESQ.
                              TARA TIANTIAN, ESQ.
                         201 Varick Street, Room 1006
                         New York, NY 10014


For the judgment         D'Agostino, Levine, Landesman,
creditor:                Lederman & Rivera LLP
                         By:  BRUCE H. LEDERMAN, ESQ.
                         345 7th Avenue
                         New York, NY  10001
```

- - -

1          THE COURT:  Good afternoon.  This is Judge Beckerman.

2 Court is now in session.  We're going to go ahead and call the

3 case and when I do, I'll ask attorneys to please put their

4 appearances on the record and then I'll also ask you to please

5 identify yourself when you're speaking.

6          Case Number 21-11298, 286 Rider Avenue Acquisition,

7 LLC.

8          May I have appearances of counsel?

9          MR. RINGEL:  Good afternoon, Your Honor.  Fred

10 Ringel, Robinson Brog, on behalf of the debtor.

11          MR. MOLDOVAN:  Good afternoon, Your Honor.  Joe

12 Moldovan, Morrison Cohen, on behalf of the lender.

13          MS. KUHNS:  Good afternoon, Your Honor.  Joyce Kuhns

14 of Offit Kurman on behalf of 286 Rider Avenue Development.

15          MR. NAGI:  Good afternoon, Your Honor.  Jason Nagi

16 from Offit Kurman for the same parties represented by Ms.

17 Kuhns.

18          MS. TIANTIAN:  Good afternoon, Your Honor.  Tara

19 Tiantian with the U.S. Trustee's Office.

20          MR. LEDERMAN:  Good afternoon, Your Honor.  Bruce

21 Lederman for the judgment creditor.

22          THE COURT:  Okay, any additional appearances of

23 counsel?

24                    (No audible response)

25          THE COURT:  Okay, Ms. Kuhns or Mr. Nagi, because of

4

1  the fact that this was originally your motion and we're doing

2  supplemental briefing, I'm going to suggest that you go ahead

3  and argue first, and then we'll hear responses from the debtor

4  and the lender's counsel.

5      (Someone not connected to the case heard on the phone)

6      THE COURT:  Who's ordering a falafel bowl needs to

7  put their phone on mute.

8      Okay, going back to you, Ms. Kuhns and Mr. Nagi,

9  sorry about that, anyway, whoever is going to be arguing from

10  your half, I think you'll go first and then Mr. Ringel and Mr.

11  Moldovan can respond and then you'll have an opportunity to

12  reply.

13      MS. KUHNS:  That's fine, Your Honor.  Thank you.

14  Good afternoon.  Joyce Kuhns of Offit Kurman for 286 Rider

15  Avenue Development.  Your Honor, we are back to you on remand

16  from Judge Abrams' remand of the appeal of your order denying

17  Development's motion to alter or amend your order denying

18  Development's motion to dismiss from August 2021.  We are

19  mindful of the legal standard on review which has been squarely

20  met here.  Reconsideration may be granted on the basis of an

21  intervening change in controlling law, the availability of new

22  evidence or the need to correct illegal error or to prevent

23  manifest injustice.  The last three elements have been squarely

24  met.

25      We maintain you were led to commit clear error

1  regarding an issue fundamental to your jurisdiction which
2  resulted in the manifest injustice of this case proceeding
3  based on a sworn to misrepresentation in the petition that on
4  April 27, 2021 lender assigned, transferred and registered all,
5  and I emphasize all, membership and equity interest of the
6  debtor to and in the name of the lender as if lender were the
7  absolute owner thereof.  That's Paragraph 5 of the declaration
8  in support of the petition.

9        And, therefore, lender's affiliate, Lender LLC, who
10 took further assignment on June 14 became the absolute owner of
11 100 percent of the equity in the debtor when it appointed Lee
12 Buchwald as manager and authorized him to file the petition.
13 That proved not to be so as debtor admitted in its amended
14 statement of financial affairs on November 5, 2021 after the
15 appeal had been noted of your order.  This SOFA is the critical
16 new evidence.

17       If Lender LLC was never the equity holder as it held
18 itself out to be on the petition date, it was never the sole
19 member of the debtor.  If not the sole member, it could not
20 appoint a manager under New York law since the New York Limited
21 Liability Company Act requires that LLCs be member managed.
22 The inescapable conclusion from the new evidence is that Lender
23 LLC, a non-member, non-equity holder, had no authority to
24 appoint Mr. Buchwald as manager and authorize him to file the
25 petition.  This is supported by the pledge agreement, Sections

1   3, 5, 10, 13 and 16, the operating agreement and New York Law

2   Sections 401 and 416, all read together as they should be

3   consistent with contract and statutory principles.

4        Lender's position that Lender LLC had the authority

5   to file as a non-equity holder is unsupportable based on the

6   key documents and the law.  Its cavalier attitude towards

7   radically-changing sworn statements is misplaced since sworn

8   statements in a proceeding are admissions against interest that

9   are intended to be relied upon by both the Court and parties-

10  in-interest.  I will briefly review the key documents and then

11  the record as it reflects your view of those documents and the

12  law based on the sworn statement in the petition that Lender

13  LLC was the absolute owner of the debtor on the petition date.

14       So, Your Honor, if we could, I'd just briefly like to

15  walk you through the operative provisions of the pledge

16  agreement.  I understand that your decisions were predicated on

17  Section 5, the right to distribution section being self-

18  effectuating.  That is not so based on an integrated reading of

19  the document in accordance with New York law that all

20  provisions are to be read together and interpreted as an

21  integrated whole.  I believe you did not do that the first

22  round because you were relying on, as will be substantively

23  reflected in the record I read into this record, the

24  representation of the debtor on the petition date that it, in

25  fact, was the sole owner because Section 5 was self-

1  effectuating.

2       What does the pledge agreement actually say?  Section

3  3 of the pledge agreement is the first thing that alerts the

4  parties reading this document that, in fact, there may be

5  limitations on the exercise of rights on the collateral, here,

6  the equity pledge.  It's called representations and warranties

7  and it says except with respect to restrictions in the loan

8  documents, there are no restrictions -- these are the important

9  words -- other than contained in the limited liability company

10 agreement of borrower dated as of August 15, 2019.  The

11 borrower operating agreement arising from undertakings or

12 agreements of pledgor upon any of the rights associated with or

13 transferred of any of the collateral.  So, this is a rep and

14 warranty that, in fact, there may be restrictions on the

15 transfer subject to the operating agreement.

16      Section 5 has the oft cited provision if an event of

17 default shall occur and be continuing, then all membership

18 interest at lender's option -- and I want to emphasize the next

19 two words -- may be registered in the name of lender or its

20 nominee if not already so registered and lender or its nominee

21 -- I want to emphasize this word -- may thereafter exercise,

22 (1) all voting and all equity membership and other rights

23 pertaining to the membership interest as if it were the

24 absolute owner thereof.  So, this is not an automatic

25 provision.  It enunciates rights that may occur on a continuing

1  default and may be exercisable by the lender.

2        The next significant provision is Section 10, once

3  again, that operates as a whole to limit the actions of a

4  lender when it's acting on behalf of the pledgor in furtherance

5  of the pledge agreement if the lender appointed attorney-in-

6  fact provision, pledgor hereby appoints lender -- pledgor is

7  attorney-in-fact -- subject to the provisions of the borrower

8  operating agreement to accomplish the purposes of this pledge.

9        Section 13, perhaps most critical of all, is the

10 remedies upon default provision.  Now, this is not unusual.

11 This is a pledge agreement but just like any other security

12 agreement, it has a rights provision and then it has a remedies

13 on default provision.  What does this remedies on default

14 provision provide?  If an event of default under the note shall

15 have occurred and is continuing -- and this is the significant

16 modifier -- subject to the borrower operating agreement, lender

17 shall have, in addition to all other rights given, its rights

18 under the Uniform Commercial Code and lender at its option may

19 liquidate the collateral in the manner permitted under the

20 borrower operating agreement.  Once again, two limitations,

21 exercise of rights and remedies subject to the operating

22 agreement.

23       And Section 16, the pledge agreement shall be

24 governed by and construed in accordance with the laws of the

25 State of New York.  So, what does the operating agreement say?

1  The operating agreement, the operative provisions for this

2  analysis are, and this was also cited, management powers at

3  Paragraph 5, 286 Rider Avenue Development LLC, the sole member

4  of the company, shall have the sole power to do any and all

5  acts necessary or convenient to or for the furtherance of the

6  purposes described herein.  286 Rider Av Development LLC shall

7  manage the affairs of the company.  Membership interests are

8  set forth at Paragraph 7.  286 Rider Development LLC has 100

9  percent of the equity and membership interest in Acquisition

10 according to the operating agreement in effect on the petition

11 date.

12        And so, what was then the state of play when the

13 Court first heard the motion to dismiss on August 30?  What did

14 Your Honor know?  What Your Honor knew was that there was a

15 petition where there was a sworn statement that Lender LLC held

16 100 percent of the equity interest in the debtor.  It was the

17 absolute owner thereof.  And the lender, in fact, continued to

18 perpetuate that theme by arguing, and the quote is in our

19 papers August 30 transcript, Page 23, Lines 17 through 21.

20 It's talking about the actions that were taken in April.  This

21 action was taken pursuant to our status as the sole voting

22 member of the debtor in accordance with the pledge and in

23 accordance with Section 402 of the Limited Liability Act.  And

24 then there was a further colloquy and the Court then ruled on

25 the motion to dismissed.

1          Accordingly, the lender validly exercised its rights

2   under the pledge agreement and became the owner as of April

3   27th, 2021 of all the membership interest in the debtor.  The

4   lender subsequently transferred the interest of such membership

5   interest to an affiliate, the new owner, on June 14, 2021,

6   August 30, '21 transcript, Page 67, Lines 9 through 13.  The

7   lender continued this theme.  It's the equity holder and it's

8   the member.  So, in April, Your Honor, when we exercised our

9   rights under the pledge, we became the member, transcript 24,

10  Lines, it looks like 6 and 7.

11          Now, at the October 5 hearing on the motion to alter

12  or amend, what was the state of the record then?  There was no

13  statement of financial affairs filed.  There was just the

14  petition.  So, according to the Court's understanding, once

15  again, Lender LLC is the 100 percent equity holder and the

16  Court observed -- ultimately ruled that under the pledge

17  agreement I found that the -- and also the New York Limited

18  Liability Act, that the pledge agreement in Section 5 is not

19  limited by the operating agreement and maybe had that paragraph

20  been limited by the operating agreement, your, Development in

21  brackets, arguments may have been more persuasive, transcript

22  at Page 23, Lines 4-8.

23          In a prescient statement you further held and so if I

24  thought that under the pledge Section 5 there wasn't the right

25  to -- for the members or the parties stepping into the shoes of

1  the member, in the this case the lender to go ahead, and I

2  guess to effectuate change of management, if that had been the

3  case, I might have found your argument more persuasive,

4  transcript, Page 25, Lines 1-4.

5          The entire predicate for this appears to be made in

6  light of your understanding that ownership was sitting 100

7  percent in Lender LLC on the petition date and that section,

8  Paragraph 5 of the pledge agreement, was self-effectuating and

9  you really didn't need to look any further to Section 13.

10         As I pointed out now, two of those things were not

11  true.  One, you did need to look further at Section 13 because

12  Section 5 is not self-effectuating and, furthermore, Lender LLC

13  was not the absolute owner on the petition date.  New York law

14  further supports this analysis, and I know you've heard this

15  before, Your Honor, but let's put it in the context once again

16  of the SOFAs.  New York law Section 417, the New York Limited

17  Liability Act, members of an LLC shall adopt an operating

18  agreement.  So it's no surprise that the pledge agreement is

19  going to be subject to the operating agreement.

20         Section 401, management shall be members unless the

21  operating agreement says otherwise.  This operating agreement

22  did not.  It expressly recognized Development as the sole

23  member and manager and that never changed.  It remained 100

24  percent sole member and the only member authorized to appoint a

25  manager under the operating agreement that's recognized in the

12

1  amended statement of affairs, the sole equity holder at that

2  time and it did not authorize Mr. Buchwald to file a petition.

3         And so we end inevitably where we started with the

4  benefit of the amended statement of financial affairs and its

5  unequivocal statement that Lender LLC did not have any equity

6  interest on the petition date and that Development had 100

7  percent of the member interest on the petition date and,

8  therefore, was, as member, the sole party with the ability to

9  appoint a manager.  Neither the lender nor its affiliate, as I

10  said, held any equity and, therefore, were not a member, let

11  alone a sole member authorized to appoint Lee Buchwald as

12  manager on the petition date.

13         The bankruptcy case was, therefore, unauthorized.  It

14  was filed by a non-member, non-manager of a New York limited

15  liability company in contravention of its operating agreement

16  and in an instance where the pledge agreement was not followed.

17  It did not follow the requirements of the operating agreement

18  which would have required probably contemporaneously with

19  executing the loan documents that an addendum be executed

20  substituting the lender on default as the sole member and

21  manager.  That never occurred.

22         And so as a result what we have here as subsequently

23  recognized by the amended SOFA was that Development's position

24  as sole equity holder never changed during any of these

25  operative dates, April 27, June 14, July 15 and subsequently.

13

1  It never changed.  The inevitable conclusion is this bankruptcy

2  case was filed by an unauthorized party and this Court lacks

3  jurisdiction.  And I would note, Your Honor, that the question

4  of jurisdiction may be raised by any party at any time and Your

5  Honor, of course, has the obligation to consider your

6  jurisdiction as you're doing today irrespective of Rule 59 and

7  60 standards although they have been met.

8         Now, the only way to right this wrong and prevent the

9  perpetuation of an injustice of a case proceeding that should

10 never have been started is to dismiss it today.  Thank you,

11 Your Honor, and I remain available to answer any questions you

12 may have.

13        THE COURT:  Okay, Ms. Kuhns.  I do have a question

14 for you.  Then how do you interpret Section 5 of a pledge

15 agreement?  Because the way that I interpret it, and I don't

16 think that applies, we've discussed this before with maybe

17 other counsel I discussed it before, but the way that I'm

18 looking at that agreement is that obviously, 13 discusses what

19 you can do with respect to the collateral and it talks about

20 your remedies on liquidating the collateral and taking over the

21 collateral and that's what that paragraph addresses.  5

22 addresses rights where somebody can step into the shoes of the

23 equity holder.  It doesn't require that you become the equity

24 holder because of the language of it.

25        The way that you're reading the pledge agreement, it

1  seems like you're reading outside.  I'm trying to understand

2  how that fits in your reading the pledge agreement.  Perhaps

3  you could help me with that.

4       MS. KUHNS:  I missed that word.  You said you're

5  interpreting -- did you say outside?  What was the word you

6  used?

7       THE COURT:  No.  I'm sorry.  I said your reading of

8  the pledge agreement seems to me to read out Section 5 and I

9  was --

10       MS. KUHNS:  No.

11       THE COURT:  -- wondering if you could explain to me

12  how it fits in then with the sections that you've noted in your

13  analysis.  That's what I'm trying to understand because it

14  seems to me otherwise you would never need Section 5 if all

15  your remedies were limited and your rights to Paragraph 13

16  which clearly does require -- has the more modifying language

17  and does require certain procedures to take place but that

18  relates to, again, liquidating or taking possession of

19  collateral or exercising, you know, certain remedies and rights

20  under the UCC.  The rights and remedies under Section 5 are

21  different.  They're the rights or remedies or rights to step in

22  essence and act as if you were the member and that's the way

23  that it's written.  And so I was just trying to understand how

24  to square them in your reading of the agreement.  That's what

25  I'm saying to you.

15

1          MS. KUHNS:  All right, I will and I think you have to

2     start at the beginning which talks about what the collateral is

3     and I think you're reading collateral as meaning something

4     other than these interests that are being transferred and all

5     of them are collateral.  They're all defined as collateral,

6     transfer of all the member interest in Section 1 defined as

7     collateral.  So, when you say remedies on default, you're

8     reading it separate from Section 5.

9          I'm seeing Section 5 as here are your rights that you

10    may have these options as to this type of collateral, you may

11    have this option, you may do this or you may do that.  It

12    doesn't mean you can do it without observing the protections

13    and the remedies under Section 13.  In fact, I believe that's

14    why you have Section 3 preceding Section 5.  Section 3 is that

15    representation warranty -- there may, in fact, be restrictions

16    on the exercise of your rights as against your collateral and

17    that includes what's under 5 and there may be restrictions and

18    they're saying that's what the restrictions are.  Section 3(c)

19    says the operating agreement so that's an outright disclosure

20    by the pledgor to the pledgee which is your rights in the

21    collateral which happen to be collateral held by a New York

22    limited liability company are subject to the operating

23    agreement.

24          So, I'm reading this as an integrated whole.  I

25    believe you're trying to separate out parts of collateral when

16

1   it's all -- this is all collateral so Section 13 pertains to

2   all collateral.  And I think you need to integrate, consistent

3   with contract principles, you need to integrate 5 with 13.  I

4   think it's just giving the options as to that collateral.  You

5   may do (a) or (b).  That's why I use the word may there and

6   emphasize it for you.  They're saying your rights, you can

7   exercise (a) or (b) here as to that collateral.  And then they

8   go to 13 and you say and when you exercise your rights as to

9   the collateral with a capital C inclusive of what's under 5, it

10  must be subject to the operating agreement.

11          So, I see that as this is your may, your options,

12  these are the options of what you can do and once again, that's

13  your option, but if you do it, you are going to be restricted

14  reading this as an integrated whole on remedies on default as

15  against your collateral.  So, I'm not separating out types of

16  collateral because the agreement doesn't separate out types of

17  collateral, Your Honor.  Section 1 makes that clear, all of it

18  is collateral and, therefore, it's going to be subject to 13,

19  remedies on default and exercising your rights as to your

20  collateral.  And, as I said, Section 3, once again, reading

21  this as an integrated whole, Section 3 is that representation

22  and warranty coming from the pledgor, it's like that red flag

23  on the field, it's your caution sign which is your rights may

24  be restricted under the borrower operating agreement.

25          THE COURT:  Okay.  I'm sure you're aware that in the

1  August 30th hearing that this issue about the ownership and

2  whether that was accurate or not was raised with me and it was

3  raised with me by counsel for Development at that time which

4  obviously wasn't you, but Mr. Lichtenstein and he did raise the

5  issue with me and there is a colloquy that we had on the

6  record.

7        And so I think that this issue about any kind of

8  confusion as to whether or not my ruling was premised upon

9  ownership versus premised upon maybe from your perspective an

10 improper reading of the pledge agreement are different

11 arguments.  And I think that the record is clear that it wasn't

12 premised on that because counsel for your client actually

13 raised the issue with me and was clear that they had a

14 differing opinion about whether the ownership was and whether

15 that would have changed anything for me, so it was raised

16 actually at the hearing.

17        And that's why I don't think that it was, you know,

18 perhaps my -- I guess what I'll say to you is that I think that

19 there was certainly a lot of imprecision including, frankly,

20 possibly by me in my ruling as to use of words.  But I think it

21 was clear before me at that hearing because it was made clear

22 to me before the hearing that it wasn't at all clear that

23 ownership had shifted because that's clearly what Development's

24 counsel raised with me specifically at, you know, the Section,

25 Page 74 through 76.  So, I don't think that wasn't raised

18

1 before me.  I do think it was raised before me at that hearing

2 so I don't know how you ignore that.

3    MS. KUHNS:  I actually don't intend to ignore it.  I

4 read that differently.  I read the briefs, I read the context

5 in which that was raised and this residual interest.  Mr.

6 Lichtenstein talked in terms of residual interest.  And he was

7 arguing and, in fact, a lot of ink was spilled on the concept

8 of clogging the equity redemption.  I believe what he was

9 talking and wanted to make really clear was that that

10 redemption right which is part of ownership rights was

11 preserved here.  So, I agree, there may be lack of precision

12 here but that's part of the problem.

13    I think that you may have not looked at the pledge

14 agreement as an integrated whole because of what the petition

15 said.  The petition clearly said that they had absolute

16 ownership.  And absolute ownership -- absolute, that's in a

17 footnote, I believe, in the reply, just plain English

18 definition of absolute is undivided so you don't get to slice

19 and dice it into pieces, it's absolute ownership.

20    And to say as if is something -- doesn't mean as

21 though you had an undivided interest.  I think that's what they

22 had.  They had and intended to have and the documents are

23 consistent with undivided interest and that's why it says

24 absolute, absolute owner.  We're the absolute owner we said

25 repeatedly but I don't believe that Mr. Lichtenstein said that

1  this is a preclusion from it being raised in the motion to

2  alter or amend.

3          I think there was imprecision.  There was an attempt

4  to integrate the interpretation of the pledge agreement with,

5  you know, he raised it too, Section 5 and 13, it's an

6  integrated whole.  But I do think Your Honor was assuming there

7  was and you used the word yourself whole interest, whole

8  membership interest.  I don't know how you divide that in parts

9  when it's a whole and that's the reference.

10          But I believe Mr. Lichtenstein looking at what the

11  briefing was, was talking really about the redemption rights

12  and as you know, that's really important to us and I think he

13  wanted to be clear it was preserved here, that that's not

14  something that went away, that there was a redemption right and

15  it resided with Development.  It didn't reside with

16  Acquisition.  In fact, there was some colloquy about that and

17  you said no and you've been very clear in your ruling since

18  that that redemption right does reside with equity and, in

19  fact, we have exercised it and there's another proceeding

20  elsewhere that was subject of a hearing yesterday.  But I don't

21  really read that the same way.

22          I believe there was imprecision and imprecision often

23  leads to confusion, so I think the motion to alter and amend

24  was about that too, that there was not an integrated view of it

25  and I believe now through the lens of the SOFA I can understand

1 why since you didn't know at that time that, in fact, 100

2 percent, 100 percent of the equity, that means the whole

3 membership interest resided with Development and under New York

4 law they're the only ones who can act.  So I believe that our

5 interpretation is the only interpretation that reconciled all

6 the sections of the pledge agreement with the operating

7 agreement with New York law.

8          THE COURT:  Okay.  All right, thank you.

9          I'm going to I guess allow -- who is going to go

10 next, Mr. Ringel or Mr. Moldovan?

11          MR. MOLDOVAN:  I'll go next, Your Honor.  This is Joe

12 Moldovan.

13          THE COURT:  Okay.

14          MR. MOLDOVAN:  Thank you, Your Honor.  Can Your Honor

15 hear me okay?

16          THE COURT:  I can hear you just fine.

17          MR. MOLDOVAN:  Thank you, Your Honor.  So, I'm

18 actually going to need to modify some of the things that I was

19 going to be saying because Your Honor has hit precisely on some

20 of the critical elements here.  Just one point and I'll get to

21 it shortly, but Mr. Lichtenstein was not talking about the

22 equity of redemption.  That's crystal clear from the colloquy.

23          But to begin, Your Honor, the district court's order

24 here was very clear as to the narrow nature of its remand.  The

25 Court hereby remands this action to the bankruptcy court for

1  consideration of the additional materials to the extent it sees

2  fit.  That's it.  Nothing more.

3        And none of the issues and arguments this Court has

4  just heard or have been argued by Development in its papers are

5  relevant in the slightest.  What the remand means is that there

6  are two questions before the Court.  First, what are these two

7  documents?  Easy question.  They are the same form documents

8  that are filled in and filed by every debtor.  They are filed

9  under penalty of perjury and they must be done correctly.  They

10 were not filled in by the lender in this case as Development

11 repeatedly and accurately states, but by the debtor to reflect

12 the status of who owns the equity interest in the debtor.

13 Here, the first contained a mistake and the second corrected

14 that mistake unprompted several days later.

15        The second question is what can the Court consider on

16 the remand?  Well, it can look at the contents of the SOFA, the

17 contents of the amended SOFA or the fact that the initial SOFA

18 stated one thing and was later amended as the Court sees fit.

19 But this is where it becomes very important, Your Honor, to

20 separate the signal from the noise and focus on what the Court

21 is being asked to decide and what Your Honor has already zeroed

22 in on.

23        That is, do any of these issues related to the SOFA

24 decided in any direction yes or no impact the fundamental point

25 and Your Honor's fundamental conclusion that there exists a

1  pledge freely given by Development to the lender as borrowers

2  give lenders pledges all the time, that the pledge was validly

3  exercised by the lender and that the events that flowed from

4  that exercise were authorized.  This is the signal.  Everything

5  else, the SOFA, the amended SOFA or what information it

6  contains is noise.

7       The district court did not direct, ask or suggest

8  that this Court examine the noise.  It did not direct, ask or

9  suggest that this Court revisit all aspects of its denial of

10  the motion to dismiss or the denial of the motion for

11  reconsideration and it did not give Development a roving

12  commission to do so.

13       Development's entire argument based upon the amended

14  SOFA is the classic non sequitur fallacy meaning that its

15  proposed conclusion does not follow from its premise.  And

16  there is not even an illusion of plausible or valid reasoning

17  behind its arguments, first.  As Your Honor has just said, the

18  amended SOFA contained information that was already known by

19  the Court when it rendered both its decision denying dismissal

20  and then its decision denying reconsideration.  It is not new

21  information and it is not information that was nefariously kept

22  from the Court.

23       The Court knew and stated that it knew in each

24  instance that Development was the owner of the equity in the

25  debtor.  Consequently, there is no connection between the

23

premises Development now asserts and the conclusion it would
have this Court draw from them.  Second, the information in the
amended SOFA has no bearing on whether the pledge was validly
exercised by the lender or the right of the lender to act as if
it were the owner of the equity in the debtor.

And the arguments about the parsing of the phrase as
if made by Development's counsel, Your Honor, are just
specious.  The Court has acknowledged this fact, this reality,
this basic aspect of finance law multiple times in this case
including during the conference yesterday.  5(a) of the pledge
is an independent grant of authority that provides a lender
with certain rights that are not in any way affected by what is
reflected in the amended SOFA which merely reflects accurately
that Development is the owner of the equity.

Your Honor, turning to this recent redemption
argument, residual ownership is how Development's counsel
characterized Development's equity ownership in the borrower
during the argument on the motion to dismiss when Development's
counsel made very certain that this Court was not saying that
the lender had actual ownership but that actual ownership is
and always has been in Development.  Your Honor, that's simply
a fact and that's the law and it's not subject to alteration
regardless how one might characterize or even mischaracterize
it or, as Your Honor said, perhaps use imprecision to describe
it.

1          Stated very simply, how I might have characterized

2    the lender's rights under the pledge or how the debtor might

3    have characterized those rights or how Development now

4    characterizes those rights do not matter.  What matters is how

5    this Court analyzed, independently determined what rights the

6    pledge conveyed and the Court's view on this has been

7    consistent in this case from day one.  The pledge vested in the

8    lender the right to vote and manage the borrower.

9          It's also the height of disingenuousness that in its

10   argument Development states that this Court believed the lender

11   owned the equity by reference in the transcript to a statement

12   that Your Honor has just said might have been imprecise and a

13   statement that was made before Development's counsel asked the

14   Court for clarification on that exact issue and before

15   Development's own counsel made sure that the Court was only

16   saying that the lender could act as if it were the owner, not

17   that the lender was in fact the actual owner of the equity.

18         The full colloquy between Development and the Court

19   is familiar to the Court, it's included in our papers but just

20   a couple of highlights make crystal clear about what the Court

21   fully understood and what Development had.  Mr. Lichtenstein

22   said and we take issue as to whether the pledge granted

23   anything more than equitable ownership with this residual

24   right.  The Court said I think the pledge is fairly clear in

25   what it says.

1          And Your Honor has already stated what Your Honor

2   said in response to Mr. Lichtenstein.  I'm finding that what

3   has occurred since an event of default has occurred and is

4   continuing that the lender has the right or its nominee to

5   exercise all voting equity in membership and other rights

6   pertaining to the membership interest.  Your Honor even said if

7   that was unclear in some way, I apologize.  Again Mr.

8   Lichtenstein said the only point is it's modified as if it was

9   the owner.  That's correct.  And then again Mr. Lichtenstein

10  just to make doubly, triply, quadruply clear said I just wanted

11  to be very careful because the word ownership writ large

12  wasn't as nuanced as what Your Honor just read or stated.  Your

13  Honor said that's fine.

14          Everybody knew as of that moment in time that there

15  was no dispute about what rights Development had, what its

16  ownership was.  So, Your Honor, the undisputed and admitted

17  facts are that Development pledged the equity to the lender and

18  in that pledge it acknowledged that on default in payment of

19  the loan, also an undisputed and admitted fact, that it was

20  divested of all of its rights as the equity owner to manage

21  both and control the borrower and that the lender alone became

22  vested with those rights and had the inviolate right to act as

23  if it were the equity owner.  This meant clearly and simply

24  that the lender could take any action Development could and as

25  this Court said, step into the shoes of the pledgor.

1          Upon default and the lender's exercise of the pledge,

2    Development had nothing more than naked ownership.  It was

3    stripped of all rights appurtenant to ownership until it

4    satisfied all obligations the pledge was provided as collateral

5    to secure.  Only upon complete and full satisfaction of those

6    obligations, economic and otherwise, would Development be

7    entitled to redeem the pledge and become revested with all of

8    the rights it had voluntarily surrendered.

9          Your Honor, as you know from yesterday's discussion,

10   Development has placed the question as to whether it has

11   satisfied all of its obligations and has redeemed the pledge by

12   virtue of the payment made to the lender before a state court.

13   This by definition is an acknowledgment that the lender never

14   had absolute ownership.  If it had such ownership, there would

15   be nothing to redeem.  This is why the pledge and the law of

16   pledges state that on default the pledgee is to be treated as

17   if it were the absolute owner, not that the pledgee is the

18   absolute owner.

19         As this Court has stated and as I hope I've made

20   clear and as everyone has known since long before the amended

21   SOFA came into existence, lender does not own the membership

22   interest.  That's just not how a pledge of collateral in this

23   case a membership interest works as security for a debt.

24   Development executed and delivered to lender pledge of its

25   membership interests under the pledge agreement, it made a

27

1  corresponding assignment of those membership interests and in

2  so doing, it clearly and inconspicuously and unambiguously

3  divested itself of all control, voting and management and other

4  rights.

5       Accordingly, as Your Honor correctly determined in

6  the motion to dismiss, the pledge agreement grants the lender

7  the absolute right to control and manage the debtor upon

8  default and be treated as if it were the absolute owner.  Your

9  Honor has stated and the facts and the law are clear, the Court

10 was not misled at any time by the lender or the debtor.  The

11 Court at all times understood the nature and effect of the

12 pledge and who actually owned the equity in the debtor.

13      Ownership of equity in the debtor was not and is not

14 relevant in analyzing the lender's rights under the pledge.

15 The Court accurately and with full deliberation analyzed the

16 law and all of the financial documents in this case and

17 concluded that the lender's power and right to act were derived

18 from the pledge that Development admitted to giving the lender

19 in exchange for an $8 million loan.  And neither the SOFA nor

20 the amended SOFA have any relevance or impact on the Court's

21 denial of the reconsideration motion.

22      Your Honor, we know that Development has made some

23 other arguments that we've already said are outside the scope

24 of this Court's remit on this very limited remand.  Your Honor,

25 this is simply more noise and we submit then that considering

28

1 anything other than the SOFA and the amended SOFA with respect

2 to the reconsideration order would be improper.

3      Nevertheless, we've addressed each and every one of

4 Development's arguments in our papers, our prior papers and

5 other arguments before this Court.  We'll only address them

6 again in argument if the Court asks us to.  We again ask the

7 Court to focus on the signal.  The only question it is being

8 asked to consider by the district court is whether the SOFA or

9 its amendment would have changed the reconsideration order if

10 the Court had them at the time.  For the reasons we have just

11 said, it would not have.  Thank you, Your Honor.

12      THE COURT:  Okay, thank you, Mr. Moldovan.

13      Mr. Ringel?

14      MR. RINGEL:  Yes.  Thank you, Your Honor.  I'll be

15 very brief because I think Mr. Moldovan covered most of the

16 ground that the debtor wanted to cover.  We agree, Your Honor,

17 that the remand from the district court was a very, very

18 limited on, limited to the additional information which is the

19 SOFA and the amended SOFA and how that would, if at all, impact

20 the Court's determination of the reconsideration motion and the

21 Court's view of the pledge and the lender's right to exercise

22 management and voting control of the debtors after the default

23 with respect to the pledge.

24      The entire remand is about whether the information

25 contained in those two documents would have made a difference

29

1   to the Court's decision that issued on October 5th, 2021 and as

2   Your Honor noted, that the fundamental problem with the

3   argument that's being advanced is the Court had the information

4   that's contained in the amended SOFA when it determined the

5   dismissal motion on August 30th, 2021 when that was discussed

6   in the colloquy with Development's counsel, Mr. Lichtenstein,

7   when he asked for the clarification with respect to the

8   ownership issue which is discussed both in the lender's papers

9   and in the papers that the debtor submitted with respect to

10  this matter.

11        The supplement focuses on ownership of the membership

12  interest as a determining factor and, frankly, we believe as we

13  set forth in our papers, that that issue is just simply

14  misplaced.  We believe Development knows or should know that

15  the Court wasn't relying on actual ownership of the debtor in

16  its ruling on the validity of the pledge and the exercise of

17  the rights under the pledge when it made its determination with

18  respect to the decision on October 5th.  The amended SOFA

19  really is not a basis to disturb the Court's prior rulings.

20        With respect to the submission of the SOFA and the

21  amended SOFA, Your Honor, I just wanted to point out that when

22  we submitted the SOFA, that was done at a time when the debtor

23  and Mr. Buchwald, we were under some significant pressure.  It

24  was submitted late and I did just want to point out that when

25  it was submitted, it was submitted with global notes, statement

1   of limitations and significant disclaimers, about four pages

2   worth, that indicated that they were subject to review and

3   verification by the debtor and significant possibility of

4   amendment.

5         And ten days later when we did have an opportunity to

6   sit down and review them again, and this was done by myself and

7   Mr. Buchwald unprompted by anyone, that's when we noticed that

8   there was a mistake with respect to the membership interest and

9   we did make the amendment to the SOFA and we submitted that as

10  soon as we properly could.

11        Your Honor, the determination that was made here that

12  the pledge was properly exercised when the lender took the

13  steps it did resulting in the eventual Chapter 11 was properly

14  made by the Court.  As I said before, the Court's rulings did

15  not rely on the issue of who or who was not the equity owner of

16  the debtor but the plain language of the pledge agreement which

17  provided that the lender's rights were properly exercised

18  leading to a duly authorized bankruptcy case and a filing by

19  the debtor, therefore, we think there's no basis to disturb

20  this Court's ruling and that based upon the remand, the Court

21  should reaffirm its ruling.  And, Your Honor, I have nothing

22  further and we think that there's no basis to disturb the

23  Court's ruling on the reconsideration motion.  Thank you.

24        THE COURT:  Thank you, Mr. Ringel.

25        Ms. Kuhns?

1          MS. KUHNS:  Well, Your Honor, I would point out that

2    Judge Abrams did not affirm.  She could have affirmed.  There

3    was fierce opposition.  Now, they're saying it's really

4    insignificant, these SOFAS?  There is opposition at the

5    appellate level to inclusion.  So I can understand a judge

6    remanding to get I'll give you the opportunity to consider it

7    in light of prior rulings.  That said, I do want to emphasize

8    she didn't affirm.  She remanded.  I think that's significant.

9    I think it's significant that they have really made a lot of

10   opposition to having it considered because it is inconsistent.

11          And I would point out everybody's talking about what

12   Mr. Lichtenstein said, but your colloquy with Mr. Lichtenstein,

13   you know, was then followed by your statement, Your Honor, that

14   the lender subsequently transferred the interest of such

15   membership interest to an affiliate, the new owner, on June 14,

16   2021 and I think that's consistent with the representations

17   that were made in connection with the petition that, in fact,

18   they were sitting with as undivided, absolute owner on the

19   petition date and that's not true.  And there is actually a

20   consequence.  There are consequences that flow from that.

21          And I also want to point out that we are talking

22   about jurisdiction here.  This is the predicate to the entire

23   case.  Someone could raise this with you tomorrow, another

24   party-in-interest and you'd have to reconsider it.  So, that's

25   why we're here reconsidering it in the full context.  But I do

32

think this splicing and dicing and the conversation about

residual interest really was in the context of making sure

there was an ability to redeem, that there is a residual

interest which is that you're equity of redemption.

But, otherwise, the representation and the sworn

statement in connection with authorizing this case was that

Lender LLC was the absolute owner. To me, that is

equivocating. I mean they didn't have to lift that out. They

didn't have to lift that out of the pledge agreement. They put

it in in support of their authority because it's necessary.

It's a predicate to a filing. It was in support of their

authority. The used the absolute ownership word. We didn't.

It was incorrect and it's been demonstrated to be incorrect and

maybe they tried to correct it in their SOFA later but there

are consequences to that. And as I said, they're being

somewhat cavalier, oh, it was last minute, you know, we filed

it last minute. I really don't know why they filed what they

filed previously and why they contradicted themselves. It's

certainly consistent with our understanding.

But I think what we're hearing today is that there

were statements made that Lender LLC was the absolute owner and

that's the predicate for this case and it was false and that's

also why we're saying as you review this and as you look at

this, this is jurisdictional. It's not that narrow.

Jurisdiction is the beginning and the end. You either have it

33

1  or you don't and we're submitting today, Your Honor, you don't

2  have it and that's your only recourse when you don't have

3  jurisdiction is a dismissal.

4          THE COURT:  Thank you, Ms. Kuhns.

5          All right, I just want to make sure there isn't

6  anybody else who wants to be heard with respect to the motion,

7  sorry, the supplemental argument.

8                    (No audible response)

9          THE COURT:  Okay, all right, here's my ruling.  286

10  Rider Development LLC which I'm going to call Development filed

11  a motion to dismiss in this Chapter 11 case pursuant to Section

12  303, 305 and 1112 and for the turnover of certain membership

13  interest under 11 U.S.C. 543, the motion to dismiss.  That's at

14  Docket Number 17 on our docket.

15         Two responses to the motion to dismiss were filed,

16  one by the debtor 286 Rider Avenue Acquisition LLC and Docket

17  Number 26 and one by the lender Be-Aviv 286 Rider LLC, Docket

18  Number 23.  In addition, the lender filed two declarations in

19  support of its responses, a declaration of Ben Harlev, Docket

20  Number 24, and the declaration of Leticia V. Thompson, Docket

21  Number 25.  The debtor also filed a declaration of Lee

22  Buchwald, Docket Number 27, in support of its response.

23  Development filed their reply, Docket Number 36, with an

24  attached declaration of Michael Lichtenstein in support of the

25  motion to dismiss.

34

1          A hearing was held before this Court on the motion to

2    dismiss on August 30th, 2021.  For the reasons set forth on the

3    record this Court entered an order denying the motion to

4    dismiss, Docket Number 39.

5          On September 13th, 2021 Development filed a motion to

6    alter or amend the judgment under Bankruptcy Rule 9023 and

7    Federal Rule of Civil Procedure 59(e).  That's at Docket Number

8    47 and I'm going to refer to it as the motion to alter or

9    amend.

10         On September 28th, 2021 lender and debtor filed

11   opposition responses to the motion to alter or amend, Docket

12   Numbers 52 and 53.

13         On October 1st, 2021 Development filed a reply in

14   support of the motion to alter or amend, Docket Number 64.

15         On October 5th, 2021 the Court held a hearing on the

16   motion to alter or amend.  On October 5th, 2021 the Court

17   entered an order denying the motion to alter or amend for the

18   reasons set forth on the record of the hearing, and I'm going

19   to call that the denial order.

20         On October 8th, 2021 Development filed a notice

21   appealing the denial order to the United States District Court

22   for the Southern District of New York, the district court,

23   under Case Number 21-cv-8812.  In the appeal appellant

24   Development moved to supplement the record before the district

25   court with materials filed after the date of the denial order

35

1  that Development described as critical to the underlying

2  determination whether the bankruptcy case was properly

3  authorized and whether the bankruptcy court had jurisdiction

4  over the bankruptcy case.

5          On January 13th, 2022 the district court entered an

6  order, the remand order, remanding this action to the

7  bankruptcy court for consideration of the additional materials

8  to the extent it sees fit, remand order at Page 2.  Pursuant to

9  the remand order, this Court entered an order scheduling

10  supplemental briefings and a hearing which we just had today on

11  the supplemental briefing.  That order is at Docket Number 320.

12          Development filed supplemental briefing on March

13  14th, 2022, Docket Number 331.

14          Debtor and lender filed their supplemental briefing

15  on March 18th, 2022, Docket Numbers 337 and 342.

16          Development filed a reply on March 23rd, 2022, Docket

17  Number 357.

18          Having reviewed the supplemental briefing by the

19  parties and having heard the oral arguments made by the parties

20  at today's hearing, the Court rules as follows.  This Court is

21  limiting its consideration to what this Court was asked to

22  consider by the district court in the remand order which is the

23  additional materials, specifically, the statement of financial

24  affairs, the SOFA, listing 286 Rider Avenue Lender LLC as 100

25  percent equity owner on the petition date docketed on October

25th, 2021 at Docket Number 97 and the SOFA replacing the first

SOFA, the replacement SOFA, stating that Development was 100

percent equity holder on the petition date which was docketed

on November 5th, 2021 at Docket Number 116.

The remand order requests that his Court determine

whether these additional materials would have altered its

decision on October 5th, 2021 with respect to the motion to

alter or amend as memorialized in its denial order.

At the August 30th, 2021 hearing on the motion to

dismiss counsel for Development raised the issue with the Court

at the hearing as to whether the Court's decision at Section

5(a) of the pledge agreement allowed the lender or its nominee

after the occurrence of an event of default to exercise, Number

1, all voting and all equity membership and other rights

pertaining to the membership interest and, Number 2, any and

all rights of conversion, exchange, subscription and other

rights or privileges or options pertaining to such membership

interest as if it were the absolute owner thereof was premised

on the lender and its nominee owning the membership interest,

see August 31, 2021 transcript, Pages 74 at Line 18 to Page 76

at Line 12.  This Court indicated that its ruling was not

premised on the lender or its nominee owning the membership

interest.

In connection with the motion to dismiss, the Court

ruled that the lender's rights under Section 5(a) of the pledge

1  agreement following an event of default were not expressly

2  limited by any other provisions of the pledge agreement or by

3  the terms of the operating agreement.  Accordingly, among other

4  things, the Court held that the filing of the Chapter 11

5  petition by Mr. Buchwald on behalf of the debtor was duly

6  authorized and voluntary.

7          Development disagrees with this Court's decision on a

8  motion to dismiss including its interpretation of the pledge

9  agreement and the interplay between the pledge agreement with

10  the operating agreement.  However, this Court notes that

11  Development did not appeal this Court's August 30th, 2021

12  ruling.  Instead, Development filed the motion to alter or

13  amend.  In the motion to alter or amend Development argued

14  that, Number 1, the effect of the order denying the motion to

15  dismiss is to vitiate Development's right of redemption in

16  violation of the anti-clogging prohibitions under the state

17  law, (2) the pledge is subordinate and subject to the operating

18  agreement which was not complied with, (3) lender acquired

19  nothing more than the economic rights in the debtor and (4)

20  that lender's exercise of so-called voting rights as equity

21  security holder post-petition is void as a violation of the

22  automatic stay.

23          This Court held that it had considered all of the

24  arguments that Development raised in the motion to alter or

25  amend at the hearing that had occurred before it on August 30,

1  2021 when this Court had the hearing on the motion to alter or

2  amend on October 5th, 2021 or as was the case with the section

3  general obligation law 5-334 argument that was raised that it

4  was a new argument which could have been raised at the August

5  30th, 2021 hearing but was not, in fact, raised by Development.

6        Based upon the remand order, this Court must consider

7  whether the filing of the statement of financial affairs by the

8  debtor and a filing of the amended statement of financial

9  affairs by the debtor would have changed this Court's decision

10 with respect to its motion to alter or amend.  The answer is

11 that it would not have.  This Court's decision with respect to

12 the motion to alter or amend was not premised on the lender or

13 its nominee owning the membership interest nor was this Court's

14 August 30th, 2021 decision with respect to the motion to

15 dismiss premised on that assumption.  Accordingly, this Court

16 will enter a supplemental order with respect to the motion to

17 alter and amend.  So, I think that takes care of that matter

18 that was on for hearing today.  I'm going to issue an order to

19 that effect.

20       I do believe though at yesterday's hearing I did

21 mention that we were going to discuss scheduling further with

22 respect to the emergency motion that has been filed before me

23 that I have not yet ruled on with respect to the motion that

24 has been filed with Development relating to issues regarding

25 the demolition, construction of the fence and the putting in of

1  footings.  And the reason that I had suggested we were going to

2  discuss that again is because I was hoping that perhaps we

3  would have more information about when exactly we might get the

4  report from the structural engineer, Rand, and when we might

5  therefore be in a position for that to be shared, et cetera.

6       I will just note for the parties that I've considered

7  this based on the discussion yesterday that we might actually

8  need an evidentiary hearing with respect to this which seems

9  perhaps odd but it might be because of the disagreement that

10  may occur between engineers.  I noted that before I did that, I

11  would like the engineers to actually speak to each other and I

12  note that Development had asked that perhaps their engineer be

13  given the right to actually go back on the premises after

14  they've seen the report and spoken to the other engineer which

15  I also said might be very reasonable.

16       And, unfortunately, with respect to my schedule this

17  coming week, I am out of town on Thursday and Friday.  I am in

18  transit to Denver on Thursday because I'm attending the board

19  meeting for the American College of Bankruptcy that I'm on the

20  board of and my schedule on Friday is not good either.  And,

21  unfortunately, the only time that I could possibly see that I

22  could schedule an evidentiary hearing would be quite late in

23  the day east coast time on Friday and I don't see that that

24  makes a lot of sense when we're going to be in front of each

25  other on the 4th anyway which is the following Monday.

40

1        So, I think that any hearing that we're going to have

2  on this motion if there's a disagreement is going to need to

3  take place on April 4th.  I just, unfortunately, do not see how

4  the parties will have an opportunity to do what I think is

5  necessary which is that we receive the report on Monday,

6  everybody has a chance to look at it, the engineers have a

7  chance to talk, perhaps Titan has an opportunity to go back on

8  the premises, then papers would have to be filed in response of

9  the motion that's on for hearings if there's still disagreement

10  and then I'd have to have two experts testifying in front of me

11  as to their differing views which is not a short hearing.

12        So, I think realistically, unfortunately, I don't see

13  how unless there's some agreement by the parties on something

14  to stipulate to or something like that, that that would be

15  possible for me to schedule this motion before April 4th but

16  I'm willing to schedule it on April 4th when we have hearing on

17  the remaining I guess portion of what I'll describe as a payoff

18  motion which really includes the dismissal request.

19        MS. KUHNS:  Your Honor, I was going to say, we do

20  have a hearing scheduled before.  I guess the concern is -- and

21  Mr. Ringel can let us know if he has the report and when he can

22  share it and certainly it makes good sense for the experts to

23  talk and potentially go and visit the site -- the concern is

24  that we have a reputable structural engineer telling us the

25  property is unsafe and that's a long time.

1          We filed the emergency motion because we really did

2    view it as an emergency because of the condition of the

3    property so that is our concern with waiting that long.  In

4    fact, the engineer had, in our conversations with him, had

5    indicated, you know, I don't know what could happen if there's

6    a bad storm, I don't know what could happen if there's high

7    winds.  You know, we're in March.  We have I would call it

8    variable weather in March so raising that, you know, as a

9    concern, maybe Mr. Ringel has more information to share as far

10   as the status of the report, but I think going out to the 4th

11   may be problematic in light of what the engineer has said about

12   the condition.

13          MR. RINGEL:  What I can tell you is that I will have

14   the report on Monday and I said what I said yesterday about

15   what Rand has told us about the condition of the building and

16   as soon as I get the report, I will share it.  It'll be some

17   time on Monday.  Going through, I guess they have their quality

18   control before they will release it to me but it'll be

19   available on Monday and I will circulate it and file it with

20   the Court.

21          But they have told us, they told myself and Mr.

22   Buchwald that this is not a danger of this coming down and that

23   they have a much different -- they've reached a different

24   conclusion from what Titan has but we will put them both

25   together and they can talk about their findings and if they

1 need to have a site visit, you know, we'll facilitate that so

2 maybe that will move things along and they'll have some

3 agreement on a way to get this done short of having a contested

4 hearing.  But, you know, hopefully we'll do that if not Monday,

5 Tuesday, as soon as we can.

6                THE COURT:  Excuse me one second.

7                     (Court spoke on another matter)

8                THE COURT:  Excuse me.  Apparently, there's quite a

9 commotion going on outside my apartment and so I apologize for

10 that.

11                Okay, my problem, Ms. Kuhns, is that I expect that

12 there's really two issues.  There's issues about -- I'm mindful

13 of the concern about the danger but I think what I'm going to

14 do is I'm going to sign the order to shorten notice.  I'm going

15 to schedule the hearing for the 4th.  You all are in front of

16 me on the 29th.  Presumably if we get the report on the 28th,

17 we'll all hopefully have read it by the time we're on in front

18 of me on the 29th and if there's truly something catastrophic,

19 I guess we'll just have to deal with it then.  I don't have a

20 better solution for that.

21                I wish I could figure out some other way of doing

22 this.  I really have tried to look at things every which way

23 and I think you all I understand after being in front of me

24 this long, that if there's a -- that I really try to reschedule

25 things in my calendar when I can when people need them and I

43

1  slap things in at ridiculous times maybe where other people in

2  the court wouldn't do it because I am concerned about things

3  like that and I try to make sure that things can be addressed

4  promptly and if I have to do that, I'll just have to figure it

5  out but I think right now that's what I'm going to do.  And

6  I'll go ahead and I'm going to enter that order.  I'm just

7  letting you know.

8         And I think what people should be mindful of is if we

9  end up with the evidentiary hearing, it seems to me there's

10  sort of three issues.  First, I'm just leaving it aside about

11  the emergency point for the moment.  But, first, what should be

12  done with the property with respect to the damage that's

13  occurred to it, whether it should be demolished, whether it

14  needs to be braced up, et cetera.  And then with respect to

15  that, how long is it going to take, what's the cost, et cetera.

16         But then there's also what makes sense in light of

17  whatever is going to happen in this case and the timing of it

18  and that's another thing that I'm struggling with.  I have a

19  payoff motion in front of me that includes a dismissal on April

20  4th.  If I'm going to end up dismissing this case if that's

21  where that ended up and there's a process for it and assuming

22  the funds were posted and people were paid, that's what I'm

23  going to do, that's perhaps one thing.

24         It's different perhaps if that's not what happens and

25  I don't know that I'll know that on the 4th.  I mean, I'll know

44

1 what I'm going to rule -- I don't mean that, but I just mean I

2 won't know where that's going to end up 'til the process plays

3 out and I guess I need to understand the timing and the cost

4 because they're sort of what people might -- what needs to be

5 done or should be done, what's best for the property and that

6 could be different potentially depending on what people are

7 intending to do with the property.  I don't know.

8       I mean, Development's perspective is clear on what it

9 thinks and I understand that and I'm not saying that's wrong

10 and that also might just be the most economical as well.  Like

11 it might be that it costs a certain amount to shore up the

12 building even if the parties disagree.  Let's just say

13 everybody comes to the conclusion that the world isn't going to

14 end if this doesn't get dealt with before and there's no damage

15 that's going to happen between now and then but we're there on

16 the 4th and it might be that, you know, there's two

17 alternatives and what makes sense in the context of time and

18 cost.  That's another item to consider.

19       So, you know, I think there are a variety of things

20 that would have to be addressed at this hearing potentially

21 and, you know, I go back to something I've mentioned to you all

22 to consider and I think I've mentioned it a number of times and

23 I think I have probably mentioned it ways that maybe were my

24 shortcutting it, but I have a schedule in my scheduling order

25 now and that scheduling order has a schedule about what's going

1 to happen in this case.

2　　　　And that schedule is going to go certain ways and as

3 we go along in the schedule, we're going to know where we're

4 heading here.  You know, there's either going to be -- I'm

5 either going to grant the dismissal request or I'm not on the

6 4th and obviously, that's going to be subject to paying the

7 amount, you know, off in full as I determine them before me on

8 the 29th and making sure that funds are put up for that purpose

9 and that then they are actually released to parties and paid

10 off by a certain date.  It's already in my order.  And so

11 that's either going to happen or it's not.  And if it doesn't

12 happen, there's also other things that are going to happen in

13 that order, another process that would be going down.

14　　　　So, I think realistically the question is also timing

15 on this, you know, when does this really need to be done?  If

16 this case is all going to be concluded by the 15th, does it

17 make sense to really have an evidentiary hearing and for me to

18 rule on these things or is it something that could wait?

19 Again, I understand the concern about danger.  I'm not

20 discounting that and that may be the correct perspective, but I

21 just think there's some practicality that people also need to

22 think about, you know, that's already built into my schedule.

23　　　　And I realize I don't know where this case is going

24 today either but I'm just saying to you we have a schedule so

25 it's, you know, you all really have to decide another thing to

1  consider really how much I really need to deal with this before

2  we see where some things go.  I'm going to schedule it for that

3  day, don't get me wrong, and I'm going to be prepared and

4  assume I'm going to have an evidentiary hearing with two

5  experts disagreeing on what's going to be done with this and,

6  you know, et cetera, what needs to be done, but I just think

7  realistically, you know, one of the things we're mindful of

8  here is, and we're supposed to all be trying to be mindful

9  because it has certainly been raised plenty of times by

10  Development are the costs of this case and whether if that,

11  you know, does this really need to happen by April 3rd, you

12  know, is that necessary, you know, or can it wait til we see

13  what happens in this case.

14         I think that's just something to consider.  Again,

15  I'm going to enter the emergency order.  I'm going to schedule

16  it for then.  I'm open, you know, if there are issues that

17  arise where the things are more urgent.  You're going to be in

18  front of me on the 29th.  I will somehow figure out how to

19  change my schedule around to accommodate an evidentiary hearing

20  where I don't have space in my calendar for it on those days

21  but if it's necessary, absolutely necessary.  But I just think

22  that realistically, we need to be mindful of that, too.  So, I

23  wanted to make sure I said that on the record today so you

24  understand what I'm thinking and the things that I'm thinking

25  about from my perspective.  I think some of this I said on the

47

1  record yesterday anyway but I just want to be clear about it.

2      So, I think what we're going to have is I'm going to

3  issue an order, I'm going to schedule this motion for the 4th

4  of April, we're going to get this report on Monday, we're all

5  in front of me on Tuesday and if there's something urgent,

6  we'll have to deal with it then and if not, we're going to

7  proceed in the way we've talked about which is I think

8  everybody agrees appropriate, the let the structural engineers,

9  you know, look at their report, talk to each other, maybe see

10 the site again and see if they can figure something out

11 because, no disrespect to any of us, they may be better at

12 trying to reach a resolution of things than maybe all of us

13 have been in this case.

14      MS. KUHNS:  Well, Your Honor, if we're going to be

15 practical, too, I think that part of the concern here because

16 you were talking about what's the plan for this property, and

17 it's one of the reasons in the lift stay we put in, you know,

18 the lender's report and the highest and best use really is

19 residential and that means taking advantage of the tax

20 abatement.  Any owner would want to take advantage of the tax

21 abatement.  It has significant value.  I don't think either

22 side disagrees with that, so there is some concern about that,

23 as well.

24      There's a public safety concern.  There's a practical

25 issue, the economic, and there is the impact on any -- you

1  know, our client as well as any ultimate owner in really

2  preserving this tax abatement because we're getting to a really

3  tight schedule I think on that and that concerns me as well.

4        THE COURT:  Okay, I understand.  I'm not minimizing

5  that issue.  I understand that's an issue.

6        All right.  Well, is there anything else that we need

7  to discuss with respect to this matter?  Because if not, court

8  is adjourned.  I'm going to wish you all a good weekend.

9  Obviously, I'll be seeing you all on Tuesday morning.  I look

10 forward to papers on Monday.

11       MR. RINGEL:  That's it.  That's it for us, Your

12 Honor.

13       THE COURT:  All right.  All right, thank you.  Court

14 is now adjourned.  And, again, you're all excused and have a

15 nice weekend.

16       UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.  You

17 too.

18                        *  *  *  *  *

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

I, MARY POLITO, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Mary Polito

MARY POLITO

J&J COURT TRANSCRIBERS, INC.        DATE:  March 28, 2022